**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Docket No. 8:18-cr-80-WFJ-JSS**

. . . . . . . . . . . . . . .
                                    :
**UNITED STATES OF AMERICA,**       :
                                    :
        Plaintiff,        : Tampa, Florida
                          : May 20, 2019
             v.           : 8:28 a.m. – 5:02 p.m.
                          :
**RASHID TURNER,**        : Volume I
                          :
        Defendant.        :
                          :
. . . . . . . . . . . . . . .


**TRANSCRIPT OF MOTION HEARING and JURY TRIAL**
**BEFORE THE HONORABLE WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**APPEARANCES:**


**Counsel for the Government:** Michael M. Gordon
                               Assistant United States Attorney
                               400 North Tampa Street
                               Suite 3200
                               Tampa, Florida  33602


**Counsel for Defendant:**     Michael P. Maddux
                               Adam R Dinsbier
                               Michael P. Maddux, PA
                               2102 West Cleveland Street
                               Tampa, Florida 33606

1

**APPEARANCES (continued):**

2

3   Court Reporter:        Nikki L. Peters, RPR, CRR, CRC
                           Federal Official Court Reporter
4                          801 North Florida Avenue, Second Floor
                           Tampa, Florida  33602
5                          courttranscripts@outlook.com

6

    Proceedings recorded by mechanical stenography.
7   Transcript produced by Computer-Aided Transcription.

8                    **INDEX OF PROCEEDINGS**

                                                **PAGE**
9   Motion to Suppress                             4

10  Testimony of Daniel Toner
         Direct Examination by Mr. Gordon          7
11       Cross-Examination by Mr. Maddux          24

12  Rule of Sequestration Invoked                 31

13  Testimony of Thomas Breedlove
         Direct Examination by Mr. Gordon         31
14
    Voir Dire (not transcribed)
15
    Jury Selection                                39
16
    Testimony of Thomas Breedlove
17       Direct Examination (continued) by Mr. Gordon  68
         Cross-Examination by Mr. Maddux          87
18       Redirect Examination by Mr. Gordon      101

19  Testimony of William Power
         Direct Examination by Mr. Gordon        103
20       Cross-Examination by Mr. Maddux         120

21  Testimony of Loretta Bush
         Direct Examination by Mr. Maddux        129
22       Cross-Examination by Mr. Gordon         132

23  Motion to Suppress Ruling                    134

24  Jury Sworn                                   141

25  Preliminary Instructions                     141

Opening Statement by Mr. Gordon                     148

Opening Statement by Mr. Maddux                     165

Testimony of Benito Rodriguez
      Direct Examination by Mr. Gordon              175

Certificate of Reporter                             207

4

```
1                    P R O C E E D I N G S
2            THE COURT:  Let's call the case.  Can we?
3            THE COURTROOM DEPUTY:  Yes, Your Honor.
4            United States v. Rashid Turner, Case
5    No. 8:18-cr-80.
6            Counsel, please state your appearances.
7            MR. GORDON:  Good morning, Your Honor.  Mike
8    Gordon for the United States.
9            THE COURT:  Good morning.
10           MR. MADDUX:  Your Honor, Michael Maddux for Rashid
11   Turner.  With me is co-counsel, he'll be here part of the
12   time, Adam Dinsbier.
13           THE COURT:  I have a little beepy thing going on
14   here.
15           Mr. Maddux, give me your co-counsel's name.  I'm
16   sorry.  I'm getting --
17           MR. MADDUX:  Adam Dinsbier.
18           THE COURT:  Adam.  Welcome.
19           MR. MADDUX:  We gave it to Madam Clerk.
20           THE COURT:  Welcome.
21           Okay.  So we've got the suppression motion
22   pending, do we not, on the first -- I call it the first LG
23   phone.
24           All right.  Mr. Gordon, you want to -- let's get
25   started on that.  I guess the issues -- you proffered the --
```

1    pretty much proffered the facts about abandonment.  But the

2    issues are that the delay, the 51-day delay, and then the

3    sequencing of the extraction of the phone versus the

4    warrant.

5              **MR. GORDON:**  Yes, Your Honor.

6              **THE COURT:**  Have I missed any issue that's on the

7    table?  Aren't those the issues?

8              **MR. GORDON:**  The defense also -- well, defense

9    also raised the -- I'm sorry -- the sufficiency of the

10   warrant with respect to probable cause --

11             **THE COURT:**  Okay.

12             **MR. GORDON:**  -- as well.

13             **THE COURT:**  Yeah.  Which is kind of a legal issue

14   there.

15             Okay.  Well, let's get somebody in the box, and

16   we'll run until we have a jury, and then we'll shorten our

17   lunch hour and do some more until we get this resolved.

18             **MR. GORDON:**  Yes, Your Honor.  And just for the

19   record, the Government objects procedurally to what we're

20   about to do here.  The Government's position is that all

21   pretrial litigation should be completed prior to commencing

22   any trial proceeding, such as jury selection, and that the

23   Government's case is prejudiced by not knowing what the

24   evidence is going to be prior to the case beginning, that we

25   should have clarity on what evidence is going to be allowed

1   in the trial before we begin the trial.

2           So, Your Honor, the Government respectfully

3   recommends that we complete the suppression hearing in its

4   entirety before bringing jurors into the room.

5           THE COURT:  That's overruled.

6           Call your first witness.

7           MR. GORDON:  Yes, Your Honor.

8           Would Your Honor mind if I provide the Court and

9   defense counsel with copies of witness lists and exhibit

10  lists before I call a witness?

11          THE COURT:  Great.  Thank you.

12          MR. GORDON:  Your Honor, United States calls

13  Detective Dan Toner.

14          THE COURT:  Thank you.

15          THE COURTROOM DEPUTY:  Please raise your right

16  hand.

17                          DANIEL TONER

18  was called as a witness and, having first been duly sworn,

19  testified as follows:

20          THE WITNESS:  I do.

21          THE COURTROOM DEPUTY:  Please state your full name

22  for the record.

23          THE DEFENDANT:  Daniel Toner.

24          THE COURTROOM DEPUTY:  I'm sorry?

25          THE WITNESS:  Daniel Toner, T-O-N-E-R.

1          **THE COURTROOM DEPUTY:**  Thank you.

2          **THE COURT:**  Detective Toner, there's some lawyers

3    in Pasco County named Toner.  Are you any kin to them?

4    Hernando County, actually.

5          **THE WITNESS:**  Hernando County, no, sir.

6          **THE COURT:**  I just wondered.

7          **THE WITNESS:**  I believe there's a judge there.

8          **THE COURT:**  Yeah.  There's a judge, and there's a

9    lawyer in Hernando.  Just wondering.

10         Okay.  Let's get started.  Mr. Gordon, we don't

11   need a whole lot of background.  I'm sure this is a fully

12   qualified detective and law enforcement officer.  Let's get

13   going.

14         **MR. GORDON:**  Yes.  Thank you, Your Honor.

15                     **DIRECT EXAMINATION**

16   BY MR. GORDON:

17   **Q**    Detective Toner, what is your employer?

18   **A**    I'm currently with the Pasco Sheriff's Office.

19   **Q**    What do you do for them?

20   **A**    I work in the Major Crimes unit.

21   **Q**    And as part of your work with the Major Crimes unit,

22   have you been involved in this case against Rashid Turner?

23   **A**    Yes, sir.

24   **Q**    What's your involvement in this case been?

25   **A**    I was assigned as a liaison investigator from the bank

1    robbery that stemmed from Hernando County and then the

2    pursuit that subsequently ended in Pasco County.

3    **Q**    Was that the Wells Fargo bank robbery?

4    **A**    Yes, sir.

5    **Q**    And what date did that bank robbery occur on?

6    **A**    November 18th, 2017.

7    **Q**    At what point in that case were you assigned to it?

8    **A**    I was called out on that Saturday morning.  My squad

9    was on call.  My supervisor had contacted me knowing that

10   I'm on call, as well as being a task force officer with the

11   FBI.

12   **Q**    And so after receiving the call to come into work, what

13   did you do?

14   **A**    I responded to the area of Dunkin' Donuts where the

15   crash site occurred.

16   **Q**    For the record, can you explain the connection between

17   the bank robbery you just alluded to and the crash site you

18   just mentioned?

19   **A**    So the bank robbery occurred at the Wells Fargo in

20   Spring Hill, which is in Hernando County.  Two suspects

21   had -- two suspects had entered the bank, committed an armed

22   bank robbery, and fled in separate vehicles.  There was a

23   witness who had observed one of the vehicles, had contacted

24   the Hernando County Sheriff's Office through 911, and then a

25   deputy with the Hernando County Sheriff's Office

1    subsequently got behind the same vehicle and initiated a

2    traffic stop.  The vehicle failed to yield and fled at a

3    high rate of speed southbound on U.S. 19 into Pasco County.

4    **Q**    All right.  Now, that vehicle that was fleeing, as you

5    just described, the traffic stop, what kind of vehicle was

6    that?

7    **A**    It was a white Hyundai, I believe, Elantra.

8    **Q**    And am I correct in understanding that it was an

9    eyewitness from the bank robbery who connected that vehicle

10   to flight from the robbery?

11   **A**    Yes, sir.  There was a guy, I believe in the

12   drive-through, that witnessed the suspects going in and

13   exiting the bank.

14   **Q**    Going in where?

15   **A**    Into the bank and then exiting the bank.  And then he

16   followed one of the vehicles with the suspects driving it.

17   **Q**    And that civilian or that informant identified the

18   occupant of the Elantra as one of the robbers; is that

19   correct?

20   **A**    Yes, sir.

21   **Q**    Now, what happened to the other robber, the one who was

22   not in the Elantra?

23   **A**    He entered a separate vehicle.  And that vehicle had

24   fled the scene and was never located.

25   **Q**    Did law enforcement officers manage to give chase to

1  that vehicle, the one the other defendant fled in?

2  **A**     No, sir.

3  **Q**     So no pursuit of that in any way?

4  **A**     No, sir.

5  **Q**     Now, the Hyundai Elantra that was fleeing that was

6  identified by the civilian eyewitness, what happened once

7  the civilian eyewitness identified it to law enforcement

8  officers and the vehicle failed to yield to make the traffic

9  stop?

10 **A**     What happened with the vehicle or the witness?  I'm

11 sorry.

12 **Q**     The vehicle.  After he said it fled at a high rate of

13 speed away from an attempted traffic stop, what happened

14 next?

15 **A**     The pursuit ended with a vehicle crash outside the

16 Dunkin' Donuts in Pasco County.

17 **Q**     And what vehicle crashed?

18 **A**     The Hyundai Elantra crashed into a pickup truck.  There

19 was a civilian that was leaving the Dunkin' Donuts' parking

20 lot.

21 **Q**     After crashing, did the vehicle stop or keep driving?

22 **A**     It traveled, like, a short distance after the crash and

23 stopped in the bushes in front of the Dunkin' Donuts.

24 **Q**     What happened to the occupants of that vehicle?

25 **A**     There was one occupant.

Q     And was that occupant later identified?

A     Yes, sir.

Q     And who was that?

A     Petrie Addison.

Q     And was he the driver of the vehicle?

A     Yes, sir.

Q     Now, what did Petrie Addison do after the vehicle
crashed?

A     He exited the driver's door and fled to the business,
which is a bakery, just to the south of Dunkin' Donuts.  And
he entered through one of the loading dock garage doors in
the back, went into an empty -- or an open trailer that was
backed up to a separate loading dock, and then subsequently
came out of that and walked out the back doors where he was
located by the Pasco Sheriff's Office.

Q     And was he arrested at that point?

A     Yes, sir.

Q     And was Petrie Addison, was his person searched
incident to that arrest?

A     Yes, sir.

Q     And what, if anything, of evidentiary value was found
on his person during that search?

A     He had an iPhone, a cellular phone.

Q     And where was that iPhone?

A     In his pocket.

1    Q    Did he have anything else of evidentiary value on him?

2    A    Offhand, no, other than just his clothing.  There was

3    other items found, obviously, back in the car or in the

4    parking lot between the vehicle and where he was located.

5    Q    We'll get to that in a moment.  Now, was Addison

6    carrying any bags when he was arrested?

7    A    No, sir.

8    Q    Now, the vehicle, what happened to the vehicle?  Was it

9    seized by law enforcement?

10   A    Yes, sir.

11   Q    And did law enforcement impound it?

12   A    Yes, sir.

13   Q    Did they search the vehicle on the scene?

14   A    It was started by the Pasco Sheriff's Office by one of

15   the forensic technicians.  But once the Hernando County

16   detectives arrived on scene, they asked Pasco to stop and go

17   ahead and impound the vehicle, and they were bringing it

18   back to their jurisdiction to obtain a search warrant.

19   Q    How far did Hernando get before -- or sorry, vice

20   versa, how far did Pasco get before Hernando stopped them?

21   A    Various items were collected from -- that were in plain

22   view right in the front passenger area.  I wasn't on scene

23   at the time.  The forensics tech just had a list of items

24   that were taken, but the majority of the items were still in

25   the vehicle.

1   Q     Okay.  Now, were any of the items that Hernando had

2   collected, were there any cell phones among those items?

3   A     Yes, sir.

4   Q     And how many cell phones were among the items that were

5   initially collected?

6   A     There was an LG cell phone from the driver's

7   floorboard.

8   Q     When you say -- was it collected -- was it removed from

9   the floorboard or was it documented?  What did they do with

10  respect to that phone on scene?

11  A     After the search warrant is obtained, typically they'll

12  do photographs and then go through and collect items that

13  they find.  And they found -- I'm sorry.

14  Q     Well, I'm not asking about after a search warrant.  I'm

15  asking on scene.  So officers responded to the crash site.

16  A     Uh-huh.

17  Q     What did they do with respect to the phone at the crash

18  site?

19  A     The LG phone?

20  Q     Yes, the LG phone that you said was located.

21  A     It remained in the vehicle until it was brought back to

22  Hernando County.

23  Q     Anybody move it?

24  A     Not that I'm aware of.

25  Q     Did they document its position within the car then?

1 **A**    I don't know if they documented it from the -- if it

2 was in any of the photographs that Pasco County took

3 possession of -- took at the scene or if it was formally

4 documented back in Hernando County.  I wouldn't know that

5 answer.  I apologize.

6 **Q**    Now, at what point in this -- well, let's keep on

7 sequence.

8     So one county starts the investigation.  The other

9 county comes in, takes over, tells them to stop, finishes

10 it.  What happens next with respect to the car and the

11 phone?

12 **A**    The vehicle was towed back to Hernando County, into

13 Hernando County's possession, along with the phone that was

14 inside the vehicle.

15 **Q**    Once it was towed back, what happened next?

16 **A**    Hernando County detectives obtained a search warrant

17 for the vehicle.

18 **Q**    And then what did they do?

19 **A**    Subsequently searched the vehicle.

20 **Q**    Did they find any other phones within the vehicle when

21 they searched it?

22 **A**    No.  The other phone was found on Petrie at the time of

23 his arrest.

24 **Q**    Petrie meaning Mr. Addison?

25 **A**    Yes, sir.

1    **Q**    Did Hernando document its search with photographs?

2    **A**    Yes, sir.

3          **MR. GORDON:**  Your Honor, permission to approach

4    the witness?

5          **THE COURT:**  Of course.

6          And just FYI for both of you, you don't need to

7    ask.  You can dance all around this courtroom as long as you

8    stay out of the jury box.

9          **MR. GORDON:**  Thank you, Your Honor.

10         **THE COURT:**  Or out of the witness's face, you

11   know.

12   **BY MR. GORDON:**

13   **Q**    Detective Toner, I've handed you three items previously

14   marked for identification as Government's Exhibits 1, 2, and

15   3.  For the record, can you identify, just what kinds of

16   things have I handed you?  What are these items?

17   **A**    Exhibit No. 1 is a photo of the driver's side of the

18   Hyundai Elantra.

19   **Q**    What's 2?

20   **A**    Exhibit 2 is a photo of the driver's side floorboard.

21   It looks like the subject is standing outside the door down

22   near the gas and brake pedals.

23         And then No. 3 is a zoomed-in picture of that cell

24   phone that you can see also in photo number 2.

25   **Q**    Do you recognize these photos?

**A**    Yes, sir.

**Q**    When did you see them before?

**A**    I've seen them before during prior investigation through Detective Breedlove from Hernando County.

**Q**    All right.  And do these photos fairly and accurately depict what -- the condition of the Elantra in Hernando County custody, as well as the location of the LG cellular phone?

**A**    Yes, sir.

            **MR. GORDON:**  Your Honor, permission to publish?

            **THE COURT:**  Of course.

            **MR. MADDUX:**  No objection.

            **MR. GORDON:**  May I have the ELMO, please.

            (Government Exhibit No. 1 published to the Court.)

**BY MR. GORDON:**

**Q**    Detective Toner, can you just describe for us what we're looking at here?

            **MR. GORDON:**  And I've published Government's Exhibit No. 1.

            **THE WITNESS:**  It's the same as I have in front of me, Exhibit No. 1, photo of the Hyundai Elantra.

**BY MR. GORDON:**

**Q**    Can you just describe, just again for the written record, what we're looking at in this photo?  What does it display for us?

1    **A**    It's a photo of the outside of the vehicle.  Obviously,

2    you can see heavy front-end damage.  And that's a result of

3    the vehicle crash that occurred outside the Dunkin' Donuts.

4              **MR. GORDON:**  Now publishing

5    Government's Exhibit No. 2.

6              (Government Exhibit No. 2 published to the Court.)

7    **BY MR. GORDON:**

8    **Q**    Can you tell us what we're looking at in

9    Government's Exhibit 2?

10   **A**    That's a photo of the driver's side floorboard of the

11   same vehicle, the Hyundai Elantra.  As you can see, the

12   phone laying near the pedals.

13   **Q**    Is that what I'm pointing to here with my pen?

14   **A**    Yes, sir.

15             **MR. GORDON:**  That's the black rectangle on the

16   floor, for the record.

17   **BY MR. GORDON:**

18   **Q**    Now, I'm pointing my pen to a white shape at the top of

19   the photograph.  Can you describe what that is?

20   **A**    It could possibly be the airbag, but I can't tell from

21   the photo.

22             (Government Exhibit No. 3 published to the Court.)

23   **BY MR. GORDON:**

24   **Q**    Government's Exhibit No. 3.  Can you identify what's

25   depicted here?

**A**     That is a zoomed-in picture of -- consistent with the previous photo of the LG phone, but it's upside down, of the phone laying on the driver's side floorboard.

**Q**     So I flipped it around.  Is that the --

**A**     Yes, sir.

**Q**     -- correct orientation?

**A**     Yes, sir.

**Q**     Now, you just a described a sequence of events from the robbery through the phone being seized and taken back to Hernando County Sheriff's Office.  At what point in that sequence did you become involved in the case?

**A**     I was involved -- I was at the scene prior to the Hyundai Elantra even being towed from the Dunkin' Donuts.

**Q**     So did you, yourself, also observe the cell phone in the spot at the scene where it is depicted here?

**A**     Honestly, I don't remember offhand articulating it. Because once I got to the scene, I was told by our forensics technician that she started processing it, she was told to stop, and the Hernando County Sheriff's Office was taking the vehicle.  So my concern was trying to just document which doors were opened and by who.  I didn't go through the vehicle at all.

**Q**     Did you become the primary detective on this case at some point?

**A**     Yes, sir.

19

```
1    Q    How did that happen?

2    A    From the Pasco Sheriff's standpoint, I was assigned it

3    because I got called out to the scene, and then as a task

4    force officer through the FBI.

5    Q    Did you have a counterpart who was the lead detective

6    in Hernando County?

7    A    Yes, sir.

8    Q    Who was that?

9    A    Detective Breedlove.

10   Q    Is that Thomas Breedlove?

11   A    Yes, sir.

12   Q    Now, were both Pasco and Hernando County investigating

13   this case simultaneously?

14   A    Hernando County had the lead in a sense because their

15   bank robbery happened there.  But we -- what Pasco County

16   Sheriff's Office was doing is -- more or less, I was working

17   as a liaison to assist them since the suspect was

18   apprehended in our county, and we had a trespassing of the

19   suspect entering -- Petrie Addison entering the bakery

20   during the -- right after the pursuit.

21   Q    Were there any driving offenses associated with Pasco

22   County?

23   A    There were driving offenses, and Florida Highway Patrol

24   came out because we have an agreement with them for our

25   county.  They'll conduct all traffic crash investigations
```

1  unless it's on private property.  And Trooper Palin (ph), I

2  believe is his name, he took the lead and pursued any type

3  of criminal offenses related to the traffic crash or driving

4  in Pasco County.

5  **Q**    So prior to federal involvement, is it fair to say

6  there were three different State agencies investigating this

7  case?

8  **A**    Yes, sir.

9  **Q**    And that being Hernando County Sheriff's, Pasco County

10  Sheriff's and Florida Highway Patrol?

11  **A**    Yes, sir.

12  **Q**    After the car was brought back to Hernando County and

13  searched, was the LG cell phone removed from the car?

14  **A**    Yes, sir.

15  **Q**    And what was done with it?

16  **A**    It would be placed in evidence.  I wasn't present

17  during that time.

18  **Q**    Was it taken into evidence at Hernando County?

19  **A**    Yes, sir.

20  **Q**    Did you have any role in what Hernando County did with

21  the phone once they took it out of the car?

22  **A**    No, sir.

23  **Q**    What was your next involvement with that LG cell phone

24  found in the driver's floorboard?

25  **A**    Several months later, then I was contacted by -- I

1    believe it was Laura Bush from the FBI and notified of other

2    robberies that have occurred in South Florida.  So I

3    attended a meeting down in the Fort Myers area related to

4    the suspects from the Wells Fargo robbery in Hernando

5    County.

6    **Q**    And approximately when was that?

7    **A**    I believe it was -- it would have been January 8th of

8    2017 -- '18.

9    **Q**    Prior to that, had you had any contact with

10   Detective Breedlove?

11   **A**    If it was, it was minimal contact, just relaying

12   information, maybe obtaining, like, reports or what have

13   you.  Because Hernando County is in the same district as

14   Pasco County and the Tampa district, the Middle District of

15   Florida, my job from the task force is to open the case,

16   because it is a bank robbery, through the SENTINEL, which is

17   the FBI database.

18   **Q**    At some point did you collect evidence from

19   Detective Breedlove related to this LG cell phone?

20   **A**    Yes, sir.

21   **Q**    Can you explain how that happened?

22   **A**    I just made contact with them.  It was later on in

23   January and February where I had requested information,

24   eventually taking the actual LG cell phone, as well, into

25   evidence.

1  Q    You took it into custody yourself?

2  A    Yes, sir.

3  Q    Did you ever receive an extraction of the data from the

4  phone --

5  A    Yes, sir.

6  Q    -- from Detective Breedlove?

7  A    Yes, sir.

8  Q    Can you explain how that happened?

9  A    Just the same as everything else, frequent contacts

10  with Detective Breedlove, asking if I can have reports, any

11  evidence -- as his investigation was going on, he didn't get

12  everything right away, because this isn't his only case.

13  He's working other investigations.  So as his stuff would

14  become available, I'd request it and then go meet with him

15  and get copies of various items.

16  Q    And do you remember when you received the data from the

17  LG cell phone from Detective Breedlove?

18  A    I believe it may have been in February of 2018.  I'd

19  have to look at my notes for a specific date.

20  Q    Just establish the foundation.  Did you, at some point,

21  know that date?

22  A    I'm sorry?

23  Q    At some point in your life, have you known the date

24  that you received that information?

25  A    Yeah.  It was in -- it was in late January or February

1    or March of -- of 2018.  I'm sorry.

2    **Q**    And do you remember with certainty now what date it

3    was?

4    **A**    Right now, offhand, no.  I'd have to refer to my notes

5    for a specific date that I got it.

6    **Q**    And would referring to your notes refresh your

7    recollection about that?

8    **A**    Yes, sir.

9            **MR. GORDON:**  Your Honor, permission for him to

10   refer to his notes?

11           **THE COURT:**  Yes.  Thank you.

12   **BY MR. GORDON:**

13   **Q**    Detective, please don't read your notes out loud.  Just

14   look at them, and then when you're done, please look up.

15   **A**    Thank you.

16           (Court was at ease.)

17           **THE WITNESS:**  It was February 8th of 2018.

18   **BY MR. GORDON:**

19   **Q**    And when you received the data from Detective Breedlove

20   from inside the LG cell phone, did you also receive a copy

21   of a search warrant affidavit at that time?

22   **A**    Yes, sir.

23   **Q**    Did Detective Breedlove inform you of any problems with

24   the search warrant?

25   **A**    Yes, sir.

24

1   **Q**    And what was that?

2   **A**    That the Cellebrite extraction was done prior to the

3   search warrant being obtained by the local judge.

4   **Q**    Was the Cellebrite extraction done once or twice?

5   **A**    I believe it was done once on January 3rd.

6   **Q**    Now, did Detective Breedlove tell you anything about

7   what, if anything, Hernando County did to deal with that

8   Cellebrite search having been done before the warrant being

9   signed?

10  **A**    What Detective Breedlove advised me is he had initially

11  filled out that warrant and affidavit back in November, I

12  believe it was the 27th, of 2017.  But with the

13  investigation and other things going on, other cases, he

14  never went and got it signed.  Then Lieutenant Powers

15  assumed it was signed, had done the download.  So then once

16  they realized that they had this issue, he went and

17  completed a second affidavit for warrant and included that

18  information in the warrant and/or affidavit.  So the judge

19  knew before signing it that they actually had already done

20  the extraction.

21  **Q**    Did Detective Breedlove describe his interaction with

22  the judge in the process of getting that warrant signed?

23  **A**    No.

24  **Q**    He didn't tell you anything about what the judge had

25  asked him or any conversation they had had?

**A**     I don't recall offhand, no, sir.

**Q**     Now once you got the data, what did you do next?

**A**     Reviewed it.

**Q**     And did you provide it to the FBI?

**A**     Yes, sir.

**Q**     And then did the FBI -- and did you have any further involvement with the data?

**A**     What case do you mean, sir?

**Q**     The data within the LG cell phone.

**A**     Just reviewing it and ...

          **MR. GORDON:**  Your Honor, no further questions for Detective Toner at this time.

          **THE COURT:**  All right.  Cross.

                          **CROSS-EXAMINATION**

**BY MR. MADDUX:**

**Q**     Good morning, Detective.

**A**     Good morning, sir.

**Q**     During the course of doing your detective work -- and, just for the record, how long prior to November 18th had you been a detective for Pasco?

**A**     I was appointed to detective in November of 2006.

**Q**     And during that time, you frequently encounter cell phones as a place that there could be evidence of crime, correct?

**A**     Yes, sir.

1    **Q**    So photographs, text messages, social media, all can

2    come from phones, correct?

3    **A**    Absolutely.  Yes, sir.

4    **Q**    And on November the 18th, 2018, you knew you needed a

5    search warrant for the cell phone before you could search

6    it, correct?

7    **A**    It was handled by Hernando County Sheriff's Office.  It

8    would be up to them to obtain the search warrant.

9    **Q**    Okay.  Well, you knew on that day that you needed -- on

10   the particular day the LG phone was visualized by you in

11   that Hyundai, you knew as a detective, just as a general

12   principle, that you needed to have a warrant before you

13   could search the cell phone, correct?

14   **A**    Yes, sir.  For expectation of privacy, yes, sir.

15   **Q**    Did you ever get your hands on the cell phone and see

16   whether it was password protected?

17   **A**    No.

18   **Q**    And you also knew back on November the 18th that

19   Special Agent Bush was involved with investigating; is that

20   true?

21   **A**    November 18th?

22   **Q**    Correct.

23   **A**    No, sir.

24   **Q**    Okay.  When did you first know about her involvement?

25   **A**    That may have been the end of December, beginning of

1   January, once the other bank robberies occurred down in her

2   area.

3   **Q**    At what point did you get a copy of the search warrant

4   that was used to search the phone?

5   **A**    Sometime in late January, early February of 2018.  I

6   apologize.

7   **Q**    And you did rely on information from the phone download

8   to follow up on some investigative leads, correct?

9   **A**    Yes, sir.

10  **Q**    And can you tell us generally what type of information

11  you relied on from the phone to further enhance your

12  investigation with the bank robbery?

13  **A**    The phone number associated with the phone, the text

14  messages, photographs, web searches.

15  **Q**    And you've provided all the testimony that you have

16  about who the second subject was because, on the 18th of

17  November, you had no idea who the second subject was,

18  correct?

19  **A**    The only thing we knew was a phone number and the name

20  "Dirty Red" according to Petrie Addison.

21  **Q**    And that's what he told who in a post-*Miranda*

22  interview?

23  **A**    That was Detective Kraft from the Hernando County

24  Sheriff's Office.

25  **Q**    And it's your understanding that Addison denied any

1   ownership of that LG phone, correct?

2   **A**      I'm sorry?

3   **Q**      That Addison denied ownership of the LG phone, correct?

4   **A**      I don't remember him acknowledging the presence of the

5   phone or having it in his possession, no, sir.

6   **Q**      In the second getaway vehicle, do you recall what

7   supposedly it looked like?

8   **A**      We were told it may be a KIA type of vehicle, SUV.

9   That's all coming from the Hernando County Sheriff's Office.

10  **Q**      Do you know anything about a pickup truck being

11  something that was used to get away in?

12  **A**      I have not been told that, no, sir.

13  **Q**      Within your office, if you get a search warrant for a

14  phone, are you somebody who is qualified to do an extraction

15  at the Pasco Sheriff's Office?

16  **A**      I have not been formally trained.

17  **Q**      Who would you rely on in your office to do an

18  extraction?

19  **A**      Our Cyber Crime unit.

20  **Q**      Your Cyber Crime unit?

21  **A**      Yes, sir.

22  **Q**      Okay.  But still within your office you'd be

23  responsible for drafting the warrant, correct, if it related

24  to a case you were doing?

25  **A**      Unless for some reason I was unable to do it because of

1    something else going on.  But, yes, sir.

2    **Q**    So normal practice, at least in your agency, is

3    extractions are -- the extraction specialist is not the

4    person normally drafting the warrant, correct?

5    **A**    Correct.  But sometimes what I'll do is I'll

6    communicate with a detective in the Cyber Crimes unit, ask

7    for a basic template of something that they may have

8    utilized in the past for me to go off of.

9    **Q**    And you would then, once you get a warrant signed, send

10   it to the extraction person who's responsible, and then they

11   would see that they have the permission to do the extraction

12   and then do it, correct?

13   **A**    They would have the permission.  It's just that they

14   would be the ones that would be trained to do it.  So, yeah,

15   I would utilize somebody who has been formally trained in

16   it.

17   **Q**    Right.  But the permission would come from the granting

18   of the warrant, correct?

19   **A**    Yes, sir.  I apologize.

20   **Q**    Okay.  And so you would let the extraction person know

21   that you had a warrant and show them a copy of the warrant

22   prior to them conducting the search?

23   **A**    Yes, sir.

24          **MR. MADDUX:**  No further questions.

25          **THE COURT:**  All right.  Redirect?

```
 1              MR. GORDON:  No.  Thank you, Your Honor.

 2              THE COURT:  Okay.  Are we still okay on the

 3     jurors, Ms. Olden?  We got 15 minutes?  How much time do you

 4     think we have?

 5              THE COURTROOM DEPUTY:  Just a few more minutes,

 6     Your Honor, 10 minutes.

 7              THE COURT:  All right.  Let's call the next

 8     witness.

 9              MR. GORDON:  Detective Thomas Breedlove.

10              THE COURT:  And just tell us when they're lined up

11     outside, and we'll end it.  No hurry.  When they get here,

12     they get here.

13                        THOMAS BREEDLOVE

14     was called as a witness and, having first been duly sworn,

15     testified as follows:

16              THE WITNESS:  I do.

17              THE COURTROOM DEPUTY:  Please state your full name

18     for the record.

19              THE WITNESS:  Tommy Breedlove.

20              THE COURTROOM DEPUTY:  Please spell your last

21     name.

22              THE WITNESS:  B-R-E-E-D-L-O-V-E.

23              THE COURTROOM DEPUTY:  Thank you.  Please have a

24     seat.

25              THE WITNESS:  Thank you.
```

1          **MR. MADDUX:**   Judge, could we just invoke the Rule

2    too?

3          **THE COURT:**   Of course.   The Rule is invoked.

4          **MR. GORDON:**   Your Honor, just to be clear, that

5    doesn't apply to Special Agent Bush, correct?   She will be

6    testifying.

7          **THE COURT:**   That's right.   And if there's a

8    defense investigator, same rule.   Thank you.

9          **MR. GORDON:**   Your Honor, I just want to make one

10   other -- a question about that.   Detective Toner has

11   essentially been a secondary case agent on this case.   He

12   will be testifying.   What would Your Honor like to do about

13   Detective Toner?

14         **THE COURT:**   Maybe discuss it with Mr. Maddux at

15   the -- you know, I'll give you a couple of minutes before we

16   start with the jury and see if you can come to some

17   agreement on that.

18         **MR. GORDON:**   Thank you, Your Honor.

19                         **DIRECT EXAMINATION**

20   BY MR. GORDON:

21   **Q**    Good morning, Detective.

22   **A**    Good morning.

23   **Q**    Are you employed?

24   **A**    Yes, sir, I am.

25   **Q**    And by whom are you employed?

1    **A**    The Hernando County Sheriff's Office.

2    **Q**    How long have you worked for the Hernando County

3    Sheriff's Office?

4    **A**    20 years.

5    **Q**    And what's your current role?

6    **A**    I'm a detective assigned to the Major Case section.

7    **Q**    What kinds of cases do you work in that section?

8    **A**    I'm primarily responsible for monitoring all registered

9    sex offenders and predators in Hernando County.

10    **Q**    Okay.

11    **A**    I also work crimes against persons, and I have a

12    caseload assigned to me from that.

13    **Q**    For how long have you been a detective generally?

14    **A**    Generally, for 26 years.

15    **Q**    And for how long have you had that focus on sexual

16    assault or sexual offense cases?

17    **A**    24 of those 26 years.

18    **Q**    Have those 24 years been the last 24 years consecutive?

19    **A**    There was a year in between where I was a patrol deputy

20    with the Hernando County Sheriff's Office.

21    **Q**    Now, in November of 2017, were you a detective then?

22    **A**    Yes, sir, I was.

23    **Q**    And were you working on primarily sexual offense

24    investigations at that time?

25    **A**    CAPS cases and sex offenders, yes, sir.

1   **Q**    What are CAPS cases?

2   **A**    I'm sorry.  Crimes-against-persons cases.

3   **Q**    Is armed robbery a crime against persons?

4   **A**    Yes, sir, it is.

5   **Q**    Do you regularly work armed robbery cases?

6   **A**    No, sir, I do not.

7   **Q**    Why not?

8   **A**    We don't have that many, and my time is taken up with

9   other assignments.

10  **Q**    Did you become involved in an armed robbery that

11  occurred on November 18th, 2017?

12  **A**    Yes, sir, I was.

13  **Q**    How did you become involved in investigating that armed

14  robbery?

15  **A**    That day was a Saturday.  I was called out from my

16  residence by my communications center to respond to a bank

17  robbery that had occurred at a Wells Fargo bank located on

18  U.S. 19.

19  **Q**    Were you the only detective called out on that day?

20  **A**    No, sir, I was not.

21  **Q**    Were you given a specific role with respect to that

22  bank robbery?

23  **A**    Yes, sir.

24  **Q**    What was that role?

25  **A**    I was assigned to process and interview all the persons

1    that were at the Wells Fargo bank in Hernando.

2    **Q**    Did you ultimately become the lead detective for that

3    bank robbery?

4    **A**    Yes, sir, I was.

5    **Q**    Why did you become the lead detective if you're

6    primarily a -- or more often a sexual offense investigator?

7    **A**    It fell to my responsibility because I was the

8    detective scheduled to be on call that day.

9    **Q**    Once you received the call to come in, what did you do?

10   **A**    I responded to the bank.  I made contact with the

11   deputies that were there.  I observed the interior of the

12   bank, made contact with the witnesses, primarily the citizen

13   witnesses that had seen a car flee the business, and then

14   the employees and the customer witnesses that were inside

15   the bank.

16   **Q**    Did you interview all those people?

17   **A**    Yes, sir, I did.

18   **Q**    After you interviewed them, what did you do next?

19   **A**    I received information that a Detective Chris Kraft,

20   also with the Hernando County Sheriff's Office, had been

21   assigned to respond down to a car crash that had occurred in

22   Pasco County directly to our south also on U.S. 19.  That

23   car crash was involved with a subject that was responsible

24   for the bank robbery.

25   **Q**    Did you respond to the scene of the car crash as well?

**A**     No, sir, I did not.

**Q**     What was your personal next involvement in the case? Besides receiving information on what other officers were doing, what's the next thing you did?

**A**     I met with our property evidence clerk at the Hernando Sheriff's Office and received information about a car -- I'm sorry, the car that was involved in the car crash in Pasco County.  It had been towed to the Hernando County Sheriff's Office.  And I observed that car as it was being put into a storage facility.  And then within the following few days, I obtained a search warrant for that car and also for an Apple iPhone that was found on the person of the driver of that car.

**Q**     And is that Petrie Addison?

**A**     Yes, sir.

**Q**     Now let's back up slightly.  You said that you observed the wrecked car being put into the police facility?

**A**     Yes, sir.

**Q**     Was that on that same day, November 18th, 2017?

**A**     Yes, sir.

**Q**     Did you take custody of any property on that day, November 18th, 2017?

**A**     No, sir.

**Q**     Were you informed on that day of the existence of the Apple iPhone seized from Petrie Addison?

1   **A**     Yes, sir.

2   **Q**     Were you informed on that day, November 18th, 2017, of

3   the discovery of the LG cell phone on the driver's

4   floorboard of the crashed car?

5   **A**     No, sir.

6   **Q**     When did you learn about the LG cell phone that had

7   been found on the driver's floorboard?

8   **A**     When the search warrant was obtained and served on the

9   Hyundai.

10  **Q**     So can you walk us through the sequence?  So on

11  Saturday the 18th, the car is seized and brought back to

12  Hernando County?

13  **A**     Yes, sir.

14  **Q**     When was the search warrant for the car executed?

15  **A**     Could I check my notes, please?

16  **Q**     Sure.  But let's just lay the foundation first.  Did

17  you once know the answer to that question?

18  **A**     Yes, sir.

19  **Q**     Do you remember it today?

20  **A**     No, sir, I do not.

21  **Q**     Would looking at your notes refresh your recollection?

22  **A**     Yes, sir, it would.

23          **MR. GORDON:**  Your Honor, permission to look at his

24  notes?

25          **THE COURT:**  Yes.

1    **THE WITNESS:**  Sir, the search warrant was served

2    on the Hyundai on November 20th, 2017.

3    **BY MR. GORDON:**

4    **Q**    Now, backing up from that, sticking on the 18th, on the

5    Saturday, you said you were present when the car was brought

6    into the police storage facility; is that correct?

7    **A**    Yes, sir.

8    **Q**    Did you stick around while it was processed at the

9    facility?

10   **A**    It was not processed at that time.

11   **Q**    Was it photographed at some point, the interior of the

12   car?

13   **A**    At the time of the service of the search warrant, yes,

14   sir.

15   **Q**    So the photographs weren't taken until the 20th?

16   **A**    Correct.

17   **Q**    Detective Breedlove, have you reviewed the photographs

18   taken of the car during that search?

19   **A**    Some of them, yes, sir.  Not recently.

20   **Q**    So I'm handing you what's in evidence as Defense

21   Exhibit --

22   **THE COURT:**  Counsel, let's break right now.

23   They're lining up.

24   Does anybody need a break before we bring the jury

25   in?  We'll run about two hours or more with them.  No one

```
1   needs a break?

2           MR. MADDUX:  Two-minute bathroom break.

3           THE COURT:  Okay.  Let's take a break.  Because

4   then we're going to run until we get that jury picked.

5           All right.  We'll put a tack in that spot on the

6   notes and bring the jury in.

7           (Recess at 9:07 a.m. to 9:14 a.m.)

8           THE COURT:  Lawyers, when I pitch the case to you,

9   then I'll have you recite your potential witnesses, and you

10  can ask if anybody knows any of them.  Okay?

11          MR. MADDUX:  Yes.

12          THE COURT:  You got that, Mr. Gordon?

13          MR. GORDON:  No.  Sorry, Your Honor.

14          THE COURT:  When I pitch the voir dire to you,

15  then that will be the time when you read your witness list

16  and say, "Does anybody know anybody?"

17          MR. GORDON:  Yes, Your Honor.

18          And, Your Honor, I filed, late last night, an

19  amended exhibit list because I added things.

20          THE COURT:  We'll print it.  I don't think we're

21  going to get there until this afternoon anyway.  But we'll

22  print it.  Thank you.

23          MR. GORDON:  Yes, Your Honor.  And I have witness

24  lists -- excuse me -- hard copies for the Court and court

25  reporter, if you'd like.
```

```
 1              THE COURT:  Thank you.
 2              MR. GORDON:  Those have not changed from what I
 3    filed.
 4              THE COURT:  All right.  Thank you.
 5              THE COURTROOM DEPUTY:  Your Honor, are we ready
 6    for the jury?
 7              THE COURT:  Yes, we are.  Thank you.
 8                             *  *  *  *  *
 9              (Voir dire proceedings commenced, not transcribed
10    herein.)
11              THE COURT:  You guys need some time or are you
12    ready to pick?
13              MR. GORDON:  Yes, definitely need some time.
14              MR. MADDUX:  Yes.
15              THE COURT:  How much time do you need?
16              MR. MADDUX:  10 minutes.
17              THE COURT:  I'll see you in 10 minutes.  Thank
18    you.  And I'm sorry to hurry you.  But the ones that aren't
19    picked, I want to let them go.  Okay?  So we'll see you in
20    10.
21              (Recess at 12:18 p.m. to 12:23 p.m.)
22              THE COURT:  I need to put something on the record
23    here.  Dr. Reigner, he doesn't recognize me.  20 years ago,
24    I used him.  I was a defense lawyer.  This is a hazy
25    recollection.  I used him in a case where a kid burnt, like,
```

1   one of those school trailers.  And then 10 years ago,

2   roughly, my partner -- it was a two-man, three-man law

3   firm -- had a case, a DUI manslaughter, and the kid, the

4   defendant, had a brain injury because of it.  And he used

5   Reigner in Tampa.  I don't remember where the arson was.

6   But, anyway, I just want you to know that for the record.

7   Okay?

8           **MR. GORDON:**  Thank you, Your Honor.

9           **MR. MADDUX:**  Thank you.

10          (Court was at ease until 12:33 p.m.)

11          **THE COURT:**  All right.  That was 15.  We okay?

12          **MR. GORDON:**  Yes, Your Honor.

13          **MR. MADDUX:**  Oh, yes, Your Honor.

14          **THE COURT:**  Mr. Gordon, so you have six

15   peremptories.  Defense has 10.  But we'll talk about cause

16   now, cause only.

17          Okay.  So I struck Bergstrom for cause unless

18   there's an objection.

19          **MR. GORDON:**  No objection.

20          **MR. MADDUX:**  No objection.

21          **THE COURT:**  And then the guy down there on the

22   corner, Kedzorski, he clearly seems to me to be nervous.  Is

23   there an objection to that?  I'll leave him on if there is.

24          **MR. GORDON:**  That's 37, Your Honor?

25          **THE COURT:**  37.

41

```
 1              MR. GORDON:  No objection.

 2              MR. MADDUX:  No objection.

 3              THE COURT:  Okay.  What else do you have,

 4   Mr. Gordon, for cause?  These aren't clocked against you, so

 5   let's hear what you have.

 6              MR. GORDON:  The whole panel, Your Honor, or just

 7   the first 14?

 8              THE COURT:  Yeah.  Just start with one, and tell

 9   me what you got, cause.

10              MR. GORDON:  Yes, Your Honor.  So I am hopeful

11   that this trial will end this week.  I can't guarantee it,

12   and I don't know how long jury selection will take.  So the

13   first is No. 2, Mr. Hartman.  He says that he's planning to

14   go to Miami to do a memorial for his sister on the 28th,

15   which would be Tuesday.

16              THE COURT:  Do you have a problem with that?  I'll

17   do it unless Mr. Maddux objects.

18              MR. MADDUX:  No, Your Honor.

19              THE COURT:  Okay.  So he's out.  Hartman is out.

20              MR. GORDON:  By the same token, Your Honor, I just

21   want to note that I'm not moving for cause on 5, Evans,

22   because I can't imagine we're going to be going, even with

23   deliberations, to Thursday of next week.  So I think she's

24   safe.

25              THE COURT:  Yeah.  I think so too.
```

1      **MR. GORDON:**  But on that same token for Hartman,

2  6, Mitchell, is leaving to go to Paris next Tuesday, the

3  28th, same problem.

4      **MR. MADDUX:**  No objection.

5      **THE COURT:**  No objection.  So our Parisian is out,

6  Andrew Cutler Mitchell.

7      Okay.  All right.

8      **MR. GORDON:**  No. 8, Ms. Faratro, despite my

9  efforts to rehabilitate her, stated unequivocally that she

10 could not be fair based on her family's experience with her

11 grandfather having been beaten near death in a robbery.

12     **MR. MADDUX:**  No objection.

13     **THE COURT:**  Okay.  So I'm going to grant that

14 cause.  And that is Faratro.

15     Okay.

16     **MR. GORDON:**  No. 12, Ms. Roces.  Either she was

17 sleeping or had her eyes closed for the vast majority of the

18 jury selection process.  Either way, I don't think that

19 she'd be physically fit to be a juror.

20     **THE COURT:**  Okay.  I'm overruling that.  We're

21 going to have to get her some coffee.

22     What else you got?

23     **MR. GORDON:**  Next is 18, Ms. Tamkins, the one who

24 has her grandchild arriving any minute, possibly even

25 already.  She said to Mr. Maddux that she would be

1    distracted throughout the trial and trying to get out of

2    here at any moment.

3              **MR. MADDUX:**  No objection.

4              **THE COURT:**  All right.  I'm going to strike --

5    that's No. 18?

6              **MR. GORDON:**  Yes, Your Honor.

7              **THE COURT:**  Grandma is stricken, okay, for cause.

8              **MR. GORDON:**  Next challenge for cause is 28,

9    Ms. Duncan.  She stated that based on her prior experience

10   with being the victim of a mugging, as well as another

11   crime, that she flat-out doesn't trust men.  I don't think

12   she's fair for either side.  We, obviously, have a male

13   defendant.  We have male witnesses.

14             **MR. MADDUX:**  No objection.

15             **THE COURT:**  All right.  I'm going to put a "C,"

16   question mark, on that.  Okay.  I got a question on her.

17             Okay.  Give me your next one.

18             **MR. GORDON:**  Yes.  Last challenge for cause is

19   Juror 33, Ms. Worsdell, who said she has physical issues

20   with both her back and her hearing.  And, obviously, hearing

21   the evidence is a crucial part of the trial.

22             **MR. MADDUX:**  No objection, Your Honor.

23             **THE COURT:**  Okay.  I'm going to strike her for

24   cause.

25             We've stricken -- okay.  Anything else on cause,

1    Mr. Gordon?

2         **MR. GORDON:**  No.  Those are all my cause

3    challenges.

4         **THE COURT:**  Okay.  So before I jump over to the

5    defense, for cause, so far, we've stricken seven, which is

6    Nos. 2, No. 6, No. 8, No. 14, No. 18, No. 33, and then I

7    have 37, with a question mark on 28.

8         **MR. GORDON:**  May I ask, Your Honor, what's the

9    nature of the question mark on 28?  Why are you --

10         **THE COURT:**  Well, I'm just -- well, first of all,

11    I have to manage these jurors.  And I don't want to run out.

12    But she -- you know, I said, "Well, isn't your son a police

13    officer?"  And I think she came back a little bit.  But

14    that's the question mark.

15         All right.  So what says -- cause, Mr. -- is that

16    it for you, Mr. Gordon, on cause?

17         **MR. GORDON:**  It is, Your Honor.

18         **THE COURT:**  Mr. Maddux, what do you have for

19    cause?

20         **MR. MADDUX:**  I would move to strike Juror No. 5,

21    Ms. Evans, who said that -- well, basically, given the

22    number -- the numerosity of the charges, that she feels that

23    the presumption is overcome.  And I don't think she

24    rehabilitated herself on that.

25         **THE COURT:**  Okay.  So that's going to be a cause,

1    question, defense.

2           Give me your next one.

3           **MR. MADDUX:**  Yes, Your Honor.

4           Judge, we'd move to strike Juror No. 15,

5    Ms. Del Castillo.  At sidebar she talked about a tragic

6    situation involving her being the victim of rape.  And I

7    believe, based on that, despite her assurance that -- given

8    her other answers in totality, that she would not be able to

9    be fair.  She watches -- crime take place, when she was an

10   AP, on video.  We have a bunch of video testimony.  And her

11   overall demeanor suggests that she's not going to be able to

12   overcome her bias created from her being the 15-year-old

13   victim of a very serious crime.

14          **THE COURT:**  That's denied.

15          Give me your next cause.

16          **MR. MADDUX:**  I have no other causes at this time,

17   Your Honor.

18          **THE COURT:**  Okay.  So the two cause questions are

19   Duncan and Evans.  All right.  Just a second.

20          All right.  I'll grant both of those.  I'm

21   granting -- the question was No. 5.  That was Mr. Maddux.  I

22   put a question mark on that.

23          Evans I'm striking for cause.  That was, in my

24   view, highly questionable.  But, whatever, it's cause.

25          And 26, Mr. Gordon's cause, the one who said she

1    didn't like men, et cetera, 28.

2           So that completes our cause strikes.  And stricken

3    for cause are 2 and 5 and 6.

4           MR. GORDON:  And, Your Honor, just for the

5    record -- I recognize Your Honor's ruling -- I do object to

6    the strike for cause of 5, Evans.

7           THE COURT:  5.  Okay.  2 and 5 and 6 and 8 and 14

8    and 18.  That's one, two, three, four, five, six there.

9           28 and 33.  Seven, eight.

10          And 37 for cause.

11          Okay?  We struck nine for cause.

12          MR. MADDUX:  Judge, may I visit two that I had

13   forgotten, because I was up there, that had the trip issues?

14    I think Juror No. 17, Mr. Rhinerson, said he started a

15   trip, supposedly, tomorrow.

16          THE COURT:  Wants to travel to Little Rock.

17          MR. MADDUX:  To Little Rock and Louisiana and --

18          THE COURT:  He's going to have to wait on his

19   travel to Little Rock.  He's non-rev.  Okay?

20          MR. MADDUX:  And then the other one would be 23,

21   who expressed her inability to find childcare at the start

22   of next week.

23          THE COURT:  Hold on.  23.

24          MR. GORDON:  And, Your Honor, I object.  She --

25          THE COURT:  Difficult to find care for kids.

1    Nope.  I'm not granting that.

2         **MR. MADDUX:**  Judge, I did have one more on travel,

3    20.  She's going on a cruise with her --

4         **THE COURT:**  Please understand that I make these

5    rulings before we sit down, and now we have a whole bunch

6    more.  So what's the next one?

7         **MR. MADDUX:**  Just 20, Your Honor.

8         **THE COURT:**  20.

9         **MR. MADDUX:**  She's the one with the cruise on

10   Saturday.  So she's here through the week.  But on Saturday

11   she paid for --

12        **THE COURT:**  Hold on.  20.

13        **MR. MADDUX:**  She's going to Key West and some

14   other location in the Caribbean, paid for it, on Saturday.

15        **THE COURT:**  What do you say on that one, Counsel?

16        **MR. GORDON:**  I agree with Mr. Maddux.

17        **THE COURT:**  Okay.  I'm going to grant that for

18   cause.  Now, if we run out of jurors, I'm going to un-cause

19   one of these.  Okay.  So that's granted as well.

20        So I will hear the first peremptory from the

21   Government.

22        **MR. GORDON:**  Your Honor, are we going to go back

23   and forth?  Is that the plan?

24        **THE COURT:**  Yes.  And you may backstrike.  I don't

25   care.  I never understood that rule, frankly.

1    **MR. GORDON:**  Thank you, Your Honor.  So I will

2    start with Juror No. 9 for peremptory.

3        **THE COURT:**  9, James Shaw, is off.  Son was a

4    chiro.  He worked in a joint compound plant.  Off.

5        Okay.  What do you say, Defense?

6        **MR. MADDUX:**  Juror No. 10, Your Honor.

7        **THE COURT:**  Ten, Trevino, the minister, is off

8    from the defense.

9        All right.  Go ahead, Mr. Gordon.

10        **MR. GORDON:**  So just procedurally, does that mean

11    I'm going to run out?  Just four in a row?

12        **THE COURT:**  Next peremptory.

13        **MR. GORDON:**  Yes, Your Honor.  I can do -- when

14    I'm done, will Mr. Maddux have his remaining four or are we

15    going to have -- usually, what I've had experience --

16        **THE COURT:**  You want to do it that way?  That's

17    fine.

18        So give me two.

19        **MR. MADDUX:**  I would strike Juror No. 14 -- I'm

20    sorry.  I meant the next one, Juror 15.

21        **THE COURT:**  15?

22        **MR. MADDUX:**  Yes.

23        **THE COURT:**  The principal?

24        **MR. MADDUX:**  Yes.

25        **THE COURT:**  The principal is off.

1          **MR. GORDON:**  Juror No. 1, Your Honor,

2    Ms. McCorquodale.

3          **THE COURT:**  McCorquodale.  Okay.  All right.  I

4    wouldn't have done that if I were you.

5          There's nothing worse than a judge playing lawyer,

6    I might add.

7          Okay.  Give me two, Defense.

8          **MR. MADDUX:**  Juror No. 7, Trombley.

9          **THE COURT:**  7, Pamela Trombley.  Okay.  The

10   defense struck Trombley.

11         Okay.  And your next strike would be?  No. 7 is

12   stricken now.

13         **MR. MADDUX:**  And Juror No. 17, Rhinerson.

14         **THE COURT:**  And Rhinerson is stricken.

15         **MR. MADDUX:**  He's one we might take back, Judge.

16         **THE COURT:**  If we're short.  Okay.

17         **MR. GORDON:**  Juror 29, Cloud, Your Honor.

18         **THE COURT:**  29 is Mr. Gordon's.  I can't find 29.

19   Where is it?  There we go.  The grand juror.  Oh, boy, you

20   are going contrary to type here.  The grand juror, No. 29,

21   is stricken by the Government.

22         Okay.  Now, as I understand it now, the prosecutor

23   has used three, and the defense has used four.

24         Okay.  Mr. Maddux, I'll take two strikes from you.

25         **MR. MADDUX:**  Just give me one more second,

1    Your Honor.  I apologize.  I'm working on it.

2              **THE COURT:**  Take your time, Buddy.

3              **MR. MADDUX:**  We'd strike Juror No. 26.

4              **THE COURT:**  Okay.  26 is Becky McCay.  26 is

5    stricken.

6              **MR. MADDUX:**  We'll strike Juror 27.

7              **THE COURT:**  Okay.  And 27 is stricken.  And that's

8    Pfister.

9              Okay.  So correct me if I'm wrong, Gentlemen,

10   Mr. Maddux has used six strikes, and the Government has used

11   three.

12             Is that correct, Mr. Gordon?

13             **MR. GORDON:**  It is, Your Honor.

14             **THE COURT:**  Okay.  I'll take your next strike,

15   please.

16             **MR. GORDON:**  Juror 11, Santos.

17             **THE COURT:**  Santos is stricken.

18             Okay.  Give me two, Mr. Maddux.

19             **MR. MADDUX:**  Juror No. 24.

20             **THE COURT:**  24 is stricken, Mr. Dinapoli.

21             Give me one more.

22             **MR. MADDUX:**  Juror No. 23.

23             **THE COURT:**  23 is stricken, and that's Jessica

24   Dodson.

25             Okay.  So Mr. Maddux has used eight strikes.

1    Mr. Gordon has used four.  I'll have one from Mr. Gordon.

2         **MR. GORDON:**  Yes.  One moment, please, Your Honor.

3         Juror 12, Roces.

4         **THE COURT:**  Nobleza is stricken by the Government.

5    And he's used five.

6         And, Mr. Maddux, you've used eight.  I will now

7    take two strikes from you.

8         **MR. MADDUX:**  Juror No. 30, Dr. Regnier.

9         **THE COURT:**  I thought you already struck him.  No.

10   Okay.

11        **MR. MADDUX:**  And Juror No. 32, Ms. Kreiser.

12        **THE COURT:**  Okay.  All right.  So you've completed

13   your strikes.

14        Okay.  You have one left, Government.  You don't

15   have to take it.

16        **MR. GORDON:**  Juror No. 13, Ms. Verity.

17        **THE COURT:**  Verity is stricken by the Government.

18        So that concludes the peremptory challenges.

19        So here's the jury.  And follow, make sure I don't

20   mess this up, Counsel.

21        No. 1 is Carmack, who's Juror 3.  No. 2 is

22   Warnock, who's Juror 4.  No. 3 is Wilson, who's originally

23   16.  No. 4 is McDonald, who was 19.  No. 5 is Henry, who's

24   21.  No. 6 is the good rabbi, Elizabeth Torop, who's No. 22.

25   No. 7 is Stojanov, who's 25.  No. 8 is LaKeisha Joy, No. 31.

```
 1   No. 9 is Paul Bassous, who's No. 34.  No. 10 is Charles
 2   Smith, New Port Richey.  No. 11 is Angela Marie Gates.  And
 3   No. 12 -- she was 36 -- is Paul Hendricks.  And the two
 4   alternates are Davis and Sperandio, 13 and 14.
 5              Okay.  That's your jury.
 6              Can we bring that jury in and seat them?  Do you
 7   have a name?  Did I mess that up?  Does that appear to be
 8   correct?
 9         MR. GORDON:  I'm just remembering, Your Honor,
10   whether or not we have challenges for the alternates.
11         THE COURT:  Well, you don't, because we're out of
12   jurors.
13         MR. GORDON:  Right.  I just didn't know if that
14   would cause us to go back on any of the challenges for cause
15   then.
16         THE COURT:  Well, do y'all want to talk about it?
17   Does somebody want to --
18         MR. GORDON:  Can Mr. Maddux and I consult for just
19   a moment?
20         THE COURT:  Yeah.  It's going to have to be an
21   agreement.
22         MR. GORDON:  Of course.  I understand.
23              (Court was at ease.)
24         MR. GORDON:  Your Honor, we're in agreement that
25   the selected alternates are fine.
```

```
 1              THE COURT:  Okay.  Very good.  All right.  We're

 2    going to bring the jury in, and we're going to let everyone

 3    go.

 4              MR. GORDON:  Your Honor, I do have an issue about

 5    bringing the jury in.  Letting everyone go, no problem.  But

 6    because of where we are procedurally with the suppression

 7    hearing, once you swear the jury, there can be no

 8    interlocutory appeal.

 9              THE COURT:  Right.  We're going to swear the jury.

10    You're overruled.

11              Okay.  Bring them in.  And I want to see

12    Dr. Regnier at sidebar to say hello.

13              COURT SECURITY OFFICER:  Yes, sir.

14              (The venire enters the courtroom.)

15              THE COURT:  All right.  Thank you very much.  We

16    have a jury.  Those of you who aren't selected,

17    unfortunately, have to cycle through three, third floor.

18    I'm not sure what their plans are for you.  But I'm going to

19    call out the jury.  And I'm going to excuse the rest of you

20    to go down to three, except for Dr. Regnier, who I wanted to

21    say hello to at sidebar for a moment.

22              So the first juror will be Cheryl Carmack, and the

23    second one will be Frances Warnock.  The third one will be

24    Emily Ashley.  The fourth one --

25              MR. GORDON:  I'm sorry, Your Honor, Ashley Wilson,
```

1    I believe.

2              **THE COURT:**  Say it again.

3              **MR. GORDON:**  I believe the --

4              **THE JUROR:**  That's my middle name.

5              **THE COURT:**  Wilson.  Excuse me.

6              Good call, Mr. Gordon.  Thank you for catching

7    that.

8              The fourth juror is Diane, Ms. McDonald.  The

9    fifth juror is Mandy Henry.  The sixth juror is Elizabeth

10   Torop.  The seventh juror is Martha Stojanov.  The eighth

11   juror is LaKeisha Johnson.  The ninth juror is Paul Bassous.

12   The tenth juror is William Charles Smith.  The eleventh

13   juror is Angela Marie Gates.  The twelfth juror is Ryan

14   Hendricks.  The thirteenth juror is John Davis, and the

15   fourteenth juror is Marsha Sperandio.

16             So thank you much.  If you've been called, please

17   come up, and I'll get you seated.  If you haven't been

18   called, you need to go to three.

19             **MR. MADDUX:**  Judge, he would like to speak with

20   you.

21             **THE COURT:**  Yes, sir.  I can't hear you.  I'm

22   sorry.

23             (The venire exits the courtroom.)

24             (Discussion at sidebar.)

25             **COURT REPORTER:**  We're not on the record.  I can't

1    hear --

2           **PROSPECTIVE JUROR NO. 34:**  -- philosophical reason

3    for doing that, didn't want to cause a thing, but I don't

4    like passing judgment on a person.  I don't think it's

5    correct fundamentally.

6           **THE COURT:**  I'm going to ask you whether your mind

7    is nimble enough to follow the law and follow the facts as

8    you determine them.

9           **PROSPECTIVE JUROR NO. 34:**  Number one, the law is

10   subjective.  You know, your interpretation of the law.  You

11   claim the thing about the Constitution, certain aspects.

12   You said he was -- armed robbery, correct?  He used a gun.

13   The gun was licensed by who?  Why is this gun in this

14   country?  Because of the laws that we have set.  So I

15   don't -- I don't -- I can't live with my conscience putting

16   a person in jail.  I just can't do it.

17          **THE COURT:**  Did you think you might want to bring

18   this up before we selected the jury?

19          **PROSPECTIVE JUROR NO. 34:**  I was nervous.  I'm

20   sorry.

21          **THE COURT:**  We couldn't have come sidebar then?

22   Now we've let the jury go.  What do you want us to do?  Are

23   you saying you can't sit in judgment?

24          **PROSPECTIVE JUROR NO. 34:**  I felt like if I spoke

25   up --

1          **THE COURT:**  We might have done something different

2   and not picked you.

3          **PROSPECTIVE JUROR NO. 34:**  I'm sorry.  I thought

4   if I made a thing, it was going to get me selected.  I don't

5   know.

6          **THE COURT:**  All right.  Well, I need you to go sit

7   outside for a minute.

8          (End of discussion at sidebar.)

9          **THE COURT:**  Well, thank you.  You-all may go to

10  lunch.  We're going to start this trial.  Take an hour, and

11  we'll see you back here in 60 minutes, at 2:00 p.m.  Thank

12  you very much.

13         Let's swear the jury before they go out.  Well,

14  wait.  We don't have a full jury yet.

15         Don't talk about the case, please.  Don't get on

16  the Google, and we'll see you.  No social media.  Don't

17  consult the internet.  Of course, there's nothing on there,

18  but don't anyway.  We'll see you in an hour.  Thank you.

19         (Jury exited the courtroom at 1:02 p.m.)

20         **THE COURT:**  What do you want to do about

21  Mr. Bassous, Counsel?

22         **MR. GORDON:**  Challenging him for cause,

23  Your Honor.  Given what he just said, I don't think he can

24  be fair to the Government.  I don't think he can sit as a

25  juror.  And as Mr. Maddux has put it, he seems, frankly,

1   like he is in no mental condition to serve as a juror.

2           **THE COURT:**  What says the defense?

3           **MR. MADDUX:**  I did just say that.  I mean, it's

4   just a quandary.  Because, like you said, Judge, why now?

5   All the opportunities.  But he came up here in a panic and

6   seems very disheveled and mentally anxious to the point

7   where I have concerns about whether or not he could do his

8   job unless the Court is able to settle him down.  I mean, to

9   be honest, I think we should bring him in here and find out.

10  Because that side conference was very weird.  Let's see if

11  we can --

12          **THE COURT:**  Now, I would be inclined to grant the

13  challenge for cause unless you feel like you need to voir

14  dire him, and we will.  I don't think that's going to go

15  well.  But that's up to you, Mr. Maddux.  If you feel like

16  you can resurrect him.

17          **MR. MADDUX:**  Can I speak with my client for a

18  second, please?

19          **THE COURT:**  Yeah.

20          (Court was at ease.)

21          **MR. MADDUX:**  Judge, I would like to briefly voir

22  dire him.

23          **THE COURT:**  Okay.  Well, let's bring him in.

24          I don't want to -- pardon my French.  I don't want

25  to freak him out.  Okay?  Do we want to put him in the box?

1  How do we want to handle this physically?

2         **MR. MADDUX:**  The front row.  He's a juror, Judge.

3  He's not --

4         **THE COURT:**  Okay.  We'll put him right in the

5  front row.  Let's bring him in, okay?

6         (Juror entered the courtroom.)

7         **THE COURT:**  Thanks, Mr. Bassous.

8         **PROSPECTIVE JUROR NO. 34:**  I'm sorry.

9         **THE COURT:**  No problem.  Just, you want to have a

10  seat in the front row.  You're okay.  Everything is fine.

11  You're not in any trouble.  Just have a seat there in the

12  jury box.  Please don't be fretting about anything.

13  Everything is fine.  This lawyer, Mr. Maddux, had a couple

14  of questions he just wanted to go over.  Okay?

15         **MR. MADDUX:**  I know you're extremely nervous, so

16  I'm trying to get just some clear answers so that I can

17  understand your perspective.  I frankly had a hard time

18  hearing you up there.

19         So understanding you didn't want to throw things

20  out of tilt or say anything wrong, there is no wrong

21  answers.  You understand?  What I need to understand is why

22  you came up and what your concern about deliberating is.

23         **PROSPECTIVE JUROR NO. 34:**  The reason why I didn't

24  speak up earlier is because --

25         **THE COURT:**  Okay.  Hold on.  Not so fast, okay?

1   Everything is cool.  Okay?  We're all cool here.

2          **PROSPECTIVE JUROR NO. 34:**  I know you guys know

3   people come here --

4          **THE COURT:**  Hold on.  Just a minute, Buddy.  Use

5   the mic.  Okay.

6          **PROSPECTIVE JUROR NO. 34:**  I know you know people

7   come here with predetermined excuses.  And if you come and

8   you start talking, obviously, like, you have an emotion

9   attached to it -- you know what I'm saying?  Like, if you

10  get passionate about it, you stand out as a juror and you

11  get selected.  Right?  I didn't want to put you guys through

12  the process of, like, thinking, "Oh, hey, he's just saying

13  something because he doesn't want to get picked or

14  whatever."  But I wanted to avoid the whole process by just

15  being quiet in the back.

16         **MR. MADDUX:**  Okay.

17         **PROSPECTIVE JUROR NO. 34:**  And I know it was

18  wrong, but I did it.

19         **MR. MADDUX:**  It's okay.  Because one of the things

20  that I went back when we were doing the selection is, I

21  realized that you were kind of a sleeping giant, we'll say.

22  I realized I hadn't asked you the questions I wanted.  You

23  do something with cardiology, right?

24         **PROSPECTIVE JUROR NO. 34:**  Yes.

25         **MR. MADDUX:**  What do you do?

1    **PROSPECTIVE JUROR NO. 34:**  I am a cardiac

2    sonographer.

3    **MR. MADDUX:**  And the reason you don't want to be

4    on the jury has nothing to do with --

5    **PROSPECTIVE JUROR NO. 34:**  It has to do with

6    punishing people for crimes that we -- we, as a nation, are

7    responsible for the faults in our country.  If somebody gets

8    arrested, it's a fault of our own.  Why was he arrested?

9    Was he low income in growing up?  Why did he have access to

10   a gun?  All these things are things to consider that put him

11   in a socioeconomic situation -- I studied public health.

12   That's what my master's is in.  People are predestined from

13   their birth for certain outcomes.  The reason why middle

14   class people are successful is because they're middle class.

15   They don't have -- why did he have whatever he robbed?  Was

16   he hungry?  Who did he have to provide for?  Why didn't he

17   have the thing he needed from the beginning?  It's like --

18   I'm sorry.

19   **MR. MADDUX:**  And so -- it's okay.  Let me -- can

20   you get with me real quick, and we'll connect on this?

21   Actually, I might personally feel the same way as you on

22   some of those issues.  But the feelings aren't the issue.

23   The question is, can you follow the law that the judge gives

24   you and contain those emotions so that you can be

25   dispassionate and just look at the evidence and make a

61

1   decision?

2        **PROSPECTIVE JUROR NO. 34:**  It's not that simple.

3   It doesn't work like that.  Nobody just wakes up one morning

4   and does a crime.  It doesn't work like that.  It's

5   conditioning through society.

6        **MR. MADDUX:**  Okay.  Well, if you heard no evidence

7   about conditioning, and you just heard evidence about

8   whether or not he did a crime, can you --

9        **PROSPECTIVE JUROR NO. 34:**  I can't judge.  I can't

10  put somebody in a cage.  I'm sorry.  The documents -- you go

11  in some -- this is a sentence -- I can't imagine living my

12  life inside a cage or any -- I can't imagine having put my

13  name on somebody's name to live their life inside a cage.

14  That's not okay.

15       **MR. MADDUX:**  Can I also just let you know, and see

16  if it makes a difference, that you're not going to be

17  deciding the sentence.  You're just going to be deciding

18  whether or not the person is guilty, Mr. Turner is guilty.

19  You don't sentence him.

20       **PROSPECTIVE JUROR NO. 34:**  It's the same thing.

21       **MR. MADDUX:**  Okay.  All right.  So you do not feel

22  that you could be fair and impartial?

23       **PROSPECTIVE JUROR NO. 34:**  No.  I'm sorry.  I

24  wanted to be cooperative, but --

25       **MR. MADDUX:**  And you were cooperative.  Thank you

1   for answering my questions.

2            I have nothing further, Your Honor.

3            **THE COURT:**  Thank you very much.

4            **PROSPECTIVE JUROR NO. 34:**  I don't like to talk

5   out like this.  I'm sorry.

6            **THE COURT:**  Paul, you're fine.  Check in with the

7   third floor.  Just, you know, next time, you've got to give

8   the people the benefit of your opinion.

9            **PROSPECTIVE JUROR NO. 34:**  Okay.  I'm sorry.

10           **THE COURT:**  Okay.  Thank you very much.

11           (The juror exited the courtroom.)

12           **THE COURT:**  Okay.  So then we -- I'm granting that

13   motion to strike.  So we will then -- John M. Davis is now

14   on the jury.  And Marsha Sperandio, the widow -- what is

15   she?  She said she was a widow in Largo -- is the only

16   alternate.

17           Now, where was Paul seated?  It would be easier if

18   we just put that alternate in Paul's seat.  Does anyone have

19   a problem with that?

20           **MR. GORDON:**  Not that logistical issue,

21   Your Honor.  But I don't -- I know that we're out of the

22   venire.  I understand that.  But, procedurally, the proper

23   thing to do in this situation would be to have two

24   alternates, a full panel.  And the proper thing to do would

25   be to venire [sic] the full next group in order to select an

1   alternate from them.

2           **THE COURT:**  Well, my recollection is that you-all

3   accepted the panel and accepted the alternates.  You did,

4   did you not?

5           **MR. MADDUX:**  Yes.

6           **THE COURT:**  And then we had this episode with

7   Mr. Bassous, correct?  So I'm striking Mr. Bassous for

8   cause.  My question to you -- Mr. Maddux, do you think

9   that's a problem?  Do you think he's resurrectable based on

10  what we saw?

11          **MR. MADDUX:**  No.  I would agree that as -- I'd

12  love to have him on my jury, but he's not capable of being

13  on the jury.  I agree with the cause.

14          **THE COURT:**  So he's stricken.  So we're going to

15  have -- we had a 12-man panel and two alternates that both

16  sides accepted.

17          **MR. GORDON:**  That's not my -- yes, Your Honor.  I

18  agree with that.

19          **THE COURT:**  No one had a problem.  And this fellow

20  showed up when he entered here.  Most recently, he was

21  crying.  So I'm striking him.  We're going to go with 13.

22          **MR. GORDON:**  Yes, Your Honor.  I just believe that

23  we need the defendant's consent to go forward with less than

24  two alternates.

25          **THE COURT:**  I don't think we do.  I think we need

1    the defendant's consent to go forward with less than 12,

2    petit jury.

3              **MR. MADDUX:**  We consent to the current jury.  We

4    consent.

5              **THE COURT:**  With 13?

6              **MR. MADDUX:**  Yes.

7              **THE COURT:**  Right.

8              Okay.  So do you-all want to take a -- and I'm not

9    trying to be a player on you, Mr. Gordon.  But we need to

10   start this trial.  Okay?  And we're not going to have this

11   suppression hearing done probably until tonight.  Okay?  And

12   with all due respect, I can't imagine that it's 5 percent of

13   your case anyway.  But I may be mistaken.

14             So my question to you is, do you want to take some

15   testimony over the lunch hour or wait until the end of the

16   day and finish it?

17             **MR. GORDON:**  Your Honor, as Mr. Maddux was

18   alluding to with Detective Toner -- and I don't want to

19   speak for Mr. Maddux.  But I assume that if Your Honor were

20   to rule that the phone should be suppressed, Mr. Maddux

21   would want to explore what came from that phone, and he

22   would want to argue to you that anything that came from it

23   was fruits of the poisonous tree.  Quite a bit came after

24   that phone.  Now, whether or not it's fruits, or whether or

25   not there's some attenuation is a whole legal argument that

1    we would need to make.

2          But if Your Honor is going to suppress the phone,

3    that creates a ripple effect for this entire trial.  I

4    cannot present an opening statement about what the evidence

5    will show if I don't know what the evidence is going to be.

6    And as we stand here currently, I have an opening statement

7    written that contains all of the evidence gathered in this

8    trial.  But I have no idea what Your Honor's ruling is going

9    to be.  I can't possibly.  So how can I open?  And,

10   Your Honor, this is not the Government -- the Government did

11   not put us here.  Mr. Maddux is the one who filed at the

12   last second.

13         **THE COURT:**  I understand that.  I'm not blaming

14   anyone.

15         All right.  So what's your thought on that?

16         **MR. GORDON:**  I'm prepared to go forward,

17   Your Honor.  I'm prepared to go forward with the suppression

18   hearing.  I'm prepared to open with the phone.  I'm not

19   prepared to open without it.

20         **THE COURT:**  How much testimony?  We have the

21   current witness.  Is that it?

22         **MR. GORDON:**  No.  There's one more.  So Detective

23   Breedlove will testify about his role in getting the search

24   warrant and all the circumstances surrounding that.  And

25   then Lieutenant William Power will testify about the

66

```
1    actual -- when he actually performed the search.
2            THE COURT:  Okay.  How much time do you think --
3    do you think we can take a quick break for lunch and start
4    on that?
5            MR. GORDON:  Yes, Your Honor.  I'm prepared to do
6    that.
7            THE COURT:  You okay with that, Mr. Maddux?
8            MR. MADDUX:  Yes, Your Honor.
9            THE COURT:  How much time do y'all need for lunch?
10           MR. MADDUX:  20 minutes, Judge.
11           THE COURT:  All right.  We'll meet you back here
12   at -- let's try and do it as close to -- let's get started
13   at 1:35.
14           MR. GORDON:  Thank you, Your Honor.
15           THE COURT:  Thank you.
16           (Luncheon recess 1:14 p.m. to 1:35 p.m.)
17           THE COURT:  The defendant is here.  Mr. Gordon,
18   thank you for pointing out that fruit of the poisonous tree
19   issue.  To be quite honest, it hadn't crossed my thick
20   skull.  So thank you.
21           And had I thought about it last week, we probably
22   would have done this last week.
23           Okay.  Can we get back with the -- is the
24   detective outside?
25           SPECIAL AGENT BUSH:  I'm sorry, Your Honor?
```

67

1              THE COURT:  Is the witness outside?

2              MR. GORDON:  Detective Breedlove.

3              THE COURT:  This will be irrelevant, the witness,

4    when he's coming in.  Let me ask you a question, Mr. Gordon.

5    Is your evidence at trial going to be that -- and, again,

6    it's contested -- but your evidence that the defendant had

7    this phone before that robbery where the crash happened?

8              MR. GORDON:  Yes, Your Honor.

9              THE COURT:  Will your evidence be that he arrived

10   at that bank that day in that vehicle?

11             MR. GORDON:  Yes, Your Honor.

12             THE COURT:  And who was the other fellow in the

13   car?

14             MR. GORDON:  Petrie Addison.

15             THE COURT:  And he will be testifying to that?

16             MR. GORDON:  Yes, Your Honor.

17             THE COURT:  Okay.  All right.  Do you want to

18   bring that witness in?

19             (Court was at ease.)

20             COURT SECURITY OFFICER:  Trying to locate him,

21   Judge.

22             THE COURT:  All right.  No problem.

23             (Court was at ease.)

24             THE COURT:  Do we think he's maybe in the facility

25   or something?

1            **COURT SECURITY OFFICER:**  I checked the men's room.

2    It was empty, sir.

3            (Court was at ease.)

4            **THE COURT:**  I guess the other witness isn't

5    around, the one after Breedlove?

6            **MR. GORDON:**  I can check, Your Honor.

7            **THE COURT:**  Okay.

8            (Witness entered the courtroom.)

9            **THE COURT:**  All right.  Detective, you're still

10   under oath.  Thank you.

11           **THE WITNESS:**  Yes, sir.

12           **THE COURT:**  You may inquire, Counsel.

13           **MR. GORDON:**  Thank you, Your Honor.

14                  **DIRECT EXAMINATION** (continued)

15   BY MR. GORDON:

16   **Q**    Detective Breedlove, I take it we caught you at lunch?

17   **A**    Yes, sir.  But I was on my way back.

18   **Q**    Detective Breedlove, did we have any contact since you

19   left the witness stand, you and I?

20   **A**    Just there at the door, sir.

21   **Q**    Just at the door?

22   **A**    Yes, sir.

23   **Q**    Did we talk about anything related to the case?

24   **A**    No, sir.

25   **Q**    I just inquired where Lieutenant Power was, correct?

1    **A**    That's correct, yes, sir.

2    **Q**    Okay.  Detective, I've handed you now what's in

3    evidence as Government's Exhibits 1, 2, and 3.  These are

4    photographs of the Hyundai Elantra.  Now, can you tell from

5    looking at these where these photographs were taken?

6    **A**    Yes, sir.

7    **Q**    And where is that?

8    **A**    They were taken at my sheriff's office.

9    **Q**    And were you present when these photographs were taken?

10   **A**    Yes, sir.

11   **Q**    Looking at Government's Exhibit No. 2 and No. 3,

12   photographs of the cell phone, do those accurately show the

13   location of the LG cell phone when you observed it?

14   **A**    Yes, sir, it does.

15   **Q**    All right.  So what day were these photographs taken?

16   **A**    And I do need to make a note on that, sir.  In looking

17   for my reports during the break, I did notice that it was on

18   the 21st of November is when the search warrant was served.

19   I obtained the search warrant on the 20th, and it was served

20   on the 21st.  So these photos would have been taken on the

21   21st of November.  I'm sorry for that error.

22   **Q**    All right.  So once these -- the search warrant was

23   served on the vehicle and you searched the vehicle and found

24   the cell phone?

25         I'll take the exhibits back?

**A**    Yes, sir.

**Q**    What did you do next?

**A**    I stood by while the forensic technicians performed the search of the car and the processing of the car.

**Q**    Now that you found a cell phone, did you search the cell phone right then and there?

**A**    No, sir.

**Q**    Why not?

**A**    We didn't know who the cell phone belonged to.  I'm sorry.  We didn't know who the cell phone belonged to.  We believed it might have belonged to Petrie Addison only because we knew that he was driving the car and the cell phone was found on the floorboard of the driver's side of the car.  But because we didn't know the ownership of the car -- or the phone, I'm sorry, we attempted to obtain a search warrant for the cell phone.

**Q**    And you're saying "we."  Does that refer to yourself, you?

**A**    The sheriff's office, yes, sir.

**Q**    Are you saying "we" just because of -- sort of common use in law enforcement?

**A**    A royal "we," yes, sir.

**Q**    Was there another detective on this case handling the phone or acquiring the search warrant?

**A**    This phone, no, sir.

**Q**    Just you?

**A**    Just me.

**Q**    The driver's seat of the Elantra, where was that
positioned?

**A**    It was in the back position.  It was pushed all the way
back.

**Q**    Approximately how tall is Mr. Addison?

**A**    He's almost seven-foot, I believe.

**Q**    And how tall -- well, was the car positioned the way it
was consistent with somebody of that height driving the car?

**A**    Yes, sir, it appeared to be.

**Q**    And you said that you next attempted to get a search
warrant?

**A**    Yes, sir.

**Q**    Did you write the search warrant affidavit?

**A**    I did, yes, sir.

**Q**    And when did you draft that?

**A**    That was on November 27th that I drafted it and put it
through to my supervisors for approval.

**Q**    Can you explain that to the Court?  Because it may be
different in your police department than somewhere else.
What's the process, internally, for generating a search
warrant?

**A**    Generally, what we would do with the search warrant is
we would complete it, complete the warrant, complete the

1    probable cause affidavit.

2    **Q**    That means you, Detective, right then?

3    **A**    Yes, sir.  Me or whichever detective was preparing it.

4    **Q**    Okay.

5    **A**    And then I would take that, and I would either hand

6    deliver it or email it to my sergeant.

7    **Q**    Your sergeant, that's your direct supervisor?

8    **A**    Correct.  Yes, sir.

9         And then once he approves it, he would pass it along to

10   my lieutenant.  If he had changes that needed to be made, he

11   would return it to me for those changes, and then I'd

12   forward it to the lieutenant.

13   **Q**    And the lieutenant, is that the direct supervisor of

14   your sergeant?

15   **A**    That's correct, yes, sir.

16   **Q**    What happens after the lieutenant receives it?

17   **A**    He would make any changes that needed to be made or

18   suggest any changes that needed to be made, return it to me

19   for those changes to be made, and then I would forward it to

20   my captain.

21   **Q**    Is your captain the supervisor of the lieutenant?

22   **A**    That's correct, yes, sir.

23   **Q**    And is the captain the last stage of the approval

24   process?

25   **A**    At that point, yes, sir.

73

```
1    Q      In November of 2017?

2    A      Yes, sir.

3    Q      Is there a different process now?

4    A      Yes, sir, there is.

5    Q      Now, so in November of 2017 it took three levels of

6    approval to get a search warrant approved to even present it

7    to a judge; is that correct?

8    A      That's correct.

9    Q      Did you finish your first draft, the one that you

10   submitted to your sergeant, on the 27th?

11   A      Yes, sir.

12   Q      And is that the day you submitted it to the sergeant?

13   A      That's correct.

14   Q      Walk us through the timeline of any approvals or

15   alterations that happened from that point.

16   A      The sergeant had very few changes to be made to the

17   search warrant, but they were made.  The lieutenant was not

18   available to review the search warrant.  So it was forwarded

19   to the captain for his review.  That was done on -- I

20   believe it was November 28th.  He returned it to me saying

21   that it looked fine.  And that's -- that was the approval

22   process for that search warrant.

23   Q      So as of November 28th, 2017, you had an approved

24   search warrant affidavit ready to submit to a judge for that

25   LG cell phone found in the car, correct?
```

**A**    That's correct, yes, sir.

**Q**    What did you do at that point?

**A**    We continued on with the investigation.  "We" as in the sheriff's office.

**Q**    What did you do?

**A**    What did I do?

**Q**    Did you take that affidavit to the judge on the 28th?

**A**    No, sir.  No, sir, I did not.

**Q**    Did you take it on the 29th?

**A**    No, sir, I did not.

**Q**    All right.  So with respect to that LG cell phone, after you got the warrant approved on the 28th, what happened to it or what did you do next?

**A**    The search warrant that was approved was printed out and put into my case file.  It was then laid aside.  We got additional information on a bank bag that was recovered from a neighborhood near the Wells Fargo bank.  But it was determined that it was from several months previous.  It was not associated with the robbery that we could determine.

         And the search warrant for the LG phone was not submitted to the judge.

**Q**    Why not?

**A**    I overlooked it.

**Q**    Walk us through what has to happen -- once you do get a search warrant approved for a phone, do you then just

75

1  yourself, the detective, power the phone on and start

2  digging through it and looking for whatever you can?

3  **A**    No, sir.

4  **Q**    So how does it actually work once you do have approval

5  to search a phone?

6  **A**    The cell phone is pulled out of evidence by a person

7  who's trained to forensically examine the cell phone, and

8  then that examination is done through a Cellebrite process.

9  **Q**    Is Cellebrite a software program?  A machine?  What is

10  Cellebrite?

11  **A**    It is.  It's a software process that requires a special

12  machine that's owned by this company.  And we purchase it

13  from them, the sheriff's office purchases it from them.

14  **Q**    Are you one of those people who is trained as a

15  forensic examiner and can examine a phone yourself?

16  **A**    No, sir, I am not.

17  **Q**    Are you able to operate a Cellebrite machine?

18  **A**    No, sir, I'm not.

19  **Q**    So once you do -- in another situation, once you get a

20  warrant approved by a judge, are you the person who pulls

21  the phone out of evidence?

22  **A**    No, sir.

23  **Q**    So how do you tell the forensic examiner, "Hey, we're

24  good to go, go ahead and pull this phone out and start

25  looking at it"?

1   **A**    Normally what would happen is I would tell him that --

2   or her that the phone is ready to be examined.  And they

3   would go to property evidence.  They would retrieve it and

4   do the examination.

5   **Q**    Just tell them verbally or is there a system you enter

6   that information in, like "phone number X," whatever, "is

7   approved for search"?

8   **A**    I just tell them verbally.

9   **Q**    In this case, after you have the warrant approved on

10  the 28th, did you then tell a forensic examiner in your

11  office at some point, "Hey, this LG cell phone is ready to

12  be searched"?

13  **A**    No, sir, I did not.

14  **Q**    Was that LG cell phone searched at some point?

15  **A**    It was, yes, sir.

16  **Q**    Okay.  When was it searched?

17  **A**    It was searched on January 2nd.

18  **Q**    Did you, on -- at some point prior to January 2nd --

19  well, first of all, who searched on January 2nd?  Who did

20  that?

21  **A**    I pulled it out of property evidence that day and

22  provided it to my sergeant.

23  **Q**    And who is that?

24  **A**    Sergeant William Power.

25  **Q**    Is William Power one of the people who was authorized

1    or trained to do a Cellebrite extraction?

2    **A**    Yes, sir, he is.

3    **Q**    So on January 2nd, why that day?  Why on that day did

4    you go and pull the phone out of the evidence and give it to

5    then-Sergeant Power?

6    **A**    I was asked what the results of the search of the cell

7    phone had been.  And I did not have the results.  And I

8    inquired about the phone and found that it had not been

9    searched.

10   **Q**    So who inquired about the results of the phone being

11   searched?

12   **A**    Detective Dan Toner.

13   **Q**    And were you -- how were you working with Detective

14   Toner?

15   **A**    Detective Toner is employed by the Pasco Sheriff's

16   Office, but he's assigned to an FBI task force, and he had

17   been assisting in this case.

18   **Q**    So when Detective Toner contacted you -- and, by the

19   way, do you remember when that was, when he contacted you?

20   **A**    Throughout the investigation.  But it would have been

21   on January 2nd.

22   **Q**    So on January 2nd Detective Toner reaches out and says,

23   "Hey, what did you find in the cell phone?"  You checked the

24   system, "I don't see results of a cell phone in here."  And

25   so you then went to pull it and gave it to Sergeant Power.

1  All correct?

2  **A**    That's correct.

3  **Q**    At some point in what I just described did you -- at

4  that point, but when you submitted to Sergeant Power, did

5  you realize, "Hey, I never got this search warrant signed"?

6  **A**    No, sir, I did not.

7  **Q**    Did you believe it had been signed?

8  **A**    Yes, sir, I did.

9  **Q**    Why did you believe it had been signed?

10  **A**    Because that would have been my normal practice to do

11  that.  And it was not followed in this case.

12  **Q**    So between November 28th and January 2nd, did you have

13  any -- did you do anything with that cell phone?

14  **A**    No, sir.

15  **Q**    Were you working on other cases at that time?

16  **A**    Yes, sir.

17  **Q**    Were you on vacation at all in that time?

18  **A**    Yes, sir.

19  **Q**    What days were you out of the office between

20  November 28th, 2017, and January 2nd, 2017?  If you can't

21  tell us the exact dates, the approximate number of days

22  would be sufficient.

23  **A**    I was on vacation on the 29th and 30th of November.  I

24  was in training from December 4th to December 14th.

25  **Q**    What kind of training?

79

1    **A**    Homicide training in Jacksonville.

2    **Q**    Were you in Jacksonville for the entirety of that 10

3    days?

4    **A**    Yes, sir.  I was off on December 21st.  The office was

5    closed on December 25th and 26th.  And then on January 2nd,

6    again, the phone was checked out.

7    **Q**    When you were out of the office in training from

8    January 4th -- I'm sorry, from December 4th through 14th,

9    could another detective have taken your warrant to be signed

10   by the judge?

11   **A**    Normally, no, sir.

12   **Q**    Why do you say "normally no"?

13   **A**    The judge would require the affiant for the search

14   warrant to swear to the contents of it in his presence or

15   her presence.

16   **Q**    What about on days when the office is closed?  On those

17   days, would be you able to take the affidavit in to the

18   judge?

19   **A**    I would, yes, sir.  The judge wouldn't be in the

20   office, but he would -- there would be an on-call judge that

21   we could take it to.  But that would not be a normal

22   practice.

23   **Q**    So is it fair to say that -- well, strike that.

24         You said you were also working on other cases between

25   November 28th and January 2nd?

**A**     Yes, sir.

**Q**     How many other cases were you working on?

**A**     My normal caseload is between 15 and 20 cases.

**Q**     Did you have a normal caseload at that time or was it greater or less than usual?

**A**     It was a normal caseload.

**Q**     With that normal caseload, what kind of hours are you working?

**A**     Normally, my workday is 10 to 12 hours day.

**Q**     Was it that at this time, from November 28th to January 2nd?

**A**     Yes, sir.

**Q**     Did anything particularly time intensive or work intensive come up for you during that time span?

**A**     During this time span, I was assigned to three active homicide investigations.  Two were in the process of being closed out with arrests, but one remained open.

I also had a sexual battery of a child where the suspect was out of state, and we were actively looking for him.

**Q**     The three homicides, were you the lead detective on those or working with others?

**A**     No, sir, I was the lead.

**Q**     Even though you were in training on -- for homicide cases between December 4th and 14th?

1    **A**    Yes, sir.

2    **Q**    So when Detective Toner contacted you on January 2nd,

3    that day you retrieved the phone and delivered it to

4    Sergeant Power?

5    **A**    That's correct.

6    **Q**    Has Sergeant Power since been promoted to lieutenant?

7    **A**    Yes, sir, that's correct.

8    **Q**    So then-Sergeant Power.  What happened after you

9    delivered it to Sergeant Power?

10    **A**    Sergeant Power completed the cell phone examination and

11    provided me with the results of that examination.

12    **Q**    Did you look through the results?

13    **A**    Briefly, yes, sir.

14    **Q**    When you say "briefly," what does that mean?

15    **A**    I looked through them.  I scanned through them.  I

16    looked at some Google searches that had been made.  I looked

17    at some images from the phone.  That was about the extent of

18    my involvement with the extracted information.

19    **Q**    And during that brief search, as you described it, did

20    you come across evidence that would tend to incriminate this

21    defendant, Rashid Turner?

22    **A**    I did find information on the phone.  At the time, I

23    did not know that it belonged to Mr. Turner.  I found

24    information concerning bank robberies, including a bank

25    robbery that had recently occurred in Hernando County.

82

1    Q    Meaning the Wells Fargo one or a different one?

2    A    A different one.

3         I found information concerning -- showing pictures or

4    map searches of different stores located in the Fort Myers

5    area.  I found a newspaper article that was searched.  If I

6    can look at my ...

7    Q    Unnecessary.

8    A    Okay.

9    Q    Detective, though, did you search for or come across

10   user attribution or user identification information that

11   would show who -- even though you found these Google

12   searches and photographs, did you also find things that

13   would tend to identify who that phone user was during your

14   search?

15   A    I believe that there was information, but I don't

16   recall what specific information was on that extraction that

17   showed the ownership of the phone.

18   Q    Okay.  So once you received the extraction, briefly

19   reviewed it, what did you do next?

20   A    The extraction was provided to Detective Toner, and

21   also other members of the task force that was working on

22   this case, as well as other bank robberies that had

23   occurred.

24   Q    At some point did you realize that you had not actually

25   gotten the search warrant that you wrote signed?

83

**A**     Yes, sir, I did.

**Q**     When did you realize that?

**A**     January 8th.

**Q**     What happened on January 8th that brought that to your attention?

**A**     Detective Toner contacted me and asked for a copy of the search warrant.

**Q**     So what happened then?

**A**     I searched for it.  I searched for the search warrant. I could not find it anywhere in my case file, anywhere in the files pertaining to this case, and realized that I had made a mistake.

**Q**     What did you do then?

**A**     I contacted my supervisors.  I told them what I had done.  And I immediately took the search warrant, with a paragraph added to it concerning the error that I had made, and presented it to a judge.

**Q**     When you presented that search warrant, the revised search warrant to the judge, which judge was that?

**A**     It was a Judge Kristie Ruppe.

**Q**     And did Judge Ruppe approve your search warrant?

**A**     Yes, sir.

**Q**     Before approving it, did she engage you in any conversation about the unlawful search you had done?

**A**     Yes, sir.

1    **Q**      And tell us about that conversation.

2    **A**      She questioned me about the search.

3             **MR. MADDUX:**  Objection.  Hearsay.

4             **THE COURT:**  Overruled.

5             **THE WITNESS:**  She questioned me about the search.

6    She questioned me why it had been done without the search

7    warrant being signed, if the new search warrant that had

8    been presented to her had included any information that had

9    been derived from the search of the cell phone, and it had

10   not.

11   **BY MR. GORDON:**

12   **Q**      And is that what you told Judge Ruppe?

13   **A**      Yes, sir, it is.

14   **Q**      Was Judge Ruppe satisfied with that representation by

15   you?

16   **A**      She was.

17   **Q**      Do you have any familiarity with Judge Ruppe's

18   background?

19   **A**      Yes, sir, I do.

20   **Q**      And what is that?

21   **A**      Judge Ruppe was a defense attorney in Brooksville for

22   several years before she was elected to the judgeship.

23   **Q**      Detective, I've just handed you what's premarked for

24   identification as Government's Exhibit 4.  Do you recognize

25   Government's Exhibit 4?

**A**      Yes, sir, I do.

**Q**      And what do you recognize it to be?

**A**      This is the signed search warrant for the LG cell phone, along with an inventory and return to that search warrant.

**Q**      Is this the same warrant that you submitted to Judge Ruppe?

**A**      Yes, sir, it is.

**Q**      Is this the first draft of the warrant or the second draft of the warrant, the one that you submitted on January 10th you said?  In other words, does this warrant contain the paragraph you referenced where you note the prior unlawful search?

**A**      It is, yes, sir.

**Q**      Can you direct us to where that paragraph appears?

**A**      It is identified as page 8 of 9, page ID 374, second paragraph beginning with "It should be noted."

**Q**      Can you read that for us, please.

**A**      It states:  "It should be noted that an extraction was performed on the LG cell phone on January 3rd, 2018.  This extraction was completed with the misunderstanding that a warrant for the phone had already been reviewed and signed."

**Q**      Did Judge Ruppe engage you in any further conversation about the contents of your affidavit?

**A**      No, sir.

1    **Q**    Did she ask you for clarifications about any of the

2    sentences or passages in it?

3    **A**    Only the content that we already spoke about, the

4    original failure to get it signed.

5    **Q**    Did she ask for additional information in any way?

6    **A**    No, sir, not that I recall.

7    **Q**    In other words, did you provide any, essentially,

8    verbal supplement to this written affidavit?  Was there any

9    probable cause that you provided orally as opposed to what

10   you wrote here?

11   **A**    No, sir.

12   **Q**    Did Judge Ruppe express any hesitation or

13   dissatisfaction with this affidavit?

14   **A**    No, sir, not with the affidavit.

15   **Q**    Did Judge Ruppe do anything to give you an impression

16   that you could not rely on this search warrant to then go

17   and lawfully search the phone?

18   **A**    No, sir.

19   **Q**    After you received this signed affidavit from Judge

20   Ruppe, what did you do next -- not signed affidavit, the

21   signed warrant from Judge Ruppe, what did you do next?

22   **A**    It was presented to Detective Toner and passed along to

23   him to include that paragraph stating my error.

24   **Q**    During the time that this LG cell phone was in Hernando

25   County's custody, did anybody contact Hernando County at any

1   time and inquire about the phone?

2   **A**   No, sir.

3   **Q**   Did anybody claim ownership of it or possession of it?

4   **A**   No, sir.

5   **Q**   Anybody attempt to retrieve it?

6   **A**   No, sir.

7   **Q**   Any detective express an interest in it related to some

8   other case?

9   **A**   No, sir.

10  **Q**   Did the defendant, Rashid Turner, contact the Hernando

11  County Sheriff's Office in any capacity?

12  **A**   No, sir.

13  **Q**   Did he appear in the Hernando County Sheriff's Office

14  personally?

15  **A**   No, sir.

16          **MR. GORDON:**  One moment, please, Your Honor.

17          **THE COURT:**  All right.  Thank you.

18          (Court was at ease.)

19          **MR. GORDON:**  I'll pass the witness, Your Honor.

20          **THE COURT:**  All right.  Cross-examination, please.

21                       <u>**CROSS-EXAMINATION**</u>

22  BY MR. MADDUX:

23  **Q**   Good afternoon, Detective.

24  **A**   Good afternoon, sir.

25  **Q**   Dealing with those last few questions you were asked,

1    did you-all post anything at the Hernando County Sheriff's

2    Office about a lost cell phone?

3    **A**    No, sir.

4    **Q**    Okay.  And just to be clear, your policies are that the

5    extractor will go get the phone, correct?

6    **A**    Yes, sir.

7    **Q**    All right.  And in this case, however, you were the one

8    that actually brought the phone to the extractor, correct?

9    **A**    That's correct.

10   **Q**    So you didn't follow your typical policies.  You

11   brought phone over to Lieutenant Power, correct?

12   **A**    Yes, sir.

13   **Q**    Okay.  And you did that because you were getting phone

14   calls from Detective Toner at Pasco wanting the contents of

15   the phone, correct?

16   **A**    That's part of the reason, yes, sir.

17   **Q**    And you were also getting calls and contact from

18   Special Agent Bush to give up the contents because they

19   wanted to proceed with their joint task force investigation,

20   correct?

21   **A**    I don't believe at this point I had ever received a

22   call from Special Agent Bush.

23   **Q**    On January 2nd, 2018, you're aware that Detective Toner

24   is on the FBI Special Investigation Task Force, correct?

25   **A**    That's correct, yes, sir.

1    Q    And so he's telling you he wants the contents, correct?

2    A    Yes, sir.

3    Q    And, in fact, on -- as soon as Power got done with the

4    extraction, he got the contents from the Cellebrite report,

5    correct, because you sent it to him?

6    A    Yes, sir.

7    Q    And that was well before Judge Ruppe was ever involved,

8    correct?

9    A    Yes, sir.

10   Q    And you can't testify to what he did with those

11   investigative leads, can you?

12   A    No, sir.

13   Q    Okay.  And it included important information, just in

14   your cursory review, towards helping resolve armed robbery

15   inquisitions done by your agency, correct?

16   A    Yes, sir.

17   Q    Now, let's talk about Exhibit 4.  Exhibit 4 is the

18   actual affidavit, correct?

19   A    Yes, sir.

20   Q    All right.  You got a copy?  Okay.  You can go ahead

21   and -- I got a copy too.  So if you want to take a look at

22   that while we're talking, okay?  First, let's look at the

23   top page.  Which the top page of Exhibit 4 is actually an

24   inventory and return, correct?

25   A    Yes, sir.

1   **Q**    Okay.  It says:  "Received the search warrant on the

2   10th day of January 2018," correct?

3   **A**    Yes, sir.

4   **Q**    Okay.  And meaning what, you received it?

5   **A**    That's when the warrant was received, yes, sir.

6   **Q**    Okay.  And then you executed it.  When does it say it

7   was executed?

8   **A**    On January 3rd.

9   **Q**    Okay.  Is that an error?

10  **A**    No, sir.  That's ... that is the correct dates.

11  **Q**    It is incorrect or correct?

12  **A**    That's correct.

13  **Q**    Okay.  So what happened on January the 3rd?

14  **A**    The search was completed on the LG cell phone, and

15  the --

16           **THE COURT:**  Mr. Gordon, do I have copies of these

17  exhibits?  I'm sorry.

18           **MR. GORDON:**  Yes, Your Honor.  I may have

19  neglected to bring the Court its copy of the search warrant.

20  I'll do so now.

21           **THE COURT:**  All right.  Sorry.  Go ahead.

22  **BY MR. MADDUX:**

23  **Q**    So is your testimony that you gave the phone to

24  Sergeant Power on the 2nd, and he did the search on the 3rd?

25  **A**    The search was completed on the 3rd, yes, sir.

1    Q    And then even after you went and saw Judge Ruppe, you

2    said that the inventory and return applied to a search done

3    on January the 3rd, correct?

4    A    That's correct.

5    Q    So that means that Sergeant Power didn't go back and

6    search the phone after he had a warrant, the phone search

7    that you relied on for all the evidence in this case was

8    conducted before you ever had a warrant, and you never redid

9    the search, correct?

10   A    That's correct.

11   Q    Then let's look at the last page of -- or, sorry, let's

12   look at page 3 of 3.  I'm looking at the bottom of the

13   exhibit.  You see that's the page where Judge Ruppe signed

14   off on the actual warrant?

15   A    Yes, sir.

16   Q    That's Judge Ruppe's writing, right?  It says, "10th

17   day of January 2018."  She had to strike that out, correct?

18   A    She had to strike out the 5th day of March 2017 and

19   write in the 10th day of January 2018.

20   Q    So the 5th day of March has nothing to do with this

21   case, correct?

22   A    That's correct.

23   Q    But it was in your warrant, true?

24   A    Yes, sir.

25   Q    And then you talked about conversations that you had

1   with the judge?  This is not the first time you've been to

2   see the judge, correct?

3   **A**    No, sir, it was not.

4   **Q**    So she's somebody that you come in and you present

5   these warrants to, you agree, correct?

6   **A**    Yes, sir.

7   **Q**    And you are testifying that you tried to be transparent

8   with her, correct?

9   **A**    Yes, sir.

10  **Q**    Okay.  Let's look at the page 8 of 9 that you

11  previously identified where you talked about the one

12  paragraph of sentences.  Do you see that?

13  **A**    Yes, sir.

14  **Q**    Where it says:  "It should be noted that an extraction

15  was performed on the LG cell phone on January 3rd, 2018,"

16  correct?

17  **A**    Yes, sir.

18  **Q**    "And this extraction was completed with the

19  misunderstanding that a warrant for the phone had already

20  been reviewed and signed," correct?

21  **A**    Yes, sir.

22  **Q**    You didn't tell Judge Ruppe that you had already given

23  the contents to one of the lead investigators in the entire

24  robbery scheme, Detective Toner, and that he had all the

25  information and was somebody who was not before the judge;

```
1    isn't that correct?

2    A    Sir, I don't believe that this information was given to

3    Judge Toner -- I'm sorry, Detective Toner at the time that

4    it was extracted.

5    Q    Well, I believe you already testified that you had

6    given it to him.

7    A    But not on the day that it was extracted.

8    Q    So is it your testimony that you did not give the

9    information to anyone prior to Judge Ruppe signing the

10   warrant?

11   A    That's correct, yes, sir.  I'm sorry.  One second.

12        That's incorrect.  I'm sorry.  I did give the

13   information to Detective Toner on January the 8th of 2018.

14   Q    Thank you for correcting that.

15   A    Yes, sir.

16   Q    You had a chance to look at your report?

17   A    Yes, sir.

18   Q    It's a lot of dates, right?

19   A    Yes, sir, it is.

20   Q    Okay.  And at that point you agree you can't control

21   what Detective Toner does with the information, correct?

22   A    That's correct.

23   Q    And at that point you wouldn't have thought to tell him

24   to control what he did with the information because, as

25   you've testified, you didn't know that it was a warrantless
```

1    search, correct?

2    **A**    That's correct.

3    **Q**    And back when this phone was originally seized on

4    November the 18th of 2017, you knew you needed a warrant for

5    that phone, correct?

6    **A**    Yes, sir.

7    **Q**    This wasn't the first time you had gotten a warrant for

8    a phone, correct?

9    **A**    No, sir, it's not.

10   **Q**    And, in fact, somebody like Sergeant Power would have

11   been able to get a warrant for the phone, true?

12   **A**    If he didn't realize that there was a warrant for it,

13   that's correct.

14   **Q**    And at the time that you provided the phone to him,

15   you're aware that Sergeant Power wrote a report that says:

16   "On January the 2nd, 2018, I was provided a locked LG cell

17   phone by Detective Breedlove who had obtained a search

18   warrant on the device to conduct a forensic examination."

19   That's what his report says, right?

20   **A**    That is correct.

21   **Q**    Okay.  So where does Sergeant Power get this idea that

22   he writes in his report that you had obtained a search

23   warrant when there is no search warrant?

24   **A**    Because he had previously approved of the search

25   warrant.  He was the sergeant that reviewed it.  He did not

1   see a signed copy of the warrant because there was not a

2   signed copy of the search warrant.

3   **Q**    And so what day is it that he would have presumed you

4   went down to get the warrant executed by any judge in

5   Hernando County?

6   **A**    It would have been immediately after it being approved

7   by my supervisors.

8   **Q**    And you said that the sergeant wasn't available but the

9   captain was.  And he reviewed it on what date?

10  **A**    No, sir.  I said that the sergeant approved it and then

11  the --

12  **Q**    The lieutenant wasn't available.

13  **A**    -- and then the captain approved it.

14  **Q**    On what day?

15  **A**    Approved it on November 28th.  I believe the sergeant

16  approved it on November 27th.

17  **Q**    And you're supposed to take warrants down as soon as

18  possible, correct?

19  **A**    That's correct.

20  **Q**    I mean, you had a warrant on the 20th for the vehicle,

21  correct?

22  **A**    Yes, sir.

23  **Q**    Okay.  And that was your work, right?

24  **A**    Yes, sir.

25  **Q**    And that is what got the phone out of the car, correct?

96

1    **A**    That's correct.

2    **Q**    And isn't it true that you didn't know who the cell

3    phone belonged to, correct?

4    **A**    That's correct.

5    **Q**    But you did put in your warrant on the top of page 8 of

6    9, the sentence:  "The LG cell phone was not claimed by

7    Addison but appeared to be in his possession during the

8    incident"?

9    **A**    Yes, sir.

10   **Q**    And you put that statement in front of Judge Ruppe

11   based on what, that it was on the driver's floorboard?

12   **A**    And he was the driver of the vehicle, yes, sir.

13   **Q**    Okay.  And you don't have any evidence to suggest that

14   if it was the phone of an occupant, some other person in the

15   car at some other time, that it wasn't lost, do you?

16   **A**    No, sir.

17   **Q**    And part of your investigation, you had discovered that

18   the phone -- strike that -- that the car was actually a

19   rental car, correct?

20   **A**    Yes, sir.

21   **Q**    Okay.  And you had contacted somebody named

22   Mr. Colombia (ph) at Hertz, correct?

23   **A**    Yes, sir.

24   **Q**    So you knew that that phone could have been a phone

25   that didn't have anything to do with Mr. Addison, correct?

**A**    It's possible, yes, sir.

**Q**    Now, you also said that -- you testified on direct that you never told the examiner it was supposed to be searched. Do you remember that?

**A**    No, sir, I don't remember saying that.  I'm sorry.

**Q**    Okay.  At the time that Detective Toner asked you about getting the contents of the phone, you would have checked your file, true?

**A**    For the contents, the extraction report.

**Q**    For the search warrant to determine that it hadn't been done, correct?

**A**    No, sir.  I would have -- when he asked for the extraction report, I would have checked my file for the extraction report.  Not finding that, and not finding it in the Cellebrite system, I assumed that it just had not been searched yet.

**Q**    Don't you load the search warrants in the computer so people can see them when they're assigned?

**A**    No, sir.

**Q**    So there's just a hard copy system?

**A**    Yes, sir.

**Q**    Okay.  Where's the hard copy kept?

**A**    In a case file.

**Q**    Okay.  So doesn't Sergeant Power go check all the case files before he searches any phones and does an extraction?

1    **A**    No, sir.

2    **Q**    So your agency allows the people who search the phones

3    to search them without having a copy of the warrant that

4    authorizes the very search they're going to do?

5    **A**    At the time, yes, sir, we did.

6    **Q**    And so just so we know, visually speaking -- and

7    actually, what happened, your office -- how far do you have

8    to go to get to Judge Ruppe's chambers?

9    **A**    It's about 3 miles.

10   **Q**    So you have to get in the car, correct?

11   **A**    Yes, sir.

12   **Q**    And then you have to go to her office, correct?

13   **A**    Yes, sir.

14   **Q**    And you have to clear the time with her judicial

15   assistant, correct?

16   **A**    If she's in, then we're allowed in to see her.

17   **Q**    Okay.  And so you have to drive to the courthouse, go

18   up, make a -- do you try to coordinate the visit?

19   **A**    No, sir.

20   **Q**    So you just walk up to the judge and ask to have a

21   warrant signed and hopefully they're not on the bench?

22   **A**    If it's the duty judge, yes, sir.

23   **Q**    Was Judge Ruppe the duty judge?

24   **A**    Yes, sir, she was.

25   **Q**    So you picked the duty judge because -- what time was

1    the warrant signed off on by her?

2    **A**    I don't know the time, sir.  I'm sorry.

3    **Q**    Okay.  Well, did you pick Judge Ruppe because you know

4    Judge Ruppe or did you pick Judge Ruppe because she's the

5    judge available on that day?

6    **A**    I picked Judge Ruppe because she's the duty judge.

7    **Q**    And so the duty judge, you had to go knock and go to

8    her office, correct?

9    **A**    That's correct.

10   **Q**    And your testimony today is that you forgot that you

11   never went in your car, for 3 miles, to Judge Ruppe's office

12   and got her to review the warrant and answered questions

13   about it and sign it, and then take it and put it back in

14   your file with the judge's signature before you said,

15   "Search the phone, Sergeant Power"?

16   **A**    That's correct, yes, sir.

17   **Q**    You said you were working three homicides?

18   **A**    That's correct.

19   **Q**    Okay.  And two of them were just pending arrest,

20   correct?

21   **A**    Two of them were in the process of being closed out

22   after the arrest.

23   **Q**    Okay.  So that basically means that you're just doing

24   non-essential paperwork or not-emergency paperwork at that

25   point because the suspect is in custody, correct?

1    **A**    That's correct.

2    **Q**    Okay.  And the other one is an active homicide

3    investigation.  What's the name?

4    **A**    The name of the victim is Patterson.

5    **Q**    Patterson?

6    **A**    Yes, sir.

7    **Q**    And then you also were doing some cases involving sex

8    offenders and you mentioned one case, correct?

9    **A**    Yes, sir.

10   **Q**    Okay.  And isn't it true that most of your files around

11   the end of 2017 were right about to close as they concerned

12   sex offenders?

13   **A**    This particular case, the case did not close until the

14   beginning of January.

15   **Q**    And what's the name of that?

16   **A**    That suspect's name was Dwaine Smith, D-W-A-I-N-E.

17          **MR. MADDUX:**  If I could just have one second,

18   Your Honor.

19          **THE COURT:**  All right.

20          (Court was at ease.)

21   **BY MR. MADDUX:**

22   **Q**    And, sir, part of your investigation on the rental

23   situation is you know that the car was rented by somebody

24   other than Mr. Petrie -- Addison, Petrie, correct?

25   **A**    That's correct, yes, sir.

1   Q    And are you sure that you don't have some record in

2   front of you where Special Agent Bush obtained a copy of the

3   Cellebrite phone extractions from you on January the 8th,

4   2018?

5   A    That's when it was given to Detective Toner and

6   provided to the FBI.

7   Q    Okay.  So it's likely she did get a copy that day?

8   A    Exactly, yes, sir.

9        **MR. MADDUX:**  Okay.  Nothing further.

10       **THE COURT:**  Redirect?

11       **MR. GORDON:**  Your Honor, first, I believe I didn't

12  do it already, so although I identified it, I'd like to

13  enter Government's 4 into evidence.  So at this time

14  submitting Government's four.

15       **THE COURT:**  Admitted.  Thank you.

16       (Government's Exhibit 4 received in evidence.)

17                    **REDIRECT EXAMINATION**

18  **BY MR. GORDON:**

19  Q    Detective Breedlove, as Mr. Maddux pointed out to you,

20  the first page of Government's Exhibit 4 is the search

21  warrant return, correct?

22  A    That's correct, yes, sir.

23  Q    What's the process for doing a search warrant return?

24  A    It is completed at the time that the search warrant is

25  served.

1    **Q**    And in this case "served" meant the day you're

2    essentially serving it on the phone, right?  Because it's

3    not a person that you're serving it on?

4    **A**    Correct.

5    **Q**    So that was January 10th?

6    **A**    That's correct.

7    **Q**    Now, once you fill out the search warrant return, what

8    do you do with it?

9    **A**    It's attached to the warrant, and it's entered into

10   records.  The warrant and -- I'm sorry, the originals are

11   returned to the Clerk of Court's office.  Copies are placed

12   into records.

13   **Q**    And is a copy sent to the judge's chambers?

14   **A**    No, sir.

15   **Q**    Once it goes into court records, what happens to it?

16   **A**    It's made available to the judge at the time of trial,

17   made available to the prosecutors and the defense at the

18   time of the arrest.

19   **Q**    After you do the return, does anybody review it?

20   **A**    No, sir.

21   **Q**    If the case -- in other words, if the case doesn't go

22   to trial, does anybody review the return?

23   **A**    Before going to trial, no, sir.

24        **MR. GORDON:**  Thank you.  Nothing further,

25   Your Honor.

1          **THE COURT:**  All right.  Call that next witness,

2    please.

3          **MR. GORDON:**  United States calls Lieutenant

4    William Power.

5          **THE COURTROOM DEPUTY:**  Please raise your right

6    hand.

7                    **LIEUTENANT WILLIAM POWER**

8    was called as a witness and, having first been duly sworn,

9    testified as follows:

10          **THE WITNESS:**  Yes, ma'am.

11          **THE COURTROOM DEPUTY:**  Please state and spell your

12    first and last name for the record.

13          **THE WITNESS:**  William Power, W-I-L-L-I-A-M,

14    P-O-W-E-R.

15          **THE COURTROOM DEPUTY:**  Thank you.  Please take a

16    seat in the witness box.

17          **THE WITNESS:**  Yes, ma'am.

18          **THE COURT:**  Yes.  Please.

19                    **DIRECT EXAMINATION**

20    **BY MR. GORDON:**

21    **Q**    Good afternoon, Lieutenant.

22    **A**    Good afternoon.

23    **Q**    Sir, are you employed?

24    **A**    Yes, sir.

25    **Q**    And by whom are you employed?

**A**     Hernando County Sheriff's Office.

**Q**     And what's your position there?

**A**     Currently, I'm a lieutenant in charge of Major Case.

**Q**     And back in November of 2017 and December and January of -- December -- from November 2017 to January 2018, were you still working at the Hernando County Sheriff's Office then?

**A**     Yes, sir.

**Q**     Did you have the same job then that you have now?

**A**     I was the sergeant in that unit at that time, sir.

**Q**     Is that one level below the lieutenant position you're at now?

**A**     Yes, sir.

**Q**     All right.  So referring to that period, November to January, were you supervising any other officers at that time?

**A**     Yes, sir, I was.

**Q**     And who were you supervising?

**A**     I was supervising the Crimes-Against-Persons unit.

**Q**     And is Detective Tommy Breedlove a member of that unit?

**A**     Yes, sir, he is.

**Q**     Now, in addition to being a supervisor of other detectives or officers, did you have any additional responsibilities at the Hernando County Sheriff's Office?

**A**     Yes, sir.  I was one of the Cellebrite certified

1    operators.

2    **Q**    How many Cellebrite certified operators are there in

3    the Hernando County Sheriff's Office?

4    **A**    At that time, sir, there was two.

5    **Q**    So all my questions are going to pertain --

6    **A**    Yes.

7    **Q**    -- to that time period, November 2017 through January

8    2018.  But thank you for that clarification.

9            So at that time there were two.  Were you one of

10   them?

11   **A**    Yes, sir.

12   **Q**    And who was the other one?

13   **A**    Detective Chris Vascellaro.

14   **Q**    Was there a division of labor between the two of you?

15   And, if so, how did you do it or did you both just work on

16   every kind of case?

17   **A**    We primarily just tried to help each other out.  He was

18   the primary operator, and I would take any overflow that

19   came up if he got busy or wasn't available.

20   **Q**    So given that that was the setup, how often did you

21   have to work as a Cellebrite operator in that sort of

22   overflow capacity?

23   **A**    During that time frame that you're referencing, about a

24   half-dozen times or so.

25   **Q**    Meaning a half a dozen searches or a half a dozen time

1    periods where Vascellaro got so busy that he needed you to

2    step in and do one phone or more than one phone?

3    **A**    During that time frame, about a half-dozen phones, sir.

4    **Q**    What does it take to be a Cellebrite operator?

5    **A**    I have the certification for the physical analyst.  So

6    there's different levels of certifications that you can

7    attend.  There's different tools also.  Cellebrite is just

8    one of the tools that we have.  For me, it was a -- I

9    believe it was a 4-day class that I took online -- it was

10   live instruction -- back in June of 2017.

11   **Q**    You said that Cellebrite is one of several tools that

12   the department has.  So, at that time, if a detective or an

13   officer wanted a, for example, cell phone searched, were

14   there other ways to do that?

15   **A**    We had one other tool at the time.  I was not trained

16   on that one.  That also was Detective Vascellaro.  It was a

17   completely different system.

18   **Q**    Was anybody other than Detective Vascellaro and

19   yourself able to search a cell phone by any tool?

20   **A**    No, sir.

21   **Q**    If a detective wanted to just sort of forego the

22   machine searching and just essentially open up a phone and

23   start looking through it, could they do that?

24   **A**    In some instances you could.

25   **Q**    And what instances would those be?

1    **A**    If the phone isn't password protected, or if you have

2    the password for the phone, you could open up a phone and

3    look through it.

4    **Q**    So does Cellebrite allow you to break a

5    password-protected phone, break into a password-protected

6    phone?

7    **A**    It supports some instances to bypass passwords, yes,

8    sir.

9    **Q**    But not all instances?

10   **A**    Correct.

11   **Q**    Like, when can you not?

12   **A**    It's based on the particular type of phone.  So there's

13   many models of phones.  There's many different manufacturers

14   of phones.  There's many different operating systems on a

15   phone.  And they try their best to keep up with as many as

16   they can.  But that's why it's recommended in forensics to

17   have multiple tools because some may bypass something that

18   another one couldn't get past.

19   **Q**    Now, did you become involved in a case ultimately

20   involving this defendant, Rashid Turner, at the time of

21   November 18th, 2017, involving a bank robbery at a Wells

22   Fargo in Spring Hill?

23   **A**    I became involved in that case later, yes, sir.

24   **Q**    So can you explain the sort of -- how you became

25   involved and when you became involved in that case?

1   **A**     Yes, sir.  So in this particular case, while it was

2   occurring, I was not on duty.  I was on vacation.

3   **Q**     You say "it was occurring."  What's the "it"?

4   **A**     The bank robbery that you're referring to, sir.

5   **Q**     So on November 18th, 2017, you were on vacation?

6   **A**     From the 17th of November to the 27th of November, yes,

7   sir, I was on vacation.

8           So in this particular case there was two instances that

9   I had something to do with it.  On January 2nd of 2018, I

10  was provided an LG cell phone that I conducted a forensic

11  examination of.  And, also, November 27th I was provided an

12  iPhone that I conducted a physical -- I'm sorry, a forensic

13  examination on.

14  **Q**     All right.  So sticking with just the LG phone.

15  **A**     Yes, sir.

16  **Q**     Was January 2nd your first involvement with that phone?

17  **A**     Yes, sir.

18  **Q**     What did you know about -- first of all, how did you

19  become involved with that phone?

20  **A**     So I was briefed upon my return about the phone that

21  was located inside of the assumed defendant's vehicle.  The

22  vehicle was towed back to our office on the 18th after the

23  incident.  And Detective Breedlove had obtained a search

24  warrant on the vehicle to recover any evidence from the

25  vehicle.

1    On the 20th of -- I'm sorry -- November, he executed

2  the search warrant.  I'm sorry, the 21st he executed the

3  search warrant.  So he provided that phone, the LG, to me on

4  January 2nd.  So I was aware of this incident, aware of his

5  follow-up investigation.  When he gave me the phone, I was

6  able to do what's called a lock bypass on the device.

7  **Q**    Before we get to your actions, let's first stick with

8  just when Detective Breedlove delivered the phone to you.

9  **A**    Yes.

10  **Q**    Was that unusual for a detective to bring you a phone

11  as opposed to you getting it yourself?

12  **A**    No, sir, not unusual.

13  **Q**    Why not?  Was it -- well, was that common practice for

14  a detective to hand you the phone?

15  **A**    Yes, sir.

16  **Q**    When Detective Breedlove gave you the phone, did he

17  tell you about the phone's accessibility or its status or

18  any warrants that were associated with it?

19  **A**    No, sir.  He wouldn't -- there's no information about

20  the phone, per se, given to me by him.  But it was

21  understood that he had a search warrant for the phone.

22  **Q**    Had you previously been involved in reviewing a search

23  warrant that Detective Breedlove had drafted?

24  **A**    Yes, sir.

25  **Q**    And did you approve that search warrant?

1    **A**    Yes, sir.

2    **Q**    And that was for the same LG phone?

3    **A**    Yes, sir.

4    **Q**    Was it your impression that that search warrant had

5    been judicially authorized by the time the phone was given

6    to you by Detective Breedlove?

7    **A**    Yes, sir.

8    **Q**    Once Detective Breedlove gave you the phone, what did

9    you do with it?

10   **A**    Okay.  So the phone was locked.  I put it inside of our

11   Faraday cage.  I was able to do a lock bypass utilizing

12   Cellebrite and was able to get a full physical extraction,

13   .ini and a file system extraction.

14   **Q**    What did you do with that extraction data once you

15   acquired it?

16   **A**    I generated a report, and those items, along with the

17   phone, were turned back over to Detective Breedlove.

18   **Q**    Including data files with all the stuff that was on the

19   phone, correct?

20   **A**    Correct.  Yes, sir.

21   **Q**    What's the next step, next event, that you have

22   knowledge of or that you were involved with regarding that

23   phone after you did the Cellebrite search on it?

24   **A**    So on that phone, at some point I was notified by

25   Detective Breedlove that he had made an error and did not

1   have the search warrant signed.  It was discussed between

2   him and I that he should go up and still present to the

3   judge and explain what happened and just report back to me

4   on what actions the judge took.

5   **Q**   And did that happen as you instructed Detective

6   Breedlove to do?  Did he go to the judge like you asked?

7   **A**   Yes, sir.

8   **Q**   When Detective Breedlove came back from the judge, what

9   did he tell you?

10  **A**   I believe that the search warrant was signed, sir.

11  **Q**   Did you then do a second search, a second Cellebrite

12  extraction, of the LG phone?

13  **A**   No, sir.

14  **Q**   Why not?

15  **A**   Everything that I could have got out of the phone was

16  already obtained at that point.

17  **Q**   So practically, was there any reason to do a second

18  search?

19  **A**   No, sir.

20  **Q**   And between November 28th and January 2nd, did you do

21  any other cell phone extractions during that stretch of

22  time?

23  **A**   I'm sorry.  What were the dates, sir?

24  **Q**   November 28th, the date that the search warrant was

25  authorized by the chain of command.

1    **A**    Yes, sir.

2    **Q**    And January 2nd, the day that you actually searched it.

3    Between those two dates, did you do any other Cellebrite

4    extractions?

5    **A**    The 27th was the day previous that I did one, sir.  But

6    I don't believe so, in that time frame.

7    **Q**    The 27th was the iPhone for this case?

8    **A**    Yes, sir.

9    **Q**    How about outside of this case, did you do any cell

10   phone extractions during that time?

11   **A**    I don't recall doing any, sir.

12   **Q**    Was Detective Vascellaro available on January 2nd?

13   **A**    Vascellaro was off between the 4th and the 6th.  There

14   was -- there was a multitude of vacations and trainings that

15   were going on, plus a couple of high-profile cases that we

16   were working.  So it was just probably a matter of timing

17   that we weren't able to get that phone done quicker, sir.

18   **Q**    So can you explain to the Court your workload or what

19   you were doing between November 28th, 2017, and January 2nd,

20   2018?

21   **A**    Yes, sir.  For 2017, we had a fairly high number --

22   especially toward the end of the year, September on -- of

23   pretty violent crimes.  During the month of September, we

24   had an officer-involved shooting where three of my

25   detectives were involved.  They were out approximately three

1   weeks, which pushed a lot of normal activities back.

2   **Q**    When that happens, an officer-involved shooting, and

3   police officers are the victims --

4   **A**    Yes, sir.

5   **Q**    -- does that become the top-priority case?

6   **A**    It does.

7   **Q**    Did that become the top-priority case here?

8   **A**    Yes.  And there was another one after the first one.

9   **Q**    Before we get to that -- so the first one, so an armed

10  robbery case, and even a bank robbery case --

11  **A**    Correct.

12  **Q**    -- does that, by your policies and practices, get

13  pushed lower in the queue of workload?

14  **A**    Yes, sir.

15  **Q**    And you said there was a second officer-involved

16  shooting around the same time?

17  **A**    Yes, with myself and another CAPS detective that was

18  involved in a large capital sex battery case.

19  **Q**    Were there any cell phone extractions required with

20  respect to those cases?

21  **A**    Those two, I had recuse myself from anything to do with

22  because I was directly involved in both of those.

23  **Q**    Directly involved how?

24  **A**    The first one, I was on scene during the shooting, so I

25  became a witness.  The second one, I was an involved

1    shooter.

2    **Q**    Now, so this -- well, and a witness as well, correct?

3    **A**    Yes.

4    **Q**    Now, were there any other cases that pushed this one

5    down the queue during that time?

6    **A**    Yes, sir.  So we had a -- in October we had a very

7    lengthy homicide involving a sex predator that ended up

8    killing another sexual predator that Detective Breedlove was

9    primary on.  This case took a couple of months to develop.

10   **Q**    Did that case, the sexual predator case, take

11   precedence over this armed robbery case?

12   **A**    Any homicide will, sir, yes.

13   **Q**    Are you in charge, or were you in charge then, of

14   prioritizing Detective Breedlove's work?

15   **A**    Yes, sir.

16   **Q**    Did you instruct him to prioritize that homicide over

17   this armed robbery?

18   **A**    We have a small unit of nine, Crimes-Against-Persons

19   unit.  And --

20   **Q**    Nine officers in that unit?

21   **A**    Yes, sir.  Everyone has to reprioritize when something

22   like this happens, sir.  There was a couple other ones, if

23   you'd like me to --

24   **Q**    Yes, please.

25   **A**    I'm sorry.  There was a homicide in mid-November -- it

was November 20th -- that Detective Vascellaro was the lead.

He's the other Cellebrite operator I mentioned.

Mid-November there was another homicide.  And in late

December we had an infant homicide that's still open.

**Q**    So how many total homicides did your nine-person unit

have to deal with between November 28th of 2017 and

January 2nd of 2018?

**A**    There was four active cases at that time.  One had

started in October.

**Q**    Is that an unusual number for a one-month period?

**A**    It is a little bit burdensome, yes, sir.

**Q**    When you say "a little bit burdensome," does that mean

a little bit more than average or are you being modest or

downplaying things?

**A**    I am being modest.  We've had a worse year than that,

but it was several years ago, and we had less

responsibilities then.  We weren't doing cell phone

forensics on top of everything else.

**Q**    So on a scale of zero to ten, where zero is the least

busy --

**A**    Yes.

**Q**    -- that your unit has ever been, and ten is the most

busy it's ever been, where does the month period between

November 28th, 2017, and January 2nd, 2018, fall on that

scale?

1   **A**    Easily an eight, sir.

2   **Q**    And how about for Detective Breedlove specifically?  In

3   your time supervising him, where does that month period

4   stack on the same kind of scale?

5   **A**    Detective Breedlove has had probably the most on his

6   plate.  He's also in charge of all of our county's sex

7   offenders.  So any time something happens with a sex

8   offender absconding or anything like that, he's the go-to

9   person for that.

10  **Q**    Did he have that same role over that period?

11  **A**    He's had it for many, many years.  Yes, sir.  And he

12  was lead on a couple of homicides I mentioned, sir.

13  **Q**    Lieutenant, I've handed you what's previously marked

14  for identification as Government's Exhibits 5 and 6.

15  Starting with 5, do you recognize Government's 5?

16  **A**    Yes, sir.

17  **Q**    And what do you recognize that to be?

18  **A**    This was a version of an Excel spreadsheet that I

19  forwarded you just outlining our active cases specifically

20  during that time period, not counting any other additional

21  work that may have come up while a particular case may have

22  been in court.  So these would be active cases at that time

23  that my unit was assigned.

24  **Q**    And does this chart fairly and accurately depict the

25  workload of your unit during that time period?

1   **A**    It's a snapshot.  But, again, there's other duties that

2   come up that would not be on this chart, sir.

3   **Q**    By that, are you including Detective Breedlove's

4   responsibility to supervise all sex offenders?

5   **A**    That, cell phone extractions, any court cases.  We deal

6   with all rapes, robberies, and homicides, big cases.   So

7   there's typically a lot of work to do as a case is coming

8   ready for court.  So there would be an immeasurable amount

9   of work on top of this that would be hard to classify, sir.

10  **Q**    And how about Government's Exhibit 6?  Do you recognize

11  6?

12  **A**    Yes, sir.

13  **Q**    What do you recognize that to be?

14  **A**    This is our 2017 homicide and officer-involved shooting

15  list that I sent you, sir.

16  **Q**    Does Government's 6 fairly and accurately capture the,

17  at least, homicide workload of your unit at the time we've

18  been discussing?

19  **A**    Yes, sir.

20          **MR. GORDON:**  Your Honor, submitting Government's 5

21  and 6 in evidence.

22          **THE COURT:**  All right.  Admitted.

23          (Government's Exhibits 5 and 6 were received in

24  evidence.)

25          **MR. GORDON:**  Publishing 5.

1          (Government Exhibit No. 5 published to the Court.)

2          **THE COURT:**  You can hand them up.  I don't think

3     we need to go through them in detail.  As long as they're in

4     the record.

5          **MR. GORDON:**  Your Honor, I just wanted to have you

6     understand the columns, that's all, just the names of the

7     columns.

8          If I could have the ELMO, please.  Thank you.

9     **BY MR. GORDON:**

10    **Q**    So, Lieutenant, case number refers to your internal

11    case number; is that correct?

12    **A**    Correct, sir.

13    **Q**    Case description, type of crime, correct?

14    **A**    Yes, sir.

15    **Q**    What does "date initiated" mean?

16    **A**    The date that the case number was pulled for the

17    incident.

18    **Q**    What does "last A-S-S-I-G date/time" mean?

19    **A**    The time that that -- the date that that case was

20    assigned to the particular detective, I believe.  Hold on

21    one second.  Let me check.

22         It may be the last supplement date for that case.  I'm

23    not a hundred percent sure on that column, sir.

24    **Q**    Just for example, I'm pointing to a row approximately

25    eight rows down.  It says "2017, 34632, sexual battery.

1   Date initiated, 11/15/17.  Last assig date/time, January

2   4th, 2019; closed, Tommy Breedlove."  Can you explain what,

3   in that context -- does that mean that case was not assigned

4   to Detective Breedlove until January 2019?

5   **A**      No.  I'd have to refer, sir -- I'm not a hundred

6   percent sure, but I believe, just looking at that, that

7   would have been a case assigned to him.  And it's probably

8   when he supplemented last.

9   **Q**      Supplemented being last report?

10  **A**      Yes, sir.

11  **Q**      Lieutenant, to the best of your knowledge, during the

12  time that you had that LG cell phone, anybody contact the

13  police department trying to get it back?

14  **A**      No, sir, not that I'm aware of.

15  **Q**      Did anybody make any inquiries about the phone at all?

16  **A**      Not that I'm aware of, sir.

17  **Q**      What would happen if somebody did; like, called the

18  police department and said, "Hey, you guys, I think you

19  might have my phone"?

20  **A**      In this particular case, I would have loved for that to

21  happen.  Because we probably would have asked them to come

22  up so we could speak to them and try to get them to explain

23  how their phone ended up in our evidence locker connected to

24  a bank robbery.

25  **Q**      Am I intuiting your statement between the lines

```
 1   accurately that you would think that person is a suspect?
 2   A    Yes, sir.
 3           MR. GORDON:  No further questions, Your Honor.
 4           THE COURT:  I've got a jury out.  Let me ask you,
 5   Mr. Gordon, how long do you think your opening is going to
 6   be?
 7           MR. GORDON:  It depends on what's in it,
 8   Your Honor.
 9           THE COURT:  As planned currently, as you have it
10   planned currently.
11           MR. GORDON:  I think 10 minutes, maybe 15.
12           THE COURT:  All right.  Cross.
13                      CROSS-EXAMINATION
14   BY MR. MADDUX:
15   Q    So, Lieutenant Power, the pressing leads that you've
16   just covered, and all the work that you've done, you agree
17   that didn't prevent Detective Breedlove from presenting the
18   phone to you on January the 2nd, correct?
19   A    Presenting the LG on January 2nd?  Is that the
20   question, sir?
21   Q    Correct.
22   A    I can't speak for him specifically.
23   Q    Well, let me ask you, you wrote a one-page report, did
24   you not?
25   A    Yes, sir.
```

1    **Q**    You have it in front of you?

2    **A**    Yes, sir.

3    **Q**    Okay.  And it says that you were provided the "locked

4    LG cell phone by Detective Breedlove on the 2nd," correct?

5    **A**    Yes, sir.

6    **Q**    So clearly, despite all the homicides and the level-8

7    status and the shootings, he was able to actually bring you

8    the phone for you to search it, correct?

9    **A**    Yes, sir.

10   **Q**    And, typically, you're supposed to go get the phone out

11   of evidence with a copy of the warrant, true?

12   **A**    No, sir.

13   **Q**    So do you have a practice of searching phones without

14   having the warrant as a cover sheet that goes with the phone

15   to show that you were authorized to do a Cellebrite

16   extraction?

17   **A**    Most of our examinations aren't done with a warrant.

18   It's done with a detective coming and bringing us the

19   evidence and explaining what they're looking for, sir.

20   **Q**    You were aware, as his supervisor back on

21   November 18th, 2017, that he needed a warrant to get in that

22   phone, correct?

23   **A**    Yes, sir.

24   **Q**    And then you're also aware, as a Cellebrite extraction

25   specialist, that you need a warrant -- back in November of

1    2017 -- to search a phone, correct?

2    **A**    Yes, sir.

3    **Q**    Just like you needed a warrant to search the car,

4    correct?

5    **A**    Correct.

6    **Q**    So it's sort of a cascading chain.  You have to get a

7    warrant to get in the car.  Then you find something that

8    needs a warrant itself, then you go get that, correct?

9    **A**    Yes, sir.

10   **Q**    Okay.  And so when you're sitting there getting ready

11   to put the cell phone on your bench, in the special case

12   that you have, the blocking -- the RF-blocking cage, you're

13   sitting there with a phone that you don't know the status of

14   whether or not it has a warrant to authorize you to do an

15   extraction, correct?

16   **A**    I -- as I explained, there's a detective bringing me a

17   phone, says he has a search warrant to search it.  I know

18   I've previously looked at a search warrant, and I assumed

19   there was a signed search warrant by a judge.

20   **Q**    And to be crystal clear, when Breedlove came to you, he

21   looked you straight in the eyes and said, "This phone has a

22   search warrant"?

23   **A**    Yeah.  And I should have looked for the search warrant,

24   being his supervisor, sir.

25   **Q**    But you don't normally look for the search warrant, do

1    you?

2    **A**    I do not.

3    **Q**    And you know that that report that you were going to

4    get, it hinges on -- the search warrant is the permission

5    slip to do that, correct?

6    **A**    A hundred percent, sir, yes.

7    **Q**    And you know that -- one of the things you've talked

8    about is that people intend their phones to be private, and

9    this was one of those phones because it was actually

10   password-protected, correct?

11   **A**    Understood, sir.  Yes, sir.

12   **Q**    So it's not one you can just flip through it and

13   observe whatever is there.  You have to actually break into

14   the phone with your special Cellebrite, correct?

15   **A**    Yes, sir.

16   **Q**    And at this point you had already done a search of

17   Petrie Addison's phone that was found on his person, an

18   iPhone, correct?

19   **A**    Yes, sir.

20   **Q**    Okay.  And you have reports related to that, right?

21   **A**    Yes, I do.

22   **Q**    And you did that search on November 27th?

23   **A**    Yes, sir.

24   **Q**    And so on November 27th, when -- did you use Cellebrite

25   also?

**A**     Sir?

**Q**     Did you use Cellebrite also?

**A**     Correct.

**Q**     Okay.  When you did that search, you didn't have a warrant for that phone, either?

**A**     There was a separate warrant for that phone, sir.

**Q**     Okay.  So there was a warrant sitting on top of that case file before you did the search, correct?

**A**     That's not what I said.

**Q**     So how did you know there was a warrant?

**A**     The detective told me he had a warrant for the phone, sir.

**Q**     So it's just word of mouth whether or not you have authorization to do these searches?

**A**     Yes, sir.

**Q**     Now, you indicated at some point that you discovered from Breedlove that, oops, there was no warrant, right?

**A**     He failed to get the warrant signed, yes, sir.

**Q**     So phone call?  Face-to-face?

**A**     Face-to-face.

**Q**     So he comes in your office and says, "I didn't have a search warrant, and you've already done the search"?

**A**     Correct.

**Q**     And what day does that happen?

**A**     Excuse me.  I've got a lot of dates here.  One second.

1          January 10th.

2     **Q**     So January 10th, the same day that the judge signs the

3     warrant?

4     **A**     Yes, sir.

5     **Q**     Okay.  So tell the Court what role you played in

6     redrafting the warrant that went to Judge Ruppe.

7     **A**     I'm not sure I understand your question, sir.

8     **Q**     Well, wasn't the warrant redrafted before it went to

9     Judge Ruppe?  Wasn't it edited?

10    **A**     On the 10th?

11    **Q**     Yes.

12    **A**     There was some language added about the search being

13    done already on the phone, yes.  But I don't recall exactly

14    what it was.

15    **Q**     So you pulled up, with Detective Breedlove, a copy of

16    the warrant that you had already reviewed before, back in

17    the end of November --

18    **A**     Yes, sir.

19    **Q**     -- correct?

20         And you told him to add something about the fact that a

21    search had already been done, correct?

22    **A**     Yes, sir.

23    **Q**     And then you sent him off to get the warrant and never

24    went to see the judge, did you?

25    **A**     No, sir.

1   **Q**    Okay.  So you, as the person who conducted an

2   unauthorized search, did not go and see Judge Ruppe?

3   **A**    Correct.

4   **Q**    And, in fact, when you had him fill out that particular

5   addition -- because you were there telling him what to do,

6   right?

7   **A**    Yes, sir.  I don't remember exactly what we put in the

8   warrant.

9           **MR. MADDUX:**  May I approach the witness with

10  Exhibit 4, Your Honor?

11          **THE COURT:**  Of course.

12          **MR. MADDUX:**  Let me just find my copy.

13          **THE COURT:**  I have 4, if you need it.

14          **MR. MADDUX:**  Sure.  Thank you.

15  **BY MR. MADDUX:**

16  **Q**    On page 8 of 9, second paragraph on the top, right

17  here, is the paragraph that you're talking about.

18  **A**    Yes, sir.

19  **Q**    That's what you told him to add?

20  **A**    Yes, sir.

21  **Q**    Now, do you understand that at that moment you're

22  sitting there with your detective, you have evidence and

23  information you are not entitled to have?

24  **A**    I understand that, sir.

25  **Q**    And, in fact, your detective has committed a violation

1    of the Fourth Amendment.  You agree?

2              **MR. GORDON:**  Objection.  Argumentative.

3              **THE COURT:**  Overruled.

4    **BY MR. MADDUX:**

5    **Q**    Right?

6    **A**    I agree, sir.

7    **Q**    And so at that moment, when you know that, do you tell

8    him and discuss with him the issue of containing the data

9    that you're not entitled to?

10   **A**    We discussed the fact that there was an inadvertent

11   error and that he needs to go face the judge and explain

12   what happened and take it from there.

13   **Q**    Did he tell you that he'd already given the information

14   to Detective Toner on January the 8th and to the FBI on

15   January the 8th?

16   **A**    I was aware of that, sir, yes.

17   **Q**    Okay.  And did you call the FBI, and did you call

18   Detective Toner, and say, "Don't do anything with that

19   information, don't give it to anyone, don't do any research,

20   don't follow up with anything.  We don't have authorization

21   for that information"?

22   **A**    I did not do that sir, no.

23   **Q**    And you didn't put that in the warrant that's in front

24   of you either, that the information had been distributed out

25   to multiple other agencies?

1    **A**    That's correct, sir.

2         **MR. MADDUX:**  I don't have any further questions,

3    Your Honor.

4         **THE COURT:**  Redirect.

5         **MR. GORDON:**  None, Your Honor.  Thank you.

6         **THE COURT:**  Okay.  Mr. Gordon -- you're excused.

7    Thank you -- I don't need any argument.  Do you have any

8    factual development you need or factual proffer beyond what

9    I've received here or in the papers?

10        **MR. GORDON:**  I do not, Your Honor.  The sole other

11   witness I would call would be Special Agent Bush solely for

12   the already-proffered fact that she -- at the time Turner

13   was ultimately arrested, he had a cell phone on him.  That

14   cell phone was searched pursuant to a search warrant, and on

15   that cell phone it showed that the earliest dates of use

16   were November 19th, the day after this cell phone.  So that

17   I'd proffer with respect to --

18        **THE COURT:**  And that's LG No. 2?

19        **MR. GORDON:**  LG No. 2, correct, Your Honor.

20        **THE COURT:**  Any other factual development or

21   proffer you need?

22        **MR. GORDON:**  No, Your Honor.

23        **THE COURT:**  Okay.  Counsel, do you have any

24   factual proffer or development that you wish to develop?  I

25   don't need argument.

1          **MR. MADDUX:**  Yes.  I'd like to call Special Agent

2     Bush, please.

3          **THE COURT:**  Okay.

4          **THE COURTROOM DEPUTY:**  Please raise your right

5     hand.

6                    **SPECIAL AGENT LORETTA BUSH**

7     was called as a witness and, having first been duly sworn,

8     testified as follows:

9          **THE WITNESS:**  Yes.

10         **THE COURTROOM DEPUTY:**  Please state and spell your

11    first and last name for the record.

12         **THE WITNESS:**  Loretta Bush.  L-O-R-E-T-T-A,

13    B-U-S-H.

14         **THE COURTROOM DEPUTY:**  Thank you.  Please take a

15    seat in the witness box.

16                       **DIRECT EXAMINATION**

17    **BY MR. MADDUX:**

18    **Q**    Good afternoon, Special Agent.

19    **A**    Good afternoon.

20    **Q**    You've been here for the duration of the suppression

21    hearing, correct?

22    **A**    Yes.

23    **Q**    And my question to you is, back in November of 2017,

24    you were actively investigating Rashid Turner for his

25    involvement in what you believed was a spree of armed

1   robberies, correct?

2   **A**    No.  That's incorrect.

3   **Q**    Okay.  At what point did he become a target for you?

4   **A**    December 28th.

5   **Q**    December 28th?

6   **A**    29th.  December 29th.

7   **Q**    So you agree, though, that after the Cellebrite

8   extraction on the 2nd that we've had at issue here, you did

9   receive information on January the 8th of 2018 concerning

10  the fact that the extraction had occurred, correct?

11  **A**    I received the disc, a copy of it.

12  **Q**    Okay.  So you actually had it in your possession by the

13  8th?

14  **A**    Correct.

15  **Q**    And who gave that to you?

16  **A**    Detective Breedlove.

17  **Q**    And, at the time, did Detective Breedlove give you a

18  copy of a warrant?

19  **A**    He did not.

20  **Q**    Okay.  Did he tell you that he'd gone and seen a judge

21  to get a warrant?

22  **A**    He did not.

23  **Q**    Did you ask him if he'd gone to see the judge and get a

24  warrant?

25  **A**    I did not.

**Q**     And, at that point, you started your investigative

follow-up, correct?

**A**     How do you mean?

**Q**     Well, you started looking into the information on the

disc and --

**A**     No.  Not immediately.

**Q**     Okay.  So how much time passed?

**A**     So that was January 8th when I received the disc.  I'd

say I didn't look at that disc until almost the end of

January, beginning of February.

**Q**     Okay.  And you also know that Detective Toner got the

disc, correct?

**A**     At that -- no, I didn't know that he received it at

that time.

**Q**     You were on a task force with him, true?

**A**     No.  I am in an office.  It's a resident agency.

Tampa's headquarter office is in Tampa.  I reside in

Sarasota.  We have our own task force down there, and

Detective Toner is on a task force out of Tampa.

**Q**     And you collaborate with those task forces, correct?

**A**     Yes.  In a situation like this, yes.

**Q**     Okay.  And you agree you personally would never have

been able to get into that cell phone had it not been for

the extraction that you subsequently relied on for numerous

leads in this case, correct?

1    **A**    Ask that again, please.

2    **Q**    You personally were not able to just look at the phone?

3    **A**    Oh, no.

4    **Q**    And you've relied on numerous leads from that phone to

5    build your case against Mr. Turner, correct?

6    **A**    Yes.  There's a lot of evidence on that phone, yes.

7    **Q**    Evidence including photographs that you believe are

8    incriminating, correct?

9    **A**    Absolutely, yes.

10   **Q**    Text messages that show communications --

11   **A**    Absolutely?

12   **Q**    -- between fellow coconspirators?

13   **A**    Yes.

14   **Q**    And social media, correct?

15   **A**    Yes.

16   **Q**    Okay.  And --

17           **MR. MADDUX:**  That's all I've, Your Honor.

18           **THE COURT:**  Cross.

19                          **CROSS-EXAMINATION**

20   BY MR. GORDON:

21   **Q**    Special Agent Bush, you didn't rely on anything found

22   on that phone until the end of January, correct?

23   **A**    Almost the end of February.

24   **Q**    Almost the end of February?

25   **A**    Correct.

1    **Q**     What's the first thing you remember using that phone to

2    do?

3    **A**     I believe using that phone in combination with

4    Mr. Addison's phone, a couple other robberies popped out at

5    me, and then I started to investigate.

6    **Q**     And are those the Dollar General and Family Dollar

7    robberies?

8    **A**     Yes.

9    **Q**     Now, you -- subsequently, Mr. Turner was arrested,

10   correct?

11   **A**     Yes.

12   **Q**     He had a cell phone on him at that time, correct?

13   **A**     Yes.

14   **Q**     And you got a search warrant -- you personally got a

15   search warrant to search that phone, correct?

16   **A**     Correct.

17   **Q**     And that was a federal search warrant, right?

18   **A**     Yes.

19   **Q**     And when you went into that phone, you found that he

20   had used that phone to make phone calls, correct?

21   **A**     Yes.

22   **Q**     And those phone calls began on November 19th --

23   **A**     Yes.

24   **Q**     -- 2017, correct?

25   **A**     That's correct.

**Q**     And one of the first five phone calls was to Gary

Stidham, correct?

**A**     That's correct.

**Q**     And Gary Stidham is the person who rented the Hyundai

Elantra?

**A**     That is correct, yes.

**Q**     The one that was crashed and his phone was found in,

correct?

**A**     Yes.

           **MR. GORDON:**  No further questions, Your Honor.

           **THE COURT:**  Redirect?

           **MR. MADDUX:**  Nothing, Your Honor.

           **THE COURT:**  Anything else -- you're excused.

Thank you, Special Agent -- factually, from the defense?

           **MR. MADDUX:**  No, Your Honor.

           **THE COURT:**  Okay.  So I am overruling the

objections to the admission of the first LG cell phone.  I

observed Detective Breedlove.  He was -- his countenance was

one of repentant and someone who had committed perhaps

negligence.  He -- it's clear to me, as a matter of how I

viewed his testimony, that he did not engage in some sort of

strategic action.  Rather, he made a mistake and attempted

to rectify it in forwarding -- and I'm going to put out a

written order on this.  I'm just giving you the highlights.

That the circuit judge was informed and no additional facts

1    were provided to support the PC that was entered on the

2    10th.

3              Furthermore, the special agent testified she did

4    not -- although there's some evidence that Toner also

5    received it -- that she did not access this until at least

6    20, and maybe as many as closer to 50, days after the

7    circuit judge had signed the search warrant.

8              There's always an issue of expiration of time, but

9    it's not particularly relevant in this case for three

10   reasons.  Number one, we want fresh PC.  We don't want

11   things to be searched weeks and weeks after when there's a

12   drug buy.  Well, the drug's long gone.  Or there's a dead

13   body but the blood is long gone.  So we want fresh PC.

14             The PC here was static.  It was never going to --

15   as long as the phone didn't implode, it wasn't going to be

16   fresh or stale.  So that concern is gone.

17             The second one, about time of search warrant is

18   that sometimes we divest people of property.  Well -- so we

19   want that to be done quickly.  We're going to search that

20   car trunk real quick to get that poor fellow's car back or

21   whatever.  But that also wasn't the case here.  We weren't

22   divested -- "we" being the Government, the active movant --

23   wasn't divesting anyone of property in the normal case of,

24   like, taking someone's briefcase and putting it away for 51

25   days.

```
 1              And then, finally, I do credit the holiday event
 2    that was occurring in late November with all the vacations
 3    and the very heavy workload.  So I don't find that the PC
 4    was particularly stale or the expiration of time was --
 5    certainly not to be recommended, but it was in good faith.
 6    And I don't find that the Fourth Amendment exclusionary rule
 7    requires any further activity to incent these police
 8    officers who know quite well how to conduct themselves, at
 9    least based on their testimony.  And they were chagrined
10    that they had dropped the ball a little bit here.  I find
11    that to be in good faith.
12              Further, based on the proffer I have -- and I
13    trust it will come forth, that it appears clearly to me as a
14    second basis, and perhaps the prime basis, that this phone
15    was abandoned.  It is my understanding of the facts to be
16    developed the defendant arrived at the bank in that Elantra.
17    And it's clear that that very same phone number was used
18    before that bank robbery and then was in the second LG phone
19    that the defendant had on his person when he was arrested,
20    eventually, after the investigation reached fruition.
21              And the first phone calls made -- as I understand
22    the facts to be, the first phone calls made were very, very
23    shortly after the wreck that caused that phone to lie on the
24    floorboard of the car, which would suggest that the
25    defendant purchased that second LG phone almost immediately
```

1   after losing the first one, but losing it in an abandonment

2   because the evidence will show that this was a bank robbery

3   that was being -- as I understand the exit, was harried and

4   hurried because there was some keys dropped and a car wreck.

5   So it was a willful relinquishment without any attempt to go

6   locate that phone, whether it be to the police officer or

7   perhaps the car rental fellow.

8           And, of course, the Government cited that Eleventh

9   Circuit case, which is somewhat on point, where the people

10  left their phone at Walmart and made a call once and then

11  just said, "Well, nevermind, we're not going after that.

12  We'll hopefully just forget about that phone and law

13  enforcement won't pick up on it."  And as proof of that,

14  they went and got them another phone, which is indicia of

15  abandonment.

16          So I'm overruling and denying the motion to

17  suppress the LG phone.

18          All right.  Let's take 10 minutes and open.  Is

19  everybody ready?

20          **MR. GORDON:**  Yes, Your Honor.  The only thing I

21  need to do with Mr. Maddux is show him a copy of the

22  PowerPoint presentation I intend to use just to make sure --

23          **THE COURT:**  So if there's any issues on it, we'll

24  holler.

25          So Nick and Kristin, please apologize to the jury

1    profusely and tell them we're going to run until 5:00.

2          Y'all need more than 10 minutes?

3          MR. GORDON:  15 would be great, Your Honor.

4          THE COURT:  All right.  Tell them we'll start at

5    25 after, and we're good to go.

6          THE COURTROOM DEPUTY:  Yes, Judge.

7          (Recess at 3:12 p.m. to 3:25 p.m.)

8          MR. GORDON:  I'm sorry, Your Honor.  We're just

9    experiencing some technical difficulties so we're waiting

10   for Kristin to come back.

11         THE COURT:  Not working?

12         MR. GORDON:  I assume it will once the plugs are

13   in the right place.

14         THE COURT:  You can't use the ELMO with slides.

15         MR. MADDUX:  Judge, can I make two arguments --

16         THE COURT:  Yeah.  Of course.

17         MR. MADDUX:  -- while we're sitting here?

18         The first is just a general argument for the

19   record.  You kind of already addressed it before, but the

20   Government has an 11-count indictment.  And one of the

21   charges that is in the conspiracy involves something that I

22   just want to put on the record, in our opinion, violates the

23   Sixth Amendment rights to have an impartial jury in the

24   state and district where the crime was committed.

25         THE COURT:  Venue, right.  And vicinage, right.

```
 1   V-I-C-I-N-A-G-E.
 2            MR. MADDUX:   Under Rule 18, the place of
 3   prosecution should be where the crime occurred.  And our
 4   concern, while it might be part of the conspiracy count --
 5   and it's listed, and Mr. Gordon did draft that into Count
 6   I -- it's clear it's going to be a major theme that they
 7   robbed a bank in Port St. Lucie, which is not in the Middle
 8   District of Florida.  Because of that bias and prejudice and
 9   how it violates and circumvents the Sixth Amendment, as well
10   as Rule 18, our position is that they should not be allowed
11   to discuss that during the trial, and we just want to put
12   that on the record.
13            THE COURT:   Thank you.  And what bank is the one
14   in Port St. Lucie?
15            MR. MADDUX:   Seacoast Bank.
16            THE COURT:   And the conspiracy is a conspiracy to
17   rob, among others, Seacoast Bank?
18            MR. MADDUX:   Correct.  And Seacoast Bank is one of
19   the prior banks in the district, in Arcadia, on
20   December 4th.
21            THE COURT:   I appreciate that.  Further, I would
22   note that a conspiracy is venued wherever an overt act
23   occurs in whatever district.  So thank you.
24            MR. MADDUX:   The second thing I wanted to bring
25   up, Judge, is the issue of the PowerPoint presentation,
```

1    would be for the record.  It's opening statement.  It's got

2    a lot of pictures of evidence and photographs.  And I think

3    I can reasonably anticipate they might admit them, but at

4    this point we object.  It's prejudicial and not necessary to

5    give an opening statement and have an opening presentation.

6           **MR. GORDON:**  May I respond?

7           **THE COURT:**  Mr. Gordon, are these things you're

8    offering things you reasonably, in good faith, expect to be

9    admitted into evidence?

10          **MR. GORDON:**  They all are, Your Honor, yes.

11          **THE COURT:**  Okay.  So, Mr. Maddux, if he doesn't,

12   then you can club him over the head and shoulders with it in

13   your closing, that he showed something that didn't come into

14   evidence.

15          All right.  We good?

16          **MR. GORDON:**  We are, Your Honor.

17          **THE COURT:**  We're good?

18          **MR. MADDUX:**  Yes.

19          **MR. GORDON:**  Yes, Your Honor.

20          **THE COURT:**  Okay.  All right.  Let's turn it off.

21   Because we've got to swear them in, and I've got to give

22   instructions.  So you guys will open.  Then you got a

23   witness you can call after openings?

24          **MR. GORDON:**  I do, Your Honor.

25          **THE COURT:**  Okay.  Great.  Let's bring them in.

1          (Jury entered the courtroom at 3:32 p.m.)

2          **THE COURT:**  All right.  While y'all are standing,

3    I'll have you sworn, please.

4          (Jury sworn.)

5          **THE COURT:**  All right.  Thank you very much.

6    Ladies and gentlemen, I'm very sorry we wasted your time

7    here this afternoon.  We won't do that again.  We had -- AV

8    just decided to -- audiovisual just decided to kind of roll

9    over and die on us.  And none of this was the lawyers'

10   fault.  It was mine.  So please accept my apology.

11         All right.  I have some brief instructions to give

12   you, and then the parties are going to present their cases.

13   We'll run tonight until 5:00 and then start tomorrow at

14   9:00, unless y'all tell me you want to start at 8:30.  So

15   now that you've been sworn, I need to read some of the law

16   to you, some of the basic principles of a criminal trial.

17         It's your duty to decide what happened, period,

18   what happened.  So you can determine whether the defendant

19   is guilty or not guilty of the crimes charged.  At the end

20   of the trial, I'll give you a lengthier description of the

21   law that you have to follow to reach your verdict.  You have

22   to follow the law.  I give the law per the law books.  But

23   you decide the facts.  You are the judges of the facts.

24         You decide the case only on the evidence here in

25   the courtroom.  There's various kinds of evidence.  It could

1  be testimony that someone saw something, someone heard

2  something.  There can be exhibits, papers.  It can be

3  photographs.

4       Some evidence proves a fact directly.  Some

5  evidence proves a fact indirectly.  If someone walked in

6  with a wet umbrella and shaking a raincoat off, that's

7  indirect, circumstantial evidence that it's raining outside,

8  because we haven't seen the rain clouds.  But as far as the

9  law is concerned, it makes no difference, direct, indirect,

10  circumstantial, or direct.

11       You may choose to believe or disbelieve any

12  evidence and to give the evidence the weight that you

13  determine.  Some things are not evidence, a couple of them.

14  The statements and arguments of the lawyers is not evidence.

15  Now, they're going to stand up here and tell you what they

16  believe the case will show.  But that's not evidence.  It's

17  just their good-faith estimation.  So the evidence is what

18  you hear from that witness stand or what I say, "admitted,"

19  when the evidence comes into -- logged in by the clerk.  And

20  then that evidence will be available for you at your -- at

21  the conclusion of the case when you retire to consider a

22  verdict.

23       Questions and objections of lawyers.  Questions

24  aren't evidence.  The objections aren't evidence.  My

25  rulings aren't evidence.  I may rule this way or that way.

1   Or if I had too much coffee that morning, you'll say, "He

2   got up on the wrong side."  That means nothing.  That means

3   nothing.

4           The only thing that counts is the evidence that

5   comes in.  So if I sustain an objection or overrule an

6   objection, don't give it any thought.  If it comes in, if

7   it's sustained and comes in, you'll hear it.  Otherwise, the

8   objection -- I'm sorry, sustained, then we just disregard it

9   if it hasn't come into evidence.

10          There's rules of evidence.  Sometimes a lawyer may

11  ask a question or offer an exhibit that the other side

12  doesn't think is permitted by the rules.  And, again, the

13  lawyer might object.  So if I sustain an objection to a

14  question, we just ignore the question.  We don't think what

15  the answer would be, and we just move on and take the next

16  question.

17          Some evidence could be stricken, meaning, "Well,

18  strike that statement," or some such-and-such.  That means

19  if you're deciding the case, you wouldn't consider the

20  evidence.  Some evidence might be admitted for a limited

21  purpose.  But I'll advise you of that.  That's unusual.

22  I'll advise you of that if that happens.

23          Credibility of the witnesses.  In reaching your

24  verdict, you may decide -- you may have to decide which

25  witnesses to believe and who not to believe.  You can

1    believe everything a witness says or part of it or none of

2    it.   In considering the testimony of a witness, you might

3    take into account the opportunity and ability of the witness

4    to see or hear things, testify to, the witness' memory, the

5    witness' manner while testifying, the witness' interest in

6    the outcome of the case, or any bias or prejudice, whether

7    other evidence contradicts the witness or backs the witness

8    up, the reasonableness of the witness' testimony in light of

9    all the evidence, and any other factor that you determine

10   that might bear on credibility.

11           As you know, this is a criminal case.   So there's

12   three basic rules.

13           Number one, the defendant is innocent until proven

14   guilty.   The indictment against the defendant, brought by

15   the Government, is only an accusation and nothing more.

16   It's not proof of guilt or anything else.   The defendant

17   starts out with a clean slate.

18           Second, the burden of proof, meaning who must

19   prove the case, is on the Government until the very end of

20   the case.   The defendant has no burden to prove his

21   innocence or to present any evidence at all or to testify.

22   And since he has no burden and has a right to remain silent

23   and can choose whether to testify or not, you can't legally

24   put any weight on a defendant's choice not to testify.   It's

25   not evidence.

1          Third, the Government must prove the defendant's

2    guilt beyond a reasonable doubt.  And I'll give you

3    instructions on what that means.  But, bear in mind, the

4    level of proof required is high.

5          Conduct of the jury.  Just a few rules.

6          Please don't talk about the case among yourselves

7    until you retire as a group to the verdict -- to the jury

8    room.  You can, of course, tell people, or your employer,

9    you know, you're a juror, and it's downtown.  But don't

10   discuss the case with anyone else or anything related to the

11   case.  Of course, don't -- and these lawyers, they're good

12   people.  They're good -- they're actually good guys, good

13   lawyers.  But I've instructed them that they're not to talk

14   to you.  So if they're on a street corner or the elevator,

15   and they're kind of going like this, please don't think

16   they're being rude.  No one is supposed to address you about

17   the case, only the evidence and the arguments in the

18   courtroom.  And if there's any incident of anything like

19   that, make sure you tell the courtroom security officer or

20   the -- it will either be Ms. Carreon or it will be Shameeka

21   Olden, the courtroom deputy.

22         There's several locations in this case.  Please

23   don't visit them.  Don't go to Google Maps and say, "Gee, I

24   wonder what the corner green light/red light looks like."

25   All the evidence that you decide will happen here.  And

 1    there will be plenty of evidence for you.

 2             I don't think there's going to be anything in the

 3    paper, but -- I'm pretty sure there won't.  But don't watch

 4    or listen to news reports, try and research any fact issue.

 5    And please stay off the internet.  You know, don't post on

 6    Facebook that "I'm up here in Tampa at this trial" or try

 7    and research some blog on what the street crossings are in

 8    Smithville, whatever these towns -- you'll hear the towns

 9    that these things happened.  Please just stay off the

10    internet.  I call it "the Google."

11             Again, you'll have plenty of time to deliberate.

12    So if a couple of you go to lunch tomorrow, please don't

13    talk about the case for two reasons.  Number one, you're not

14    all together, okay?  And you're a body, a decision-making

15    body.  And, also, the case isn't over.  It's just like a

16    movie; the case ain't over until it's over.  So keep an open

17    mind.  But please don't share thoughts with each other until

18    it's time to deliberate.

19             Taking notes.  You can take notes.  There should

20    be legal pads, et cetera, in the jury room.

21             Do we have those, Kristin?

22             Okay.  So if you want legal pads, she'll hand them

23    out.  You don't have to take notes.  Just do me this favor.

24    Either leave them here or in the jury room.  Don't take them

25    out with you.  Because it's part of your jury process.

1          Secondly, some people take great notes.  Okay?

2    But that person knows nothing more or less than you do.  So

3    don't say, "Oh, well, Juror No. 15 took great notes.  I'm

4    going to listen to everything he says."  Well, you rely on

5    your own recollection.  And don't decide someone is the

6    note-taker and what they say is the holy writ, because it's

7    your recollection, your individual recollection, that

8    applies.

9          There's multiple charges or counts.  It's called a

10   count, Count I, Count II.  They're all separate.  So each

11   one is decided separately for you.  It's set out for you

12   separate, and you have to decide each one separately.

13   You'll have a verdict form.  So at the end of the day, it

14   will be very -- it's just like a little, you know, I, II.

15   It won't be complicated.  But there's multiple counts or

16   charges here.  But each is separate.

17          Okay.  So the Government is going to make their

18   opening statement, what they view the evidence will show.

19   Then the defense may or may not.  Because they don't have a

20   burden, they don't have to.  But if they do, then I'll

21   recognize Mr. Maddux.  And then the Government will begin to

22   present its witnesses subject to cross-examination.

23          After all the evidence is in, the lawyers will

24   present their closing argument to you.  I'll summarize the

25   law.  And then you'll retire to consider your verdict.

```
 1              All right.  I'll recognize you now, Counsel.

 2              MR. GORDON:  Thank you, Your Honor.

 3              I'm providing an exhibit list for the Court.

 4              THE COURT:  Thank you.

 5              MR. GORDON:  May we switch to counsel table?

 6              Ready, Your Honor?

 7              THE COURT:  Yes.  Proceed.

 8              MR. GORDON:  Thank you.

 9              Mr. Maddux, Mr. Turner.

10              May it please the Court.

11              We are all here because the defendant committed

12     five armed robberies.  And then he got caught.

13              The evidence is going to show you that over the

14     course of four months in the late summer of 2017, through

15     the early winter of 2017, August through December, the

16     defendant robbed two Dollar stores and three banks, took

17     over $140,000.  The robberies spanned from Lehigh Acres in

18     the south to Spring Hill in the north, from Arcadia on the

19     west to Port St. Lucie on the east.  And in each robbery,

20     the defendant had help, coconspirators that he had recruited

21     to join him.

22              (Government Exhibit published to the jury.)

23              MR. GORDON:  That's the defendant, Rashid Turner.

24     That's Petrie Addison.  He was the defendant's partner for

25     all five of the armed robberies, every one of them.
```

1          You're going to hear from Petrie Addison in this

2   trial.  He'll tell you about how the defendant recruited him

3   on the basketball court.  He'll tell you about how he had no

4   criminal record before the defendant came into his life.

5   He'll tell you how he committed five armed robberies with

6   the defendant.  And he'll tell you about how he pled guilty

7   and decided to cooperate with the Government pursuant to a

8   plea agreement.

9          That's Zachary Gloster.  He joined the defendant

10  for the final two robberies in the spring -- in the spree,

11  the final two bank robberies.

12         Finally, that's Dakiriya Lias.  She was the

13  defendant's getaway driver for at least one of the armed

14  robberies.  She'll also tell you how she had no criminal

15  record before the defendant came into her life.  She'll tell

16  you about how he recruited her to do armed robberies with

17  him, serve as his getaway driver.  She'll tell you how she

18  pled guilty and, pursuant to a plea agreement with the

19  Government, is here to testify and cooperate with the

20  Government.

21         Addison and Lias will both come in here and say,

22  "Yep, I did robberies, and I did them with him."

23         The defendant was the one who planned every

24  robbery.  He picked the target.  He picked the date and

25  time.  He picked the team.  And in every one he had the same

1   role.

2           The defendant was the one who did crowd control.

3   He's the one who held the gun.  He's the one who brandished

4   it.  He's the one who pointed it at the victims.  He's the

5   one who threatened them.  He's the one who did crowd

6   control.

7           In each robbery, the defendant tried to conceal

8   his identity.  He wore a mask.  He wore gloves.  And, for a

9   bit, that worked.

10          You're going to hear from the detectives who

11  investigated the first two armed robberies in the spree, a

12  Family Dollar store and a Dollar General store.  And they're

13  going to tell you that after those first two robberies, they

14  basically had no leads.  The defendant's plan so far had

15  worked.

16          But after the two Dollar Stores, the defendant and

17  his team got a little greedier.  They decided to switch from

18  dollar stores to banks.  And then they started getting

19  sloppy.  In each of the three bank robberies that followed,

20  the defendants left behind clue, after clue, after clue.

21  And then they all got caught.

22          The evidence allowed law enforcement officers

23  ultimately to identify and charge four people, the four

24  people you saw previously, Petrie Addison, Dakiriya Lias,

25  Zachary Gloster, all of whom have pled guilty, and the

1    defendant, Rashid Turner.  The defendant is the only one

2    left.

3              Now, I expect that you're going to find that

4    conceptually this trial is actually fairly easy.  I

5    anticipate that both sides are going to essentially agree

6    that five robberies occurred.  I expect -- I anticipate that

7    both sides are essentially going to agree that whoever

8    committed those five armed robberies committed not just

9    crimes but federal crimes.  Those are not the issues that

10   are going to be in dispute in this trial.

11             This is a trial about identity.  Remember, I said

12   the defendant wore a mask and gloves.

13             (Government Exhibit published to the jury.)

14        **MR. GORDON:**  So there is a still photograph from

15   the surveillance footage from the Family Dollar robbery that

16   occurred on August 27, 2017, the first robbery in the spree.

17   The evidence is going to show that that man in the red

18   hoodie with the black mask, that that's the defendant,

19   Rashid Turner.

20             (Government Exhibit published to the jury.)

21        **MR. GORDON:**  That's a surveillance still from the

22   second robbery in the spree, the robbery of the Dollar

23   General that occurred on October 28th, 2017.

24             Can we have the lights dimmed slightly, please.

25             (Government Exhibit published to the jury.)

1          **MR. GORDON:**  That's a surveillance still from

2   November 18th, 2017, the robbery at the Wells Fargo bank

3   located in Spring Hill, Florida.

4          (Government Exhibit published to the jury.)

5          **MR. GORDON:**  That's a surveillance still from

6   December 4th, 2017, the Seacoast Bank in Arcadia, Florida.

7          (Government Exhibit published to the jury.)

8          **MR. GORDON:**  And, finally, that's another

9   surveillance still from December 28th, 2017, an armed

10  robbery at the Seacoast Bank in Port St. Lucie.

11         Remember, Addison, Lias, Gloster, they pled guilty

12  to all of these.  The question in this trial is who is the

13  man behind that mask, the mask in every one of those

14  pictures and the ones from the slide before it?  And you're

15  going to see many more.  In each case, the evidence is going

16  to show you that that man is the defendant.  It's the

17  defendant's picture there, and there, and there, and there,

18  and there, and there, and there, and there.

19         Now, of the photographs on the screen, the one

20  highlighted in yellow, that's the defendant's arrest photo.

21  The first of the -- so I had eight photos that appear after

22  that one.  The first six of those you're going to recognize

23  as surveillance stills from the robbery or various

24  robberies.  The last two came from surveillance footage at

25  Walmart the night before the fourth robbery in the string

153

1      and the last robbery in the string.

2              And the Walmart surveillance footage caught the

3      defendant on both of those times buying gear he used the

4      next day in the robberies.  Every one of those photographs

5      shows the defendant.  That's what the evidence in this trial

6      is going to show to you.

7              So what is that evidence?  I keep referring to it,

8      but what is it besides these photographs?  What can you

9      expect to hear and see over the next week?  For the rest of

10     my opening statement, I'm going to give you a roadmap of

11     that evidence.  I'm not going to describe all the evidence

12     in the case.  I'm going to hit the highlights.

13             It's like you're doing a puzzle.  Every piece of

14     evidence that you're going to hear over the course of the

15     next week is a piece of that puzzle.  What I'm about to do

16     is show you the back of the box, what I expect the picture

17     will look like when you put all of those puzzle pieces

18     together.  I expect that you'll arrive at the same

19     conclusion that law enforcement did, that the defendant is

20     the man in every photo.

21             So what are those puzzle pieces?  As I said, this

22     is a trial about identity.  And law enforcement gathered, in

23     this case, all of this evidence.

24             Petrie Addison's -- we're going to go clockwise

25     from 12:00 o'clock around.  Petrie Addison's cooperation.

1    He says, "Yep, I did all those robberies with Rashid

2    Turner."

3              Dakiriya Lias' cooperation.  She says, "Yep, I was

4    the getaway driver for Rashid Turner.

5              Text messages on two of the defendant's cell

6    phones -- he lost a cell phone during one robbery.  And when

7    he got arrested, he had another.  Cell phones cover the

8    entire span from the second robbery through the fifth.  And

9    you're going to see text messages in which the defendant

10   planned those robberies with his coconspirators.

11             You're going to see photographs of targets the

12   defendant took prior to the robberies or photographs he

13   lifted from the internet.  You're going to see internet

14   searches on the phone for target locations, as well as

15   searching the news to see if anybody was on to him as a

16   suspect.  You're going to see photographs of the defendant

17   holding very large amounts of cash, despite fact that he

18   didn't have a job.

19             You're going to see video of him buying supplies

20   from Walmart the night before the robberies or at least

21   before two of the robberies.  You're going to see the

22   defendant's fingerprints left on the getaway car from one of

23   the robberies.  You're going to see evidence that he

24   purchased a car with money wrapped in bank bands.  And

25   you're going to see cell site proximity; in other words,

1   hits on his phone, the location down on his phone, showing

2   him, at the times of the robberies, near the robberies,

3   despite living hours away.

4          So I'm going to take you through the timeline

5   here.  The first robbery occurred August 27th, 2017, about

6   closing time at a Family Dollar store located in Lehigh

7   Acres, Florida.  There were two clerks inside the store

8   finishing up for the night.  Per their procedure, one of

9   them stays inside the store and one of them left to go to

10  his car.

11         As the first one was in the parking lot, two

12  men -- at least one of them had a gun -- the defendant and

13  Petrie Addison, rushed up to him in the parking lot and

14  forced him back into the store where the first clerk was

15  still waiting.  The robbers forced them to the ground and

16  then forced them to where the safe was and forced them to

17  open the safe.

18         The safe had a delay on it.  There were actually

19  two safes, one with a 5-minute delay, and one with a

20  10-minute delay.  So they all sat there, the two victims and

21  the two robbers, waiting for the safe to open.  Eventually,

22  it did.  The robbers took the money, as well as a box of

23  fidget spinners for their kids.  And then they zip-tied the

24  hands of the two victims and left.

25         The police showed up.  Not much evidence left

1    behind except the zip ties.  No DNA on either of them.

2              Second robbery.  Also closing time, also a Dollar

3    store, also located in Lehigh Acres.  Only this one, a

4    Dollar General instead of a Family Dollar.  This one

5    happened on October 28th, 2017, about 2 months after the

6    first one.

7              Similar set of circumstances from the first one.

8    Two clerks, at closing time.  This time they both walk out

9    into the parking lot.  And, again, two men rush up to them,

10   at least one of whom has a gun, the defendant.

11             Each man takes a different victim and forces them

12   back inside the store.  Petrie Addison, Rashid Turner,

13   forced the clerks behind the counter, where, again,

14   everybody has to sit there and wait for the safes to open,

15   ten terrifying minutes where the clerks are doing everything

16   they can to make sure that the robbers don't get upset

17   somehow and hurt either of them.  Robbers take the money,

18   use the zip ties, and out the robbers go.

19             Again, law enforcement shows up.  Not many leads

20   there, if at all.  Just the similarity to the prior one.

21             Three weeks later, November 18th of 2017, Petrie

22   Addison, Rashid Turner decide to do a third robbery.  Now

23   they're graduating to a bank.  This time they go up the

24   night before.

25             They go farther.  Instead of -- they live in Fort

1    Myers.  Instead of going next door to Lehigh Acres, a

2    half-hour away, this time they go all the way up to Spring

3    Hill, Florida.  It's a far drive, so they leave the night

4    before.  They get a room at the Motel 6.  You're going to

5    see records of that stay.

6         They stay overnight at the Motel 6, get up early

7    in the morning and go to Target, where they meet in the

8    parking lot with a vehicle, a KIA SUV, containing another

9    person, unknown coconspirator.  To this day, law enforcement

10   doesn't know who this is.  They spend some time in the

11   parking lot.  And then both cars, the KIA SUV and the one

12   with the defendant in it, the defendant and Petrie Addison,

13   they drive to that Wells Fargo bank.

14        And just after the bank opens, the defendant and

15   Petrie Addison run into the bank.  The defendant, remember,

16   he's the one with the gun.  He's the one doing crowd

17   control.

18        Petrie Addison leaps over the counter, starts

19   grabbing the money.  They demand to go in the vault.  Clerks

20   can't get into the vault.  It's a Saturday.  They don't have

21   access to it.

22        The defendant and Petrie Addison gather all the

23   money they can.  Then they sprint out the side exit,

24   emergency exit door, to where their white Hyundai Elantra

25   getaway car is waiting.

1          But they have a huge problem.  Because Petrie

2    Addison dropped the keys inside the bank.  They can't drive

3    away in their getaway car.  Someone has got to go back into

4    the bank to get the keys.

5          So Petrie Addison does that.  He runs back in the

6    bank and grabs the keys.  The defendant, whom you'll see on

7    the video, he's already taken his mask off.  He runs around

8    too, runs into the bank briefly, looks around.

9          And as Petrie Addison runs out the emergency exit

10   door, back to the Hyundai Elantra, now that he's got the

11   keys, the defendant goes the other direction.  He gets into

12   the waiting KIA SUV and drives off, gets away.  Again, we

13   don't know who that driver was.

14          Petrie Addison gets in the Hyundai Elantra.  He's

15   got the keys now.  He takes off.

16          And an incredible good samaritan, Adam Haynes,

17   gives chase in his own car, a civilian.  He sees what

18   happened and he follows Petrie Addison on the highway,

19   calling law enforcement, 911, and telling them the location.

20   And law enforcement follows.  They pick up the chase from

21   Adam Haynes, a high-speed chase ensues, and eventually

22   Petrie Addison wrecks the Hyundai Elantra at a Dunkin'

23   Donuts, flees inside a bakery, and he's caught.  He's

24   arrested.

25          Now, at the time Petrie Addison is arrested, he

1    has his own cell phone in his pocket.  But this is where law

2    enforcement catches the massive break.  Because the

3    defendant had left his cell phone in the Hyundai Elantra

4    right on the floorboard.  Law enforcement gets it, gets a

5    search warrant for it, looks inside the cell phone, and it

6    is a treasure trove of evidence.  Photographs, text

7    messages, call records, the mother lode of evidence, all

8    pointing towards the defendant.

9           But this takes some time, this process, getting

10   the phone, getting the search warrant, doing the forensic

11   tools on it to crack the phone open and look inside it.  All

12   that takes time.  And in the time that that's happening, the

13   defendant commits two more robberies.

14          Petrie Addison, he got arrested.  But he got a

15   bond.  He got out.  While out, he did two more armed

16   robberies with the defendant.  Even while facing charges on

17   the Wells Fargo, he does two more.

18          At that point, the defendant recruits a third

19   person.  He recruits Zachary Gloster, who joins them for the

20   fourth and fifth armed robbery.  Those happened on

21   December 4th and December 28th of 2017.

22          So December 4th, the Seacoast Bank robbery in

23   Arcadia.  The night before, again, the defendant and his

24   crew, Zachary Gloster and Petrie Addison, they go to

25   Walmart.  They go to buy some gear to use in the robbery.

1    You'll see video of this.  You'll see receipts from this.

2          They buy camouflage gloves, camouflage masks, and

3    two distinctive backpacks, one of which they don't even

4    bother taking the tag off.  The next day they commit a

5    robbery at the Seacoast Arcadia, where you can see, on

6    video, them using the same backpacks, the same masks, the

7    same gloves they bought the night before.

8          Again, the same MO.  They go in.  Rashid Turner

9    uses the gun and does crowd control.  Petrie Addison and

10   Zachary Gloster jump over the counter.  They seize the

11   money.  Eventually, they all run out, and they get away.

12         The last armed robbery is on December 28th, 2017.

13   The night before, they go to a Walmart.  They buy blue latex

14   gloves, which you'll see on their hands in the robbery.

15   This time, after they follow their same pattern of Rashid

16   Turner controlling the crowd and the other two jumping over

17   the countertop to steal money, this time they get in a white

18   Ford Edge as a getaway car, a stolen car, and they drive a

19   short distance, abandon that car, and then get in a second

20   car and drive away from the scene.

21         The problem is, they left two things behind in

22   that Ford Edge.  One, a receipt from the Walmart.  And,

23   second, Rashid Turner's fingerprint on the driver door.

24         While law enforcement is putting all this

25   together, Rashid Turner takes some of the money, and he goes

1   to a car dealership and spends about $6,000 cash to buy a

2   car.  And the cash he gives to the car dealership is wrapped

3   in bank bands, the kind that the bank uses to hold the money

4   internally, not what it looks like when they give it to

5   customers.

6            Ultimately, Addison, Gloster, and the defendant

7   are all arrested.  At the time of their arrest, all three of

8   them have cell phones on them.  All three of those cell

9   phones are seized and then searched pursuant to search

10  warrants.  And inside Addison's cell phone, as well as the

11  defendant's, is another treasure trove of evidence.  Again,

12  text messages, calls, photographs, a wealth of information.

13           And law enforcement takes another step.  And they

14  get a warrant for what's called cell site information.  Your

15  phones, you're going to learn, whenever they access the

16  network, they create a record.  This phone connected to this

17  cell phone tower, at this time, on this day.  And the phone

18  companies keep those records.  Law enforcement got those

19  records and plotted them on maps.  And lo and behold, those

20  defendants' cell phones are in the vicinity of each robbery

21  at the date and time they happened, despite the fact that

22  they lived quite far away.

23           Ultimately, after being indicted, Addison pleads

24  guilty, Lias pleads guilty, Gloster pleads guilty.  The

25  defendant chooses to go to trial.  Here we are.

1          That's the timeline of this case.  You'll notice

2     that this picture is dated in the afternoon of

3     December 28th, 2017, a few hours after the last robbery in

4     the string.

5          So this -- I mentioned they were all indicted.

6     This is what the indictment contains, 11 charges.  Eleven

7     charges that you, as the jury, after you hear all of the

8     evidence I just described, are going to be tasked with

9     considering, evaluating, and determining whether the

10    defendant is guilty or not guilty of these 11 crimes.

11         So, first, Count I, conspiracy.  You're going to

12    hear that the defendant made an unlawful plan or agreement

13    with one or more other persons to do something unlawful.

14    That's a conspiracy.  Every armed robbery involved more than

15    one person.

16         I anticipate that you're going to hear the

17    defendant planned to do this.  That planning, the unlawful

18    agreement, is the conspiracy charge.  It covers the full

19    range from the time the first robbery was being planned to

20    the time the defendant was arrested.  That's just about the

21    plan, not the actions.  Count I is about the plan.

22         Count II charges that the robbery occurred, that

23    the Family Dollar robbery on August 27th occurred.  And

24    there is a separate charge, a separate federal crime, for

25    not just doing a robbery, but actually brandishing a gun

1    during a robbery or in relation to a robbery.  Count II is

2    the robbery itself.  Count III is the separate charge for

3    brandishing a gun.

4            Same pattern follows for Count IV, the robbery of

5    the Dollar General, and then Count V, the brandishing the

6    gun.

7            Now, VI and VII, the Wells Fargo bank robbery, has

8    two charges attached to it, the robbery itself, the same

9    charge for doing the robbery that you see in II and IV.  But

10   then, also, banks get their own charge.  There's a separate

11   federal law that says it's unlawful to rob a bank.  So Count

12   VI, a robbery occurred.  Count VII, that robbery was a bank

13   robbery.  And then, Count VIII, a firearm was brandished

14   during it.

15           Same pattern follows for Counts IX and X, a

16   robbery that was also a bank robbery, during which a firearm

17   was brandished, Count XI, which brings us to the Seacoast

18   Bank robbery December 28th.  You're going to hear that that

19   robbery occurred in Port St. Lucie, which is not in the

20   Middle District of Florida, but rather in the Southern

21   District of Florida.  And because it's in the Southern

22   District of Florida, by law, it can't be charged here as its

23   own separate crime.  So that one you'll see is uncharged,

24   even though the planning for it falls within the conspiracy.

25           You were selected to be jurors because Judge Jung,

1    the defendant, Mr. Maddux, and I all believed that you could

2    be fair and impartial jurors, that you could give the

3    Government and Mr. Turner -- I'm sorry -- Mr. Turner a fair

4    trial.  We asked you to leave your biases outside of the

5    courtroom.  But nobody asked you to leave your common sense

6    outside the courtroom.  That, we want you to bring in.

7    That, we expect you to bring in.  Because you're going to

8    need that to analyze the evidence, to look at all the puzzle

9    pieces the Government is going to put out there for you and

10   ask you to put together at the end to match the picture on

11   the back of the puzzle.

12          At the end of this trial, I'm going to ask you to

13   do just that.  I'm going to come back up here again.  I'm

14   probably going to have another PowerPoint presentation, and

15   I'm going to ask you to consider every one of those puzzles

16   and the picture it reveals.  The truth, that this defendant

17   planned to commit five bank robberies, did commit five bank

18   robberies, and brandished a gun in all of them.  And in so

19   doing, he is guilty of every one of the 11 counts with which

20   he is charged.

21          Thank you.

22          **THE COURT:**  Thank you very much, Mr. Gordon.

23          If the defense would like to give an opening

24   statement, they may at this time.

25          **MR. MADDUX:**  I would, Your Honor.

1        Good afternoon.  Recently, I got to go to Atlanta

2   and visit the civil rights museum.  And I just wanted to

3   start off the conversation about the evidence with a quote

4   from Martin Luther King that I thought was important.  It

5   says:  "Everybody can be great because anybody can serve."

6        That's you guys, the jury.  You don't have to have

7   a college degree to serve.  You don't have to make your

8   subject and verb even agree to serve.

9        Martin Luther King went on to say that "You need

10  to have a heart full of grace and a soul that's generated by

11  love."  Now, those concepts are, in this courtroom, going to

12  be that you'll listen to the evidence, that you'll withhold

13  judgment until the end of all the evidence, that you won't

14  let assumptions, and you won't let law enforcement, who are

15  driven to believe a certain person is involved, to be

16  ensnared in something if you believe there is a doubt about

17  this case and about the evidence.

18        And one of the things we talked about in jury

19  selection that's so key is you saw that last chart that was

20  up there, the one that has all of the different squares?

21  Every one of those squares, all 11 counts, has its own

22  elements.  And His Honor is going to instruct you about

23  those elements.  And when the Government fails to prove any

24  one of those elements in its case, that means you have to

25  find him not guilty.

1            And, as we talked about in jury selection, this

2    idea of association, this idea of close proximity, that's

3    not guilt.  Things have to be tied a lot tighter than that.

4    And so when we come here, meaning Mr. Turner, myself, my

5    cocounsel Mr. Dinsbier, we do enjoy a privilege.  And it's

6    called a clean slate.  The judge said, it's a clean slate.

7            You've seen a lot of pictures already.  I noticed

8    how some of the pictures -- on the first one with pictures

9    of who they claim to be Mr. Turner, has pictures of him when

10   he's shopping.  Okay?  Shopping is not a crime.  Okay?  So

11   you see how things get associated quickly already.  Shopping

12   near a bank robbery is not a crime.  Okay?  So I'm asking

13   you to look at all the evidence and keep your mind open.

14           And what you're going to see during this trial is

15   that there's two kinds of witnesses.  Witness number one is

16   the one who saw the event.  Okay?  You're going to hear from

17   five -- five armed robberies, people that were in the banks,

18   people that were the workers outside of the Dollar Generals.

19   And here's the reality of what the evidence is going to

20   show, that the people who are actually involved, actually

21   present, they're genuine, for sure.  But they have issues

22   with clarity.  They have issues with certainty.  And they're

23   not quite certain sometimes what they saw.  And they

24   actually have issues of capability.

25           Because you're going to learn from the jury

1    instructions, and you're going to learn from what you hear

2    in the trial, some common-sense things.  Did a person

3    actually have an adequate opportunity to observe?  When

4    people are frightened, they're not the best historians.

5          Did they have time?  The first two of the

6    robberies, actually, there's this time factor with this time

7    delay on the safes.  I want you to see what happens during

8    that time.  Are these people able to identify Mr. Turner?

9    The answer is going to be -- you're not going to hear them

10   identify him.  Okay?  Because they don't know.  Even though

11   they spent 10 minutes, supposedly, with Mr. Turner.  They

12   say, "Oh, well, he had a mask on."  But they still can't

13   identify enough key features to even say.

14         In fact, you'll hear both victims in one of the

15   Dollar General robberies identified a Hispanic male.  Law

16   enforcement put out a B.O.L.O., "be on the lookout" for a

17   Hispanic male.  Supposedly, Mr. Turner is now Hispanic.

18   Those are the people that were there.  So I'm asking you,

19   keep an open mind.

20         In addition, we know -- beyond the fact that the

21   people there are identifying Hispanic males, we know that

22   you have to look collectively.  The Government chose to

23   charge this case as a conspiracy, saying that there's a

24   common plan.  Well, the plan breaks down when they switch to

25   banks.  Mr. Gordon wants to say it's about greed.

1          The evidence is going to show you that the first

2    two robberies are not at all like the next three, and they

3    go completely different.  People are accosted outside of

4    stores or at closing hour.  And then we switch suddenly and

5    Mr. Turner is going to be somebody sprinting into banks,

6    jumping over countertops, and assailing people.  They're not

7    even similar.  That's a factor that you should consider in

8    your analysis.

9          So when you look at this first kind of witness,

10   somebody who saw the event, consider how close they were,

11   whether or not they had an ability to actually see what they

12   claim they did, and whether or not they give consistent

13   testimony with their recollections at or near the time.

14         And what you're going to see during this trial is

15   that the evidence is going to show that Mr. Rashid Turner is

16   guilty of knowing some very deceptive individuals.  And they

17   turned their deception on him.  And that's why they're here.

18         They're going to come in, and you're going to hear

19   from these witnesses.  And you're going to hear from, for

20   example, Mr. Addison.  You're going to learn that -- first,

21   detectives are probably going to tell you it's not uncommon

22   for a robber to collaborate with somebody who he's recently

23   met.  He's known him for a long time.  A robber -- like,

24   Addison will basically collaborate with anyone.  Okay?  And

25   it's -- actually, when you get done listening to the

1    evidence, you're going to see that he's the ringleader, he's

2    the one who recruited people, and now he needs a scapegoat.

3           We know that -- you'll hear some basic common

4    sense things from his background, like he was on the Trinity

5    basketball team up in Trinity, Florida.  He led a clique of

6    athletes called "Petrie and his Disciples."  He was known as

7    a manipulative and magnetic personality.  But he's

8    supposedly the follower in this case, according to the

9    Government's case.

10          And you'll see he's trying to practice his skills

11   of deception on you so he can get a good deal from the

12   United States of America to wipe his slate clean.  He's

13   testifying to receive substantial assistance credit, credit

14   off of his sentence.  And that is a massive motivator to say

15   whatever is needed to be of good service to the United

16   States.  Listen during the trial for the way his presence

17   sours and spoils this case.

18          There are other cooperators, each with their own

19   agendas of trying to "magic erase" their own crimes.

20          So when we come to the conclusion of the trial, at

21   the end of the day, their rotten -- and I'm calling it

22   rotten -- testimony is really going to inject, like, some

23   ferment into this case, and you'll have to rely on the

24   reasonable doubt.  And reasonable doubt can come as to any

25   element, as we've discussed.

1          A couple of things I want to point out just for

2     you to look at.  What other suspects did they consider?

3     There are some people that you'll probably hear about that

4     are well known for being robbers in some of these areas.

5     Are law enforcement just making a lot of guilt by

6     association?

7          When you come in here as jurors, you're different

8     than law enforcement.  Because law enforcement is construing

9     everything against Mr. Turner.  He's their agenda.  You

10    heard it.  He's the one who won't submit.  But for you,

11    everything is in his favor, because the slate is clean.

12         You won't see his name on hotel receipts.  You'll

13    hear a claim about a fingerprint.  But consider all the

14    hypotheses.  A, whether or not you believe the fingerprint

15    is accurate.  How much of a match is it?  Number two, if it

16    is a match, are there, like, half a dozen ways that it could

17    have gotten there without criminal involvement?  The answer

18    is going to be yes.

19         Then, consider whether or not things are

20    consistent between those first two robberies and the next

21    robbery.  Supposedly, the people that are crashing into

22    banks, jumping over the teller, are the same people that one

23    of the victims will tell you when she gets so nervous one of

24    the robbers says, "I'm not going to shoot you, Mama."  Does

25    that sound like the same set of robbers, the same set of

1    people?  They've congealed a whole bunch of things into one

2    mass, and they're asking you to accept it.  "If we put

3    enough up, they'll just bind it all together, and, at the

4    end of the day, find him guilty of everything."

5            At the end of the day, when you look at the

6    specific circumstances of the people at the bank, they can't

7    ID anybody.  And when you look at the specific situation

8    involving the difference in the nature of the crimes, the

9    fact that there's no photographic lineup IDs, that there's

10   not any compelling DNA evidence in this case, there's no

11   prints on firearms belonging to my client, all of this shows

12   that this is a lot of speculation.

13           And, at the end of our case, I'm going to get that

14   chart sitting right back over there.  And that chart is

15   going to come out.  And that chart has a whole graph on it

16   showing you:  "I think he might have done it.  It's

17   possible.  It's a strong possibility."  It's "maybe he did

18   it."  All of those things are not guilty in this country.

19   Because on that spectrum that we talked about, you have to

20   be all the way over here and beyond a reasonable doubt.

21   We're not down there thinking, "Well, it's possible.  Well,

22   the Government tried.  There's a lot of evidence here."  All

23   of that, during this trial, is not going to be enough.

24           So they've got their chart with all their

25   different kinds.  I'm asking you during the trial to

1    consider, A, is the evidence accurate?  B, does the evidence

2    show what they say it shows?  And, C, so what if that's the

3    evidence?  Does that really mean he's guilty?

4              And, remember, technology and inferences from cell

5    phones and all kinds of places are not a substitute for

6    eyewitness testimony, which this case doesn't have.

7              So you'll see at the end of the trial that the

8    robberies that they've chosen to charge against Mr. Turner

9    are all still in what is the unresolved category because

10   they've charged the wrong person.

11             Thank you.

12             **THE COURT:**  Thank you very much, Mr. Maddux.

13             Okay.  Let's call our first witness for the

14   Government.

15             **MR. GORDON:**  Thank you, Your Honor.  May I have

16   one second just to get the PowerPoint set up.  Or not the --

17   the display set up?

18             **THE COURT:**  Yeah.

19             (Court was at ease.)

20             **MR. GORDON:**  Can we take it off display for now?

21             (Court was at ease.)

22             **MR. GORDON:**  Your Honor, while it's setting up, at

23   this time the United States is moving into evidence

24   Government's Exhibit 99, which, as I've discussed with

25   Mr. Maddux, is a summary CD that contains Government's

1    Exhibits 1 through 13, Government's Exhibit's 15 through 16,

2    Government's Exhibit 19, Government's Exhibit 69 through 73,

3    all of which are business records supported by the

4    declarations filed on the docket at 186.

5              **MR. MADDUX:**  Judge, can we approach for one second

6    on that, please?

7              **THE COURT:**  Sure.

8              (Discussion at sidebar on the record.)

9              **MR. MADDUX:**  I agree that we stipulated to that.

10   I just want it on the record that it's subject to relevance,

11   subject to 403, depending on how the interpreted evidence

12   comes out in --

13             **THE COURT:**  And you'll make those objections?

14             **MR. MADDUX:**  Yes.  I'm just letting you know.

15             **THE COURT:**  So this is authentication?

16             **MR. GORDON:**  (Nods head.)

17             **THE COURT:**  Note authentication has been

18   established, but admissibility based on other grounds will

19   be handled in due course.  Does that sound good?

20             **MR. MADDUX:**  Yes.  And I just want to be clear.  I

21   would agree that we've established that there's generally a

22   presumption that they're admissible, but I may have --

23             **THE COURT:**  Okay.

24             **MR. MADDUX:**  I'm not trying to play games.  I'm

25   just --

```
 1              THE COURT:  Okay.  And then when he offers it,
 2   just make your objection.
 3              Now, do I have those exhibits?
 4              MR. GORDON:  They're all the ones from the docket.
 5   But I have a copy for the Court.
 6              THE COURT:  Okay.  Are they the stack that had
 7   the --
 8              MR. GORDON:  Declarations.
 9              THE COURT:  Okay.  All right.
10              (End of discussion at sidebar.)
11              THE COURT:  Okay.  So those exhibits, as to
12   authentication, are accepted and then subject to objection
13   on other grounds as they proceed in or as Counsel proceeds.
14              MR. GORDON:  Thank you, Your Honor.  We're
15   calling -- the United States calls Benito Rodriguez.
16              THE COURT:  All right.  Mr. Rodriguez.
17              MR. MADDUX:  We'd just invoke the Rule again,
18   Your Honor.
19              THE COURT:  Say again.
20              MR. MADDUX:  Just invoking the Rule.
21              THE COURT:  Yes.  The Rule is invoked.  Of course.
22              THE COURTROOM DEPUTY:  Please raise your right
23   hand.
24                          BENITO RODRIGUEZ
25   was called as a witness and, having first been duly sworn,
```

1    testified as follows:

2             **THE WITNESS:**  Yes.

3             **THE COURTROOM DEPUTY:**  Please state and spell your

4    first and last name for the record.

5             **THE WITNESS:**  First and last?

6             **THE COURTROOM DEPUTY:**  Please.

7             **THE WITNESS:**  Just -- Benito Rodriguez.  It's

8    B-E-N-I-T-O, R-O-D-R-I-G-U-E-Z.

9             **THE COURTROOM DEPUTY:**  Thank you very much.

10   Please take a seat in the witness box.

11            **THE COURT:**  And you've got to speak real loud,

12   Mr. Rodriguez.  This microphone system, I think we bought at

13   Kmart.  It ain't too good.  Okay?

14                        **DIRECT EXAMINATION**

15   **BY MR. GORDON:**

16   **Q**    Good afternoon, Mr. Rodriguez.

17   **A**    Good afternoon.

18   **Q**    Are you employed?

19   **A**    Yes.

20   **Q**    And by whom are you employed?

21   **A**    Family Dollar.

22   **Q**    And what do you do for Family Dollar?

23   **A**    I'm an assistant manager.

24   **Q**    Mr. Rodriguez, how long have you been an assistant

25   manager at Family Dollar?

1    **A**    Almost about three years.

2    **Q**    And what Family Dollar is that?

3    **A**    The one on Lee Boulevard in Lehigh Acres, Florida.

4    **Q**    For anybody who hasn't visited a Family Dollar before,

5    what kind of -- what is Family Dollar?

6    **A**    It's a retail store.  You just buy either groceries,

7    detergent for your clothes, soap, other things like

8    essentials for your body, shampoo, clothes, stuff like that.

9    **Q**    Does Family Dollar sell anything that isn't made in

10   Florida?  Does it sell any toys?

11   **A**    Yeah.

12   **Q**    Are any of those toys made in China?

13   **A**    Yes.  A few of them, yeah.

14   **Q**    Sell any plastic items that are made outside of the

15   U.S.?

16   **A**    Yes.

17   **Q**    Any food items like, I don't know, avocados from Mexico

18   or fruit from some other state?

19   **A**    Like coffee, chips, stuff like that, from, like, Mexico

20   and stuff.

21   **Q**    And other things that are made outside of the United

22   States?

23   **A**    Yeah.

24   **Q**    Tell us about yourself.  Where did you grow up?

25   **A**    I grew up in Florida.  I originally grew up in Central

```
1    Florida, in the Clermont area.  And then, when I was about
2    15, I moved to my father's 'cause my mom and dad had
3    separated.  I moved over there because of family.  And I've
4    been there ever since, for about seven years now, I believe.
5    Q    What's the highest education level you received?
6    A    A GED.
7    Q    Did you graduate high school?  So you got -- the GED
8    was the degree instead of graduating high school, correct?
9    A    Yeah.
10   Q    So how far did you go in sort of formal school?
11   A    Tenth grade.
12   Q    And what happened in tenth grade that you stopped going
13   to school?
14   A    Just a lot of family drama and stuff like that with
15   going back and forth between my mom and dad.  And so I just
16   thought it would be better off just to get my GED.
17   Q    Did you start working at that point?
18   A    Yeah.  I started working when I was about 18.
19   Q    How old were you when you got your GED?
20   A    17.
21   Q    Did you get your GED before or after your classmates
22   graduated high school?
23   A    Before.
24   Q    And once you received your GED, did you immediately go
25   to work?
```

1  **A**     Yeah.  Yes.

2  **Q**     And where was your first job after receiving your GED?

3  **A**     First job was at a packing house, which is -- it's

4  where all the, like, fruits and, like, vegetables and

5  everything, they come from the fields, and we pack them in

6  the boxes, and we sticker them, and then we send them off.

7  **Q**     And how long did you work for that packing house?

8  **A**     Usually until season is over.  So it depends really.

9  So for about, like, maybe, like, two months is probably the

10  longest I've worked at a packing house.  And when that's

11  over, I'd try to find another one, where season's up for

12  another fruit or vegetable or something.

13  **Q**     Some other form of seasonal employment?

14  **A**     Yeah.

15  **Q**     What did you do -- or what was your first non-seasonal

16  job?

17  **A**     Family Dollar.

18  **Q**     And when did you start that job?

19  **A**     I believe late 2014.  I believe so.

20  **Q**     And when you started that job at Family Dollar, what

21  was the job you took?

22  **A**     I was a cashier at the moment.

23  **Q**     What does being a cashier involve?

24  **A**     You just handle money, ringing up people for the stuff

25  they're buying, and then also working the front area for

1    stocking, and, as well, maintaining and cleaning the front

2    area of the store.

3    **Q**    Have you worked at Family Dollar non-stop since you

4    started there in 2014?

5    **A**    No.  I worked there for about six months, 'cause I had

6    got a health issue.  So I needed to take some time off for

7    myself to better myself.  And then about after -- I want to

8    say five months I started working -- after I was good with

9    myself, I was healthy again, I started working for

10   construction for fire sprinklers.  And then I did that for

11   about six months.

12        And after that, I started working with family because

13   we have a family company with semi trucks.  I started doing

14   mechanic work.  I did that for about a month, two months.

15   And then after that, I started working for Family Dollar

16   again.  And ever since I've been there.

17   **Q**    So this last stint at Family Dollar, the one that

18   you're currently in, when did that begin?

19   **A**    Say it again.

20   **Q**    When did you start working for Family Dollar most

21   recently?  And so your current employment, when did that

22   begin?

23   **A**    Early 2017, about October.

24   **Q**    Of 2017?

25   **A**    No, 2016, October.

1    **Q**    And then you've been at Family Dollar ever since

2    approximately that time?

3    **A**    Yes.

4    **Q**    Are you still -- you said you're an assistant manager

5    now?

6    **A**    Yes.

7    **Q**    When did you get -- is that a promotion from cashier?

8    **A**    Yes.

9    **Q**    When did you get promoted from cashier to assistant

10   manager?

11   **A**    About three or four months in, working there.

12   **Q**    So is that roughly January/February 2017?

13   **A**    Yeah.  It was a new year, about -- I believe it was

14   January.  No, wait.  Yeah, January.  I believe so.

15   **Q**    And as an assistant manager, do you supervise anyone

16   else?

17   **A**    Yeah.  I supervise the -- my other stockers and

18   cashiers.  Yeah, cashiers.

19   **Q**    How many people is that that you're supervising?

20   **A**    Usually between three or four people.

21   **Q**    Working the store at one time?

22   **A**    No.  There's usually -- per day, only -- Mondays is

23   when we have mostly everybody in the store.  But the rest of

24   the week it's just usually either two or three people in the

25   store.

1    **Q**    As the assistant manager, do you make the schedule of

2    who's there when?

3    **A**    No.  That's the store manager.  She does that.

4    **Q**    But when you're working physically in the store, how

5    many other people are there at the same time as you?

6    **A**    One person.

7    **Q**    One person?

8    **A**    Yeah.

9    **Q**    And are you supervising that person?

10   **A**    Yes.

11   **Q**    Besides supervising a person, what are the duties of an

12   assistant manager?

13   **A**    I just -- I take care of the store when the store

14   manager is not there.  So I handle the cash.  I stock.  I

15   clean the back room.  I make sure everything is how it's

16   supposed to be.  And I make sure the registers are right for

17   when the cash registers is ringing up the customers so

18   they're not short on money or they're not over.  Because

19   we're only supposed to have a certain amount of money in the

20   register all day.

21   **Q**    And what is that threshold of money that you're

22   supposed to keep in the register?

23   **A**    We're roughly supposed to be -- in the till, which is

24   the register, the black box that we keep the money in,

25   there's only supposed to be about 200.  And then we have a

1    drop box is where we have all the big bills.  And then when

2    the cashier thinks -- or when the cashier knows that he has

3    too much money in there, but -- I come do -- I come do a

4    pickup.  So I make him do a pickup.  They count all the big

5    bills in their drop box.  And I count it all.  He counts it.

6    I double-check it, and then we put it in a baggie and we

7    drop it in a safe behind the registers.

8    **Q**    But all of that is inside the store, correct?

9    **A**    Yes.  That's all inside the store.

10   **Q**    So if you suddenly had a rush of customers, and you had

11   $1,000 that had come in all at once over a few hours, and

12   the register has more than 200, has $1,000 in it --

13   **A**    Okay.

14   **Q**    -- what do you do with the other 800 bucks?

15   **A**    I just wait until customers die down a little bit, and

16   then do it when it's safe for me to count the money out.

17   **Q**    You pull out the register, you count out how much is in

18   there?

19   **A**    Uh-huh.

20   **Q**    You separate out the 800 you're going to not keep in

21   the register anymore?

22   **A**    Yes.

23   **Q**    What do you do with that $800?

24   **A**    I put it in a baggie.  And behind the registers, near

25   the window, on the wall, on the bottom there's two safes.

1    There's one on the bottom -- there's one on the bottom, one

2    on the top.  It has a little door.  So I put it in a baggie

3    and I write it off.  Like, I have them write it off, how

4    much they counted, and I write off how much I counted.

5    **Q**    You keep a log of the money?

6    **A**    Yes.  And then we drop it, and you can't open it until

7    the end of the day.

8    **Q**    Into the safe?

9    **A**    Yeah.  The bottom part of the safe.

10   **Q**    What happens if it was the middle of the day and you

11   wanted to get into the safe?  Could you do that?

12   **A**    You're only allowed -- supposed to open the top part of

13   the safe.  Because the bottom is where we have -- there's no

14   reason for us to be in the bottom during the day.  Because

15   that's only for when we're -- towards the end of the day is

16   when all the money that we got, we count it all.  And I have

17   to count it all and make sure it's all there.  And then I

18   put it in a baggie, write how much we made that day, and

19   that's for us to take it the next day to the bank.

20   **Q**    So you describe for the jury how these safes work.

21   First of all, you said there's two safes?  Is that correct?

22   **A**    Yeah.  Well, there's one safe, but it has two parts to

23   it.  There's a top, and there's a bottom.

24   **Q**    Do those parts have separate locking mechanisms --

25   **A**    Yes.

1    **Q**      -- or one locking?

2    **A**      They have separate locking.

3    **Q**      And is it a code?  A dial combination?  How does the

4    lock work?

5    **A**      It's a code.

6    **Q**      Do you know that code?

7    **A**      Yes, I know that code.

8    **Q**      Do the cashiers know the code?

9    **A**      No, they don't know the code.

10   **Q**      Besides you as an assistant manager, who else knows

11   that code?

12   **A**      The store manager.

13   **Q**      So if there were two cashiers working at the store at a

14   time, and no assistant manager or manager, for some reason,

15   there, could they open the safe?

16   **A**      No, they could not open the safe.

17   **Q**      So you punch in the code?

18   **A**      Yes.  Right.

19   **Q**      And then what happens?

20   **A**      It takes -- it takes time for -- so for the top, it

21   takes about five minutes for it to open.  So you punch in

22   the code, and it's got a timer.  That takes roughly like

23   about five, six minutes for it to open.  And the bottom one

24   takes a little longer.  It takes about 10, 11 minutes to

25   open.

**Q**     What is the point of that?  Why are there timers?  Why can't you just punch in the code and the safe pops open?  Do you know?

**A**     I don't know, to be honest.

**Q**     Was that ever part of your training?

**A**     No.  I believe it's just so -- we have a reason to give so that if anybody wants to try something, I say, "There's a timer, so you're going to have to wait a little bit."  And I guess they get -- you know, they scared so they run off or something.

**Q**     When you say "they," do you mean like a potential robber?

**A**     Yeah.  Like a potential robbery or something.

**Q**     So is that meant to be like a security mechanism then?

**A**     I believe so, yes.

**Q**     Why is there a difference between the top safe and the bottom safe?

**A**     The top safe is -- it's the only safe we can open during the day.  Because if, say --

**Q**     And that's -- sorry.  That's by rule, like from the company, the policy, or that's like physically it will only open during the day?

**A**     It's policy.  The only time I open the top part of the safe is if my cashiers say they run out of ones, and they have no more ones in the register, I have to open the top

1    safe and exchange it.

2    **Q**    Now, you alluded to at the end of the day you have to

3    have count up the money and keep a log of how much is there,

4    correct?

5    **A**    Yes.

6    **Q**    And you're also preparing sort of deposits to be picked

7    up to be taken to the bank?  Is that part of your procedure?

8    **A**    Yeah.  We take the deposits to the bank.

9    **Q**    You did it yourself?

10   **A**    Yeah.  We do it ourselves.

11   **Q**    Okay.  Besides those two things, what else is part of

12   the closing procedure at the store?

13   **A**    So when we close the store, there's a thing we do.

14   It's called "stagger."  And what we're supposed to do is I'm

15   supposed to let my cashier walk out the door to check -- to

16   walk out the door to go to his car.  And he's got to drive

17   around the store to check if anybody is in there.

18   **Q**    He has to do his own sweep of the perimeter?

19   **A**    Yeah.

20   **Q**    Why is your cashier doing a sweep of the perimeter?

21   **A**    I don't know.  That's what I was just told to do.

22   **Q**    As a security mechanism or something else?

23   **A**    Yeah.  As a security mechanism.

24   **Q**    So step one, your coworker goes out and does a sweep.

25   Then what?

**A**     Then he comes back.  He lets me know it's good.  I put the code and I leave, and then we're on our way.

**Q**     The code where?

**A**     The code.  It's -- so we have an alarm.  We have an alarm for the store.  And there's a dial, I guess, by the doors.

**Q**     The front doors?

**A**     By the front doors, yes.

**Q**     Besides counting the money, doing the perimeter sweep, and putting the code in, do you have to, for example, clean the store before closing?

**A**     Yes.

**Q**     Anything else that you have to do before you can say, "Okay, I've done my job, the store is ready to close for the night"?

**A**     I just count the money.  Whoever is with me, my cashier, has to clean the store while he's waiting for me.

**Q**     Now, on November 18th -- sorry.  On August 27th, 2017, were you working that day?

**A**     Yes.

**Q**     And were you working at the Family Dollar?

**A**     Yes.

**Q**     Were you working as an assistant manager?

**A**     Yes.

**Q**     Did you have a cashier working with you that day?

1   **A**   Yes.

2   **Q**   And who was the cashier that day?

3   **A**   Justin Parmer.

4   **Q**   Do you have any relationship to Justin Parmer?

5   **A**   He was my cousin.  Or he is my cousin.  Sorry.

6   **Q**   Still is.

7        And what shift, approximately, were you and Justin --

8   you guys working the shame shift?

9   **A**   Yes.

10  **Q**   What shift were the two of you working on that day?

11  **A**   Night shift.

12  **Q**   And what is the night shift?

13  **A**   It's usually between 3:00 to closing, which is 3:00 to

14  9:30.

15  **Q**   9:30 is what time the store is supposed to close or

16  what time you are going to walk out?

17  **A**   It's supposed to be the time we walk out.

18  **Q**   So what time are the posted hours for the store?

19  **A**   It's open between 8:00 and 9:00, 8:00 a.m. to 9:00 p.m.

20  **Q**   And so is it accurate to say that the closing

21  procedures you've been describing take you approximately a

22  half hour?

23  **A**   Yeah.

24  **Q**   So the store says it closes at 9:00, and you tend to

25  walk out around 9:30?

**A**     Yeah.

**Q**     Okay.  On August 27th, 2017, were you present in the store at around 9:00 p.m. doing those closing procedures?

**A**     Yes.

**Q**     And was Justin Parmer there with you, doing them alongside you?

**A**     Yes.

**Q**     Did anything usual happen on that day, August 27, 2017, at around closing time?

**A**     Yes.

**Q**     Can you please explain to the jury what happened?

**A**     I got robbed.

**Q**     Tell them a little more detail.  Let's talk about how that happened.

**A**     Okay.

**Q**     So where were you at the moment the robbery began?

**A**     I was up front counting the -- wait.  Say it again.  Sorry.

**Q**     Where were you at the moment the robbery began, when you became first aware that the store was being robbed?

**A**     Oh, I was in the front of the store by the door.

**Q**     Where was Mr. Parmer?

**A**     He was getting ready to do the stagger.  So he's walking out.

**Q**     So he's already outside the store?

1    **A**    Yes.

2    **Q**    Has he done his perimeter sweep yet at that point?

3    **A**    No.  He just walked out of the store.

4    **Q**    And were you watching him walk out?

5    **A**    A little bit, yes.

6    **Q**    What did you see, if anything, happened to Mr. Parmer

7    as he walked out of the store?

8    **A**    I let him out.  And I turned a little bit, and I heard

9    a loud noise.  And I looked back real quick, and I just saw

10   him flinching.

11   **Q**    Flinching how?

12   **A**    Flinching like (indicating), like an -- I don't know

13   how to describe it.  He was just, like, somebody was coming

14   after him.

15        **MR. GORDON:**  Let the record reflect the witness

16   sort of made a move backwards with his body and raised his

17   hands up near his face.

18   **BY MR. GORDON:**

19   **Q**    All right.  So Mr. Rodriguez, you saw that happen to

20   Mr. Parmer or him make that reaction?

21   **A**    Yes

22   **Q**    What did you see next?

23   **A**    I saw two guys running after him.  One of them had a

24   gun, and he grabbed Justin.

25   **Q**    "He" being the person with the gun?

**A**     Yes.

**Q**     And grabbed Mr. Parmer, Justin, and did what with him?

**A**     He held it against his head.

**Q**     Held the gun against his head?

**A**     Yeah.  He held the gun against Justin's head, and he was looking at me and pointing at me, and then at him, at me, then at him, and telling me to open the door.  So I did, because I was scared.  I was fearing for my life, and I was fearing for Justin's life.  So I opened the door.

**Q**     Was it -- the door -- was it locked at that point?

**A**     Yes.  It was locked.

**Q**     So if you had not opened the door, could the robbers have gotten in?

**A**     No.

**Q**     Other than, say, smashing the window?

**A**     I mean, they could.  But it would be a while.

**Q**     Did you believe, however, that if you didn't open the door, something bad would happen?

**A**     I believe so.

**Q**     So you unlock the door.  What happened next?

**A**     They threw us to the ground, and they checked if we had anything on us.

**Q**     Anything like what?

**A**     I'm not too sure.  I guess like maybe a panic button or something or money, if we had money on us, or something.

1   **Q**   So when you say they threw you to the ground and

2   checked, how did they do that?  How did they check to see if

3   you had anything?

4   **A**   They just patted us down.

5   **Q**   Did they take things out of your pockets?

6   **A**   Yeah.  They took, I believe, my keys and some other

7   things I had on me that I can't remember.

8   **Q**   So where were you?  Were you standing up, lying down,

9   when all this was happening?

10   **A**   When they first came in and they pushed us, I was lying

11   down.

12   **Q**   On your stomach or your back?

13   **A**   Flat on my stomach.

14   **Q**   Then did they -- when they were patting you down,

15   searching for things, were you still on your stomach?

16   **A**   Yes.

17   **Q**   Then what happened?

18   **A**   And then after they were done patting us, one guy --

19   the guy -- one guy went -- told me to get up and go to the

20   register while another one was going around it, I guess to

21   check if anybody else was in the store.

22   **Q**   These two robbers, were they approximately the same

23   height or different heights?

24   **A**   Different heights.

25   **Q**   The one who was taller, can you give just a ballpark

1    estimate of how tall you think he was?  Let's start with

2    this.  How tall are you?

3    **A**    5-5.

4    **Q**    Okay.  Was he -- was he a lot taller than you or a

5    little taller than you?

6    **A**    A lot taller than me.

7    **Q**    So when you're describing who did what, if you could

8    help the jurors out by distinguishing between the taller

9    robber and the shorter robber, it will make things a little

10   clearer.

11   **A**    Okay.

12   **Q**    The shorter robber, was he taller than you or about

13   your height?

14   **A**    A little bit taller than me but almost about my height.

15   **Q**    But a little bit taller?

16   **A**    Yeah.

17   **Q**    So we'll start with the shorter of the two guys and the

18   taller of the two guys.  So which one was patting you down?

19   **A**    The taller one.

20   **Q**    What happened next after they finished patting you

21   down?

22   **A**    They told me to go to the -- behind the registers and

23   to open the safe.

24   **Q**    Were both of them talking to you or just one of them?

25   If you remember.

**A**     I don't remember.  I felt like they were both talking,

but I don't really remember.

**Q**     Were either of them threatening you?

**A**     Yes.

**Q**     Both of them or just one of them?

**A**     Mainly, just one of them.

**Q**     Which one was mainly the one threatening you?

**A**     The taller one.

**Q**     Then what happened?

**A**     Then they told me to open the safe.  So I punched in

the codes.  And I was just telling them that it's going to

take a while.  So I told them just to calm down, duck down,

trying to get on their good side.  Because I was scared.  I

was scared for my life.  So I didn't -- I didn't know what

to really do but just do that.

**Q**     Did you punch in the correct code to the safe?

**A**     Yes.

**Q**     Any thought to punching in the wrong code or saying you

forgot it or didn't remember it?

**A**     No.

**Q**     Why not?

**A**     I was scared.  I just wanted to give them whatever they

wanted and let them be on their way.

**Q**     And did, on that day -- you described the general

procedure.  On that date, was there, in fact, money inside

1    the safe?

2    **A**    Yes.

3    **Q**    Money belonging to the store, the Family Dollar store?

4    **A**    Yes.

5    **Q**    So you punch the code into both safes or just one of

6    them?

7    **A**    Both safes.

8    **Q**    At the same time?

9    **A**    Yes.

10   **Q**    But now you had to wait for the timer; is that correct?

11   **A**    Yes.

12   **Q**    So were you behind the counter with the robbers waiting

13   for the timer to expire?

14   **A**    Yes.

15   **Q**    Where was Mr. Parmer?

16   **A**    He was on my left side on the floor while the taller

17   guy was holding him down with his knee, kind of making sure

18   he doesn't move.

19   **Q**    Holding him down with his knee?

20   **A**    Yeah.  On his, like -- like, he was just on him, I

21   guess.

22   **Q**    What was the shorter guy doing?

23   **A**    He was on the right side.  He was just waiting for the

24   safe to be open.

25   **Q**    Was he nearer to you or farther to you of the two of

1   them?

2   **A**     They were close to me.

3   **Q**     Both of them?

4   **A**     Yeah.

5   **Q**     So I'm going to start walking towards you.  I'd like

6   you to tell me to stop when I'm as close to you as the

7   shorter robber was to you during the course of this robbery.

8               **MR. GORDON:**  (Walking.)

9               So let the record reflect I'm maybe 2 feet away,

10  maybe 3.

11  **BY MR. GORDON:**

12  **Q**     Now, was the robber near you like that for the entirety

13  of the robbery?

14  **A**     Yes.

15  **Q**     Were you looking at him?

16  **A**     A little bit here and there.  I was mainly just looking

17  at the register and down at my sides.

18  **Q**     Why only a little bit?

19  **A**     I didn't want to really make eye contact, like, get

20  them mad or anything.

21  **Q**     Did it occur to you that maybe it would be important to

22  do everything you could to memorize his features or whatever

23  you could about him to later identify him to police?

24  **A**     Yeah.  But I was scared.  I didn't want to take a

25  chance with anything.

1  **Q**    So because of that fear, you didn't sort of stare at

2  his face and try to memorize it; is that accurate?

3  **A**    Yeah.

4  **Q**    While you're waiting for the 5-minute timer, the first

5  timer, to go off --

6  **A**    Yeah.

7  **Q**    -- did you engage in any conversation with either of

8  the robbers?

9  **A**    Yes.

10  **Q**    Which one?

11  **A**    Just whoever was listening.  I was just talking out

12  loud.

13  **Q**    Were they talking back to you or you were just speaking

14  yourself?

15  **A**    The taller one was talking back to me.

16  **Q**    Why were you talking?

17  **A**    I was just trying to keep them calm to make sure

18  nothing happens, to know that everything is going to be all

19  right, just do as I say, and nothing is going to happen,

20  you'll be gone.

21  **Q**    You felt it was your responsibility to keep them calm?

22  **A**    Yeah.

23  **Q**    Why were you focused on keeping the robbers calm?

24  **A**    So they won't do anything to harm us.

25  **Q**    What kinds of things did you say to keep the robbers

1  calm?

2  **A**    I just told them that -- I just told them, like, if you

3  just, "Calm down, don't get up, just wait for the safe.

4  Nobody is going to come.  There's no way for me to set the

5  alarm from here where I'm at.  And just relax and the safe

6  will open in about 5, 10 minutes, 5 for the top, 10 for the

7  bottom, and then you can grab it and you can go."  That's

8  not what happened.

9  **Q**    Did the taller robber seem calm during the robbery?

10 **A**    No.

11 **Q**    How did he seem?

12 **A**    Very -- like, very, like, nervous.  But, like, angry

13 and -- like, he was just all over the place, constantly

14 saying, you know, if I call the cops or anything, that he'll

15 kill us right there.

16 **Q**    And what about the shorter robber, what was he doing?

17 **A**    He was mainly the calm one.  He didn't really say much.

18 **Q**    What made you feel like he was calm?

19 **A**    Just him not moving around too much and just not

20 talking.

21 **Q**    Did you see the shorter robber use his cell phone at

22 any point?

23 **A**    Yes.

24 **Q**    And what did you see him do with it?

25 **A**    He just took it out of his pocket, put it against his

1   ear, and then he put it back in his pocket.

2   **Q**    Did he make a phone call?

3   **A**    I don't know.

4   **Q**    Did you hear him speak?

5   **A**    No.

6   **Q**    Did you see him, like, tapping away with his fingers

7   perhaps to send a text message or do something else?

8   **A**    No.  I just saw him take it out, open it, and then put

9   it against his ear.

10  **Q**    Did you hear anyone speaking on the other end of the

11  phone?

12  **A**    No.

13  **Q**    Did you get a good look at the gun that the shorter

14  robber had?

15  **A**    Yes.

16  **Q**    Do you remember what color it was?

17  **A**    I remember it was silver, and it was small.

18  **Q**    When you say -- small means different things to

19  different people.  So for jurors, can you describe what you

20  mean by the gun was small?

21  **A**    I don't know.  It's just -- it's like a little --

22  small, little pistol.

23          **MR. GORDON:**  All right.  Let the record reflect

24  the witness held his fingers up approximately six inches

25  apart.

BY MR. GORDON:

Q     Is that accurate?

A     Yeah, 6.   Yeah, 6, 4 inches.

Q     It was a handgun?

A     Yes.

Q     As opposed to a rifle or some other type of gun?

A     Yeah.

Q     When the 5-minute timer expired, what happened?

A     I opened the safe.   He got the money, put it in the

bag.   And then I just told them to wait, it's going to be

another five minutes for the bottom safe.

Q     And did the robbers calmly wait another five minutes or

did something different happen during the second 5-minute

block of time?

A     They were -- the one, the shorter one, was already

calm.   But it was the taller one.   He was calmed down a

little bit than the beginning.   Because I continued to talk

to him, tell him, like, "It's okay, just relax and chill,

and just wait for it," and that nobody was coming.

Q     And what about the shorter robber?   What did he do

during that second 5-minute block of time?

A     He just waited.   At one point he said to grab the

fidget spinners that we had on the window.

Q     So let's stop there for a second.   So fidget spinners.

So for jurors who maybe don't know, can you describe what a

1   fidget spinner is?

2   **A**    It's like a little toy that spins in your hand.  I'm

3   not sure how to describe it.

4   **Q**    And were you selling fidget spinners inside the store?

5   **A**    Yes.

6   **Q**    Where did you -- and did you have a box of them?

7   **A**    Yes.  We had two boxes of them.

8   **Q**    Where were those boxes?

9   **A**    They were all -- they were sitting on -- by the window

10  behind the registers.

11  **Q**    How close were those boxes of fidget spinners to where

12  you and Mr. Parmer and the two robbers were?

13  **A**    It's about like 3 foot apart, 3, 4 foot apart.

14  **Q**    So relatively close to you?

15  **A**    Yeah.

16  **Q**    So while you're waiting out the second 5-minute block

17  of time, you said the shorter robber brought up fidget

18  spinners?

19  **A**    Yes.

20  **Q**    What did he say about them?

21  **A**    He just said, "Grab some fidget spinners for our kids."

22  And then the taller gentleman just reached over and grabbed

23  them.  And they took almost a box, I believe.

24  **Q**    The shorter robber directed the taller robber to grab

25  fidget spinners for "our kids"?

1   **A**    Yes.

2   **Q**    And did you hear distinctly "our kids" as opposed to

3   "your kids" or "my kids"?

4   **A**    Yes, "our kids."

5   **Q**    Did the robbers take any other property besides money

6   and fidget spinners?

7   **A**    They took our IDs, me and Justin's IDs.  And they took

8   money from me as well.

9   **Q**    How much money did they take from you?

10  **A**    I had $400 on me.

11  **Q**    And it was the shorter robber or the taller robber who

12  took it?

13  **A**    The shorter one.

14  **Q**    From you personally?

15  **A**    Yeah.

16  **Q**    What about your ID?

17  **A**    The shorter one took my ID, and the taller one took

18  Justin's ID.

19  **Q**    Did they say anything about why they were taking your

20  IDs?

21  **A**    They said that if we said anything, that they would

22  come to our houses and kill us and our family.

23  **Q**    Both of them say that to you?

24  **A**    The taller one did.

25  **Q**    What did the shorter robber say at that time?

1    **A**    He didn't really say anything.

2    **Q**    But he took your ID?

3    **A**    Yeah.

4    **Q**    When the second 5-minute timer expired, what happened?

5    **A**    They -- the shorter one grabbed the money from the

6    bottom safe.  And then after that, they told me to lie down,

7    and they zip-tied me.  And they brought me back up and put

8    me and Justin side-to-side and zip-tied us together.

9    **Q**    You say they zip-tied you.  First of all, can you --

10   for any grand [sic] juror who may not be familiar with it,

11   what's a zip tie?

12   **A**    It's a thing -- I don't know how to describe it.  It's

13   a plastic thing that ties stuff together.  I don't know how

14   to describe it.

15   **Q**    And the robbers used those to bind what parts of your

16   body?

17   **A**    My hands.

18   **Q**    Did they bind them in front of you?  Behind you?  Above

19   your head?

20   **A**    Behind us.

21   **Q**    Both you and Mr. Parmer?

22   **A**    Yes.

23   **Q**    After they bound your hands behind your back, what did

24   they do next?

25   **A**    Um ...

**Q**     Did they bind you to each other or did they leave you
alone?

**A**     They bind us to each other.  And then, after that, they
just -- they took my cell phone.  But he didn't take it with
him.  They just -- they took our cell phone and put it in a
box, like, away from us so -- I guess so we don't call
anybody right away.  And then they just left.

**Q**     Did they say anything to you as they were leaving?

**A**     No.

**Q**     How did they leave?  Where did they go?  Could you see?

**A**     I couldn't see, no.  I was facing the other way, away
from the door.

**Q**     Did you see whether they got into a car or walked away
on foot?

**A**     I didn't see anything.

**Q**     After they left the store, what did you do next?

**A**     I told Justin to wait a little bit, about -- like, give
it a couple -- like, 20 seconds.  The zip ties weren't tight
on us.  We were able to get out.  But I told him, "Wait
about 20 seconds.  We're going to get out of these Zip
Ties."  Because we were talking to each other.  And I asked
him if he was free from the zip tie.  He said yeah.  So was
I.  So I told him that we're going to run to the back room,
lock it, and we're just going to call the cops.

**Q**     And did you do that?  Did you call the police?

1    **A**    Yes.

2              **THE COURT:**  All right.  We're going to call it a

3    day with that fact.

4              Ladies and gentlemen, thank you.  I appreciate

5    your time.  We'll see you here tomorrow at 9:00.

6              Remember, you don't have the case for your

7    submission until it's all in.  So please don't talk to

8    anybody about it.  Don't check the Google.  Don't look on

9    the internet or anything like that.  And we'll see you at

10   9:00 a.m. tomorrow.

11             Thank you very much.  We're glad you're here to

12   serve.

13             (Jury exited the courtroom at 5:00 p.m.)

14             **THE COURT:**  Mr. Rodriguez, you're free to go for

15   the evening.  Remember, don't talk to anybody about your

16   testimony.

17             **THE WITNESS:**  Be back tomorrow?

18             **THE COURT:**  Tomorrow.

19             **THE WITNESS:**  What time?

20             **THE COURT:**  Maybe be out there, say, 10 till 9:00.

21             **THE WITNESS:**  10 till 9:00?

22             **THE COURT:**  10 minutes till 9:00 a.m.  8:50 a.m.

23             **THE WITNESS:**  Okay.

24             **THE COURT:**  Thank you.

25             **THE WITNESS:**  Thank you.

1      **THE COURT:**  All right.

2      **MR. GORDON:**  Your Honor, just in open court, can I

3  just tell Mr. Rodriguez that if you have any issues with

4  hotel stay, to contact Eric Johnson or Cynthia Medina.

5  They'll take care of you.  I'm not allowed to talk to you

6  until you're back on the witness stand tomorrow.

7      **THE WITNESS:**  Sure.

8      **THE COURT:**  Okay.  Anything else, Counsel?  Well,

9  thanks for a good start, everyone.  I appreciate it.  We'll

10  see you -- unless you have something, we'll see you about 10

11  till 9:00 tomorrow.

12      Now, if y'all want to leave your stuff, it will be

13  locked up.  I wouldn't leave -- well, you can leave whatever

14  you want.  But if someone steals a laptop, I ain't paying

15  for it.  But it will be locked up here very shortly.

16      Thank you.

17      **MR. MADDUX:**  Judge, can I just get the lineup for

18  tomorrow?

19      **THE COURT:**  Yes.  Absolutely.  Go ahead and give

20  him that so there's no delay.  All right.  Counsel, thank

21  you.

22      **MR. MADDUX:**  Thank you, Your Honor.

23      (Proceedings adjourned at 5:02 p.m. until

24  9:00 a.m. the following day.)

25

1                    **C E R T I F I C A T E**

2

3           I certify that the foregoing is a correct

4     transcript from the record of proceedings in the

5     above-entitled matter.

6

7     November 16, 2019

8

9        s\  Nikki L. Peters
      _____
      Nikki L. Peters, RPR, CRR, CRC
10    Federal Official Court Reporter
      United States District Court
11    Middle District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25